UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE No.: **6:22-cv-2157-CEM-DCI**

WILTRON DIAZ, JERRY RAYMOND,
ANGEL SOTO, THOMAS CANNETTI
and BLAINE IFILL
    Plaintiffs,
v.

DEL-AIR HEATING, AIR CONDITIONING
AND REFRIGERATION, INC.
    Defendant.

_____/

## AMENDED COMPLAINT

The Plaintiffs, WILTRON DIAZ, JERRY RAYMOND, ANGEL SOTO, THOMAS CANNETTI and BLAINE IFILL (hereinafter, "Plaintiffs"), hereby file their Amended Complaint against Defendant DEL-AIR HEATING, AIR CONDITIONING AND REFRIGERATION, INC., (hereinafter Defendant or "Del-Air"), and allege:

## JURISDICTION, VENUE, PARTIES

1.  This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., on behalf of current and former employee participants in the DEL-AIR HEATING, AIR CONDITIONING AND REFRIGERATION, INC., EMPLOYEE STOCK OWNERSHIP PLAN (the "ESOP" or "Plan") to obtain equitable remedies to require

an accounting as to the fair market valuation of stock and to enforce the terms of the plan. *See* 29 U.S.C. §1132(a)(3).

2.     This Court has original jurisdictional over this matter as it involves a civil action involving a federal law, specifically, an ERISA claim.

3.     Plaintiff, WILTRON DIAZ, is and has been a participant, as defined in ERISA  3(7), 29 U.S.C. §1002(7), in the ESOP at all relevant times. Plaintiff DIAZ is a former employee of Defendant and worked for the company from around 1994-1995 until October of 2022.

4.     Plaintiff, JERRY RAYMOND, is and has been a participant, as defined in ERISA  3(7), 29 U.S.C. §1002(7), in the ESOP at all relevant times. Plaintiff is a former employee of Defendant and worked for the company until 2008.

5.     Plaintiff, ANGEL SOTO, is and has been a participant, as defined in ERISA 3(7), 29 U.S.C.  §1002(7), in the ESOP at all relevant times. Plaintiff is a current employee of Defendant and has worked for the company since 2002.

6.     Plaintiff, THOMAS CANNETTI, is and has been a participant, as defined in ERISA  3(7), 29 U.S.C. §1002(7), in the ESOP at all relevant times, Plaintiff CANNETTI has been employed by DEL-AIR since February of 1994.

7.     Plaintiff, BLAINE IFILL, is and has been a participant, as defined in ERISA  3(7), 29 U.S.C. §1002(7), in the ESOP at all relevant times, Plaintiff IFILL has been employed by DEL-AIR since 2002.

8.     Defendant, DEL-AIR HEATING, AIR CONDITIONING AND REFRIGERATION, INC, is a Florida Corporation with its primary place of

business in Sanford, Seminole County, Florida, which is located in the Middle District of Florida.

9.    Venue is proper in this District Court as the Defendant resides herein and a substantial part of the events giving rise to the claim occurred herein. Additionally, venue is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331, and ERISA 29 U.S.C. §1132(a)(3).

11.    This Court has personal jurisdiction over Defendant because it has its principal place of business in the Middle District of Florida and transacts business in, and has significant contacts with, this District.

12.    All conditions precedent to this action have been met, excused, or waived.

13.    Plaintiffs have retained the undersigned counsel and firm and have agreed to pay a reasonable fee for services rendered. Plaintiffs are entitled to recover their attorney's fees from the Defendant if Plaintiffs are the prevailing party in this lawsuit pursuant to 29 U.S.C. §1132(g).

## **FACTUAL ALLEGATIONS**

14.    The purpose of the Defendant's Employee Stock Option Plan (ESOP) is to enable each eligible person employed by the Employer to benefit, in accordance with the terms of the Plan, from an accumulation of stock of the Company and to provide for substantial Employee participation in the ownership

of the Company. It is a primary purpose of the Plan to establish for each Participant an ownership interest in the Company. *See* Restated Plan, attached hereto as Exhibit "A".

15.     Defendant, as the Plan Sponsor, is a Named Fiduciary under the Plan and has the authority and responsibility, among others, to appoint the Trustee and the Plan Administrator and to monitor each of their performances, and to provide channels and mechanisms through which the Plan Administrator and/or the Trustee can communicate with Participants and their Beneficiaries.  See Exhibit "A" Section 14.1, Restated Plan.

16.     The Board of Directors for Defendant have a fiduciary obligation to protect the interests of its shareholders.

17.     On March 1, 2020, the State of Florida officially reported its first two COVID-19 cases of the global pandemic.

18.      Regardless, at the end of 2020, valuation under the plan of the ESOP shares was determined to be 84 cents per share, which was higher than the previous year's valuation of shares  at 76 cents per share.

19.     On June 4, 2021, Robert Dello-Russo, founder and President of Defendant, passed away.

20.     Following Mr. Dello-Russo's passing but within that same month, Chad Barton, investor and operator with Astara Capital Partners Fund I, L.P. (hereinafter, "Astara"), joined the Defendant's Board of Directors.  Through his

past experience with Astara, and his current affiliation with Astara, he began steps for Astara to acquire a controlling share of Defendant.

21.    Once the Board of Directors and Astara had substantially completed their due diligence period and had initiated discussions and negotiations for the purchase by Astara of Defendant, certain steps needed to be made to ensure that the Participants in the ESOP as employee owners of Defendant did not disrupt the plan for the Purchase Transaction in which Astara was to purchase Defendant or a controlling share of its stock.

22.    One strategy implemented to prevent any interference was an amendment to the ESOP plan, Amendment No. 6, made in September of 2022. Prior to this plan amendment, there was an ESOP Committee that provided direction and instruction to the Trustee as to voting on Employer Securities. However, Participants and Beneficiaries retained the right to direct the voting of any Employer Securities allocated to their Accounts with respect to any vote required for the approval or disapproval of any corporate sale of assets of the business.

23.    With Amendment No. 6, effective September 13, 2022, the ESOP Committee was removed.  Additionally, under the Amendment, if a Participant or Beneficiary failed to direct the Trustee as to his voting, the Trustee automatically was granted the ability to vote on the Participant's or Beneficiary's behalf.  This meant that misdirected ballots and untimely ballots that reached the employee too

late for meaningful consideration and vote casting would be voted by the Trustee in favor of the sale without regard for an employee's actual wishes.

24.    Another such step was to withhold information from the Participants. Throughout the second half of 2021 and the first nine months of 2022, neither the Plan Administrator nor the Defendant through its Board of Directors as Fiduciaries, notified the Plaintiffs or other ESOP Participants and Beneficiaries of the intent for Astara to purchase[1] Defendant or that Mr. Barton was affiliated with both the buyer and the seller and thus had conflicting financial interests on both sides of the purchase.  Further, Mr. Barton sat on the Board of Directors for Defendant with a fiduciary duty to the ESOP participants while at the same time was an "investor" and "operator" for Astara.[2]

25.    Yet one more tactic was to delay important information including required ballots to the Participants. When Defendant finally issued notice of the impending sale, it did so to some but not all of the Participants and Beneficiaries, failed to include information regarding Chad Barton and his conflict of interest, and provided Participants and Beneficiaries no more than 8 days (less in some cases where the notice was mailed via U.S. Post instead of e-mail) to return their vote.  The notice was dated October 18, 2022, but is believed that the notices were not mailed until October 21, 2022, or later, such that employees had no more than

---

[1] The Del-Air Board of Directors unanimously approved the Purchase Transaction on October 10, 2022.
[2] Chad Barton did not resign from the Board of Directors until after the parties had accomplished the most critical steps referenced above to ensure Participants did not interfere, and after the purchase price had been negotiated.  He resigned from the Board on October 1, 2022.  It is unclear what "Member Interest" or amount Mr. Barton received as a result of the Purchase Transation as such information is not included in the notice provided to Participants and employees.

four days to research the sale, ask questions about the information contained in the notice as permitted in the notice,[3] make a decision on how to vote, complete the Pass-Through Ballot, and return it in a timely fashion.

26.     The lack of meaningful time for employees to consider the sale for voting purposes was exacerbated as the notice was confusing and misleading.  The ballot indicated that the voting would be at the special meeting of the shareholders to be on October 27, 2022; however, elsewhere, the ballot required that the employee ballots be received by 5pm on October 26, 2022, by the Trustee.  And although the notice states the Trustee must receive the ballot, the instructions only provide mailing, faxing, and emailing information for a different entity, the ESOP Third-Party Administrator, who was located in Boston (making mailing the ballot risky at best in light of the short time frame permitted).

27.     On or about Friday October 21, 2022, Defendant held a companywide meeting with all employees to announce that the Board of Directors had decided to sell the majority shareholder's interest in the company to Astara Capital Partners Fund I, L.P.

28.     Defendant told all employees that the vote would take place in eight (8) days on Thursday, October 27, 2022.

29.     Defendant announced to all employees that they would receive a notice via email and regular mail with a ballot to vote either for or against the sale.

---

[3] Participants were instructed to contact Crystal Palacios, VP of Human Resources, at a given telephone number and extension if any had questions regarding the information contained in the notice.

30.     Based on Defendant's announcement, it is believed that the notice and Pass-Through ballots were not sent until after the companywide meeting of October 21, 2022 or that, at the earliest, the ballots were not received until after such date.

31.     Not every employee received notice of the sale. For example, Plaintiff Angel Soto never received the notice and only found about the upcoming sale and vote through another employee. Other employees who are not listed as Plaintiffs did not receive the notice and ballot and were unable to cast a vote in the decision, thus rendering their vote as one in support of the sale.

32.     Having the Pass-Through ballots sent so late with an unreasonable amount of time remaining to respond resulted in a significant number of Participants' ballots not being returned or returned late.  With Amendment No. 6 to the Plan securely in place, the unreturned or untimely ballots were automatically counted as a vote supporting the sale.

33.     Unsurprisingly, the Purchase Transaction was approved with the closing occurring at or around the end of October 2022.

34.     As a result of the Purchase Transaction, there was a restructuring that had the effect of causing ESOP Participants to lose their actual direct ownership of Defendant through its stock. The stock was replaced so that Participants would have an indirect ownership through owning stock of Astara.  Participants no longer owned stock in the company where they worked but rather owned stock of a foreign company for which the employees were not employed.  Participants have no ability

to vote on any activities of Astara, Astara has no fiduciary responsibility to the ESOP Plan or its Participants, and can make unilateral decisions as to its ownership interest of the stock of Defendant leaving the Participants mere bystanders with little to no authority to effect change.

35.    Prior to the sale an evaluation of the company by an independent appraiser was approved by the Defendant's Trustee, James Urbach, and was conducted to determine the value of the shareholder's interest in the company and the value of the company itself.  The per share price for the ESOP securities was valued at only .34 cents per share, less than half the value of the preceding year.

36.    The Trustee was instructed on the method to use to calculate the valuation, which was different than what had been used previously.

37.    Defendant admits in the notice that the Trustee and the independent financial advisor were not requested to perform a market-clearing process or consider the merits of the Purchase Transaction relative to any alternative business strategies that may have existed for the Defendant or the ESOP or the effect of any other transactions in which the Defendant or the ESOP might have engaged. Defendant recognizes that using the method it required of the ESOP Trustee could have resulted in the undervaluing of shares.  The ESOP Trustee should have looked at all factors to determine valuation, not just the one method that the Defendant demanded. Alternatively, Defendant, as one of its duties owed to the Plan and Participants, should have taken appropriate actions where the Trustee did not, and performed a correct valuation.

38.    Another problem with the Defendant's restructuring is that the Participants will obtain Class C LLC shares. Distributions initially are given to Class A and Class B and only then to Class C.  However, Class C shares (but not Class A or Class B) can be reduced or even forfeited to satisfy obligations to Astara for loss arising out of the Purchase Transaction agreement.  Further, that same agreement, according to the notice, contains an option permitting Astara to repurchase the Class C LLC stock at any time for the then fair market value. Plaintiffs and other participants, through the Defendant's restructuring, are subject to the whims of Astara who can reduce ESOP interest by seeking payment for any loss under the purchase agreement or repurchase the stock at a minimum price.   Under the ESOP plan for Defendant prior to the Purchase Transaction, Plaintiffs and Participants could not be deprived of their stock so easily or unilaterally.

## **COUNT I – EQUITABLE ACCOUNTING**

39.    Plaintiffs restate and reallege Paragraphs 1-38 as if fully set forth herein.

40.    Defendant was the Plan Sponsor and a Named Fiduciary in the ESOP Plan.

41.    One of its fiduciary duties was to monitor the Trustee and the Plan Administrator to make sure they were performing their duties to the best interests of the Plan Participants and Beneficiaries.

42.    If either was not, then Defendant had the corresponding fiduciary duty to take appropriate action which could include replacing the Trustee or the Plan Administrator or performing the functions itself.

43.    The Trustee failed to take appropriate action in determining the valuation of the Defendant stocks within the ESOP plan.  Specifically, the Trustee deviated from its normal valuation system and complied with the direction of the Defendant, excluding certain methodologies and information which would have resulted in a higher valuation for the Participants.  Defendant likewise failed to take appropriate actions upon learning of the Trustee's failure.  Both failed to carry out their obligations as explicitly provided in the ESOP Plan.

44.    Defendant further failed to follow the terms of the ESOP Plan when it seized the ESOP shares from the Plaintiffs' accounts and turned them over to Astara.  The restructuring also provides a means by which Astara can come in and simply take Astara shares by paying the fair market value at the time of repurchase. The shares under the Plan are only the stock of Defendant.  Defendant violates the plan by not only seizing Plaintiffs' stock from their ESOP account but by also giving it to Astara.  The Plan only provides for Defendant stock to be in the plan; adding non-employer shares violates the Plan.

45.    As a result of the foregoing, Plaintiffs were each damaged in that their individual ESOP accounts were undervalued so as to provide a benefit to Astara. Additional damage to each Plaintiff occurred when they lost individual property rights under the ESOP plan by Defendant restructuring to seize all of Plaintiffs'

ESOP stock in the Defendant and replacing it with stock of Astara.  Further damage
occurred as the Astara stock lacked the full safeguards of the ESOP plan, could be
used to pay obligation due to Astara under the purchase transaction agreement,
and could be repurchased by Astara by simply paying then fair market value.
Plaintiffs are entitled to a full accounting of all valuations that went into the
proposal for the sale of Defendant's company and a full accounting of all
distribution of shares for the ESOP.

46.    Regardless of the fiduciary relationship between Plaintiffs and
Defendant, the matter is complex particularly as to the Plan share valuation
process which is the subject of this matter.  There is no single mathematical
formula that determines fair market value (hereinafter, "FMV") of an interest held
in an ESOP plan.   Defendant, in its notice, recognized that the valuation of shares
in the ESOP was complex or difficult due to the lack of a public market, difficulties
and uncertainties involved in predicting business operations, and other factors.
The process under the Plan required the Trustee but could also (and in the instant
case, did) require an independent financial adviser.   It is so complex, that
Defendant acknowledged that the valuation of shares in 2022 at the time of the
Purchase Transaction could be undervalued and thus wrong.

47.    Plaintiffs through their complaint have demonstrated that they do not
have an adequate remedy at law.   The extent of the damages to the Plan and the
individual Plaintiff ESOP accounts cannot be determined until and unless the
Court permits the requested accounting.  The documents necessary to do a

meaningful analysis are in the Defendant's possession.  Defendant has refused to provide such documents.

48.    Additionally, Plaintiffs seek an equitable order from the Court requiring Defendant to transfer shares of Defendant stock to the ESOP Plan and distribute to individual Plaintiff ESOP accounts in an amount equal to that which would have been in those accounts prior to any restructuring; and invalidating any provision in the Purchase Transaction agreement that would permit Astara to repurchase or reduce the shares of ESOP Participants inconsistent with the ESOP Plan.

49.    Plaintiffs are entitled to a full accounting of the Board of Director's shares and any windfall or side agreements/deals that they may receive from the proposed sale of the ESOP plan and the shareholder's interest.

**WHEREFORE**, Plaintiffs ask this Court to enter Judgment in favor of the Plaintiffs and against the Defendant and require the following relief:

A. Order Defendant to provide to Plaintiffs an accounting of all income and expenses of Defendant related to the recent sale of Defendant to Astara, and for a complete accounting of all distributions that Defendant made;

B.  Order Defendant to transfer shares of Defendant stock to the ESOP Plan and distribute to individual Plaintiff ESOP accounts in an amount equal to that which would have been in those accounts prior to any restructuring;

C.  Strike any provision in the Purchase Transaction agreement that would

permit any party to repurchase or reduce the shares of ESOP Participants

inconsistent with the ESOP Plan;

D. Enter award for Plaintiffs for recovery of costs and reasonable attorney's

fees; and

E. Such other and further relief as this Court deems appropriate.

### COUNT II − DEFENDANT'S FAILURE TO MONITOR

50.    Plaintiffs restate and reallege Paragraphs 1-38 as if fully set forth

herein.

51.    Defendant, as the Plan Sponsor, is a Named Fiduciary under the Plan

and has the authority and responsibility, among others, to appoint the Trustee and

the Plan Administrator and to monitor each of their performances, and to provide

channels and mechanisms through which the Plan Administrator and/or the

Trustee can communicate with Participants and their Beneficiaries.  *See* Exhibit

"A" Section 14.1, Restated Plan.

52.    This gave Defendant the duty to monitor the Trustee and/or Plan

Administrator's conduct and to take appropriate action if the Trustee or Plan

Administrator were not adequately protecting the interests of the ESOP

Participants, including Plaintiffs.

53.    Defendant knew that Trustee failed to properly value Defendant's

shares at the time of the Purchase Transaction as it was the Defendant who

directed the Trustee how to perform the valuation analysis while excluding other pertinent information.

54.    Defendant knew that the communication from the Trustee and the Plan Administrator, most notably the notice of the Purchase Transaction with Pass-Through Ballots was misleading, omitted information of a conflict, and failed to provide the Participants adequate time to respond on the voting of the Purchase Transaction, which allowed a significant number of ballots to be treated as supporting votes.

55.    By failing to properly monitor and/or take appropriate action against Trustee and/or the Plan Administrator, Defendant failed to discharge its duties under ERISA with respect to the Plan solely in the interest of the Participants and Beneficiaries for the exclusive purpose of providing benefits to Participants and Beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, all in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. §1104(a)(1)(A) and (B).

56.    As a result of the violations by Defendant, the Plan suffered a loss and/or the participants including Plaintiffs correspondingly also suffered losses to their individual accounts.

**WHEREFORE**, Plaintiffs ask for judgment in favor of the Plaintiffs and against the Defendant, and require the following:

A.      Order Defendant to comply with the ESOP Plan and, at its expense,

have a new valuation completed with full, accurate, and honest information;

B.      Enter award for Plaintiffs for recovery of costs and reasonable

attorney's fees; and

C.      Such other and further relief as this Court deems appropriate.

DATED this 27th day of December 2022.

> /s/ Richard W. Smith
> John W. Zielinski, Esquire
> Fla. Bar No.:  0527661
> Richard W. Smith, Esquire
> Fla. Bar No.:  0013943
> NeJame Law, P.A.
> 189 S. Orange Ave., Suite 1800
> Orlando, Florida 32801
> Tel.: (407) 500-0000
> Fax: (407) 802-16416
> civilservice@nejamelaw.com
> john@nejamelaw.com
> richard@nejamelaw.com
> chelsea@nejamelaw.com
> *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on December 27, 2022, I electronically filed the foregoing with

the Clerk of the Court by using CM/ECF system which will send a notice of filing

to all CM/ECF participants.

> */s/Richard W. Smith*
> Richard W. Smith, Esquire
> Attorney for Plaintiffs

# EMPLOYEE STOCK OWNERSHIP PLAN AND TRUST
# FOR THE EMPLOYEES OF
# DEL-AIR HEATING, AIR CONDITIONING
# & REFRIGERATION, INC.

**(Effective:  January 1, 2005)**
**(Restatement Effective:  January 1, 2016)**

EXHIBIT "A"

## TABLE OF CONTENTS

**Page**

PART I ............................................................................................................................ 1

   ARTICLE I       STATEMENT OF PURPOSE ........................................................... 2

      1.1   General Purpose ............................................................................ 2

      1.2   Qualification Under the Code ....................................................... 2

      1.3   Plan Documents ............................................................................ 2

   ARTICLE II      DEFINITIONS ................................................................................ 3

      2.1   Account ......................................................................................... 3

      2.2   Administrative Policy ................................................................... 3

      2.3   Adoption Agreement .................................................................... 3

      2.4   Affiliated Company ...................................................................... 3

      2.5   Age ................................................................................................ 4

      2.6   Aggregation Group ....................................................................... 4

      2.7   Alternate Payee ............................................................................ 4

      2.8   Anniversary Date .......................................................................... 4

      2.9   Annual Addition ........................................................................... 4

      2.10   Beneficiary ................................................................................... 4

      2.11   Benefit Commencement Date ....................................................... 5

      2.12   Board of Directors ........................................................................ 5

      2.13   Code .............................................................................................. 5

      2.14   Company ....................................................................................... 5

      2.15   Company Stock ............................................................................. 5

      2.16   Compensation .............................................................................. 6

      2.17   Deferred Retirement Date ............................................................ 6

      2.18   Determination Date ...................................................................... 6

      2.19   Direct Rollover ............................................................................. 6

      2.20   Distributee .................................................................................... 7

      2.21   Effective Date ............................................................................... 7

      2.22   Eligible Retirement Plan .............................................................. 7

      2.23   Eligible Rollover Distribution ..................................................... 7

      2.24   Employee ...................................................................................... 7

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 2.25 | Employer | 7 |
| 2.26 | Employer Securities | 8 |
| 2.27 | ERISA | 8 |
| 2.28 | ESOP Committee | 8 |
| 2.29 | Exempt Loan | 8 |
| 2.30 | Five-percent Owner | 9 |
| 2.31 | Fund | 9 |
| 2.32 | Highly Compensated Employee | 10 |
| 2.33 | Hour of Service | 10 |
| 2.34 | Independent Appraiser | 11 |
| 2.35 | Key Employee | 11 |
| 2.36 | Key Employee Ratio | 11 |
| 2.37 | Leased Employee | 12 |
| 2.38 | Limitation Year | 12 |
| 2.39 | Mandatory Aggregation Group | 12 |
| 2.40 | Named Fiduciary | 12 |
| 2.41 | Non-Key Employee | 12 |
| 2.42 | Normal Retirement Age | 12 |
| 2.43 | Normal Retirement Date | 12 |
| 2.44 | One Year Break in Service | 13 |
| 2.45 | One-percent Owner | 13 |
| 2.46 | Participant | 13 |
| 2.47 | Participating Employer | 13 |
| 2.48 | Permissive Aggregation Group | 13 |
| 2.49 | Plan | 14 |
| 2.50 | Plan Administrator | 14 |
| 2.51 | Plan Year | 14 |
| 2.52 | QDRO | 14 |
| 2.53 | Required Beginning Date | 14 |
| 2.54 | Review Committee | 14 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 2.55 | Spouse | 14 |
| 2.56 | Suspense Account | 14 |
| 2.57 | Termination Date | 14 |
| 2.58 | Top-Heavy | 15 |
| 2.59 | Top-Heavy Compensation | 15 |
| 2.60 | Total Disability | 15 |
| 2.61 | Trust Agreement | 15 |
| 2.62 | Trustee | 15 |
| 2.63 | Valuation Date | 16 |
| 2.64 | Year of Participation for Diversification Election | 16 |
| 2.65 | Year of Service for Accrual of Benefits | 16 |
| 2.66 | Year of Service for Participation | 16 |
| 2.67 | Year of Service for Vesting | 16 |
| ARTICLE III | PARTICIPATION ELIGIBILITY | 18 |
| 3.1 | Minimum Service Requirement | 18 |
| 3.2 | Procedure for and Effect of Admission | 18 |
| 3.3 | Waiver of Participation | 18 |
| 3.4 | Resumption of Participation | 19 |
| ARTICLE IV | EMPLOYER CONTRIBUTIONS | 20 |
| 4.1 | Contributions to Pay Principal and Interest on Exempt Loans | 20 |
| 4.2 | Additional Employer Contributions | 20 |
| 4.3 | Timing of Contributions | 20 |
| 4.4 | Exclusive Benefit; Refund of Contributions | 20 |
| ARTICLE V | PARTICIPANT CONTRIBUTIONS | 22 |
| 5.1 | Participant Contributions | 22 |
| ARTICLE VI | ALLOCATION OF CONTRIBUTIONS | 23 |
| 6.1 | Allocation of Employer Contributions | 23 |
| 6.2 | Forfeitures | 24 |
| 6.3 | Omission of Eligible Employee | 25 |
| 6.4 | Inclusion of Ineligible Employee | 25 |

# TABLE OF CONTENTS
(continued)

**Page**

6.5 Special Rules for Top-Heavy Plans ........................................................ 26

6.6 Top-Heavy Plan Minimum Allocation ................................................... 26

6.7 Annual Additions Limitations ................................................................ 27

6.8 Restrictions on Allocations ................................................................... 29

ARTICLE VII    ADMINISTRATIVE PROVISIONS ........................................ 30

7.1 Application of Employer Contributions.................................................. 30

7.2 Valuations .............................................................................................. 30

7.3 Crediting of Contributions ..................................................................... 30

7.4 Crediting of Investment Results, Adjustment of Accounts, and Dividends ............................................................................................... 30

7.5 Exercise of Shareholder Voting Rights................................................... 31

7.6 Purchase of Employer Securities ........................................................... 32

7.7 Suspense Account ................................................................................... 32

7.8 Domestic Relations Orders .................................................................... 34

7.9 Diversification of Investments ............................................................... 36

7.10 Cash Dividends ...................................................................................... 37

ARTICLE VIII    RETIREMENT AND DISABILITY BENEFITS ........................ 38

8.1 Normal Retirement Benefit..................................................................... 38

8.2 Deferred Retirement Benefit................................................................... 38

8.3 Disability Benefit ................................................................................... 38

8.4 Effect of QDRO ..................................................................................... 38

ARTICLE IX    DEATH BENEFITS AND SURVIVING SPOUSE'S BENEFITS ............................................................................................. 39

9.1 Pre Distribution Death Benefit............................................................... 39

9.2 Post Distribution Commencement Death Benefit.................................... 39

9.3 Spousal Consent to Designation of Alternative Beneficiary ................... 39

9.4 Beneficiary Designation.......................................................................... 40

9.5 Effect of QDRO ..................................................................................... 41

9.6 Death Benefits While in Qualified Military Service................................ 41

ARTICLE X    NONFORFEITURE PROVISIONS (VESTING) .......................... 42

10.1 Deferred Vested Interests........................................................................ 42

# TABLE OF CONTENTS
(continued)

**Page**

10.2    Amendments to the Vesting Schedule ...................................................... 42

10.3    Effect of QDRO ..................................................................................... 43

10.4    Restoration of Forfeitures ...................................................................... 43

ARTICLE XI     METHODS AND TIMING OF BENEFIT DISTRIBUTIONS ........ 44

11.1    Form of Benefit Payments .................................................................... 44

11.2    Benefit Commencement Dates .............................................................. 45

11.3    Post-Distribution Credits ...................................................................... 47

11.4    Conditions Attaching to All Distributed Company Stock ...................... 47

11.5    Certain Securities Law Restrictions ...................................................... 49

11.6    Share Certificates ................................................................................. 49

11.7    Eligible Rollover Distributions ............................................................. 50

11.8    Required Minimum Distributions .......................................................... 50

11.9    Substitution of Company Stock in Accounts of Terminated
Participants........................................................................................... 54

ARTICLE XII     PROVISIONS RELATING TO TOP HEAVY PLANS ................... 55

12.1    Determination of Top-Heavy Status ...................................................... 55

12.2    Additional Top-Heavy Rules ................................................................. 55

ARTICLE XIII    PLAN ADMINISTRATOR ......................................................... 56

13.1    Appointment and Tenure ...................................................................... 56

13.2    Meetings; Majority Rule ....................................................................... 56

13.3    Delegation ............................................................................................ 56

13.4    Authority and Responsibility of the Plan Administrator ........................ 56

13.5    Reporting and Disclosure...................................................................... 57

13.6    Construction of the Plan....................................................................... 57

13.7    Engagement of Assistants and Advisors................................................ 58

13.8    Bonding ................................................................................................ 58

13.9    Compensation of the Plan Administrator.............................................. 58

13.10  Indemnification of the Plan Administrator ............................................ 58

ARTICLE XIV    ALLOCATION AND DELEGATION OF AUTHORITY .............. 60

14.1    Authority and Responsibilities of Company........................................... 60

# TABLE OF CONTENTS
(continued)

**Page**

14.2　Authority and Responsibilities of the Plan Administrator ...................... 60

14.3　Authority and Responsibilities of the Trustee .......................................... 60

14.4　Limitations on Obligations of Named Fiduciaries ................................... 60

14.5　Duties of the ESOP Committee ................................................................ 60

14.6　Indemnification of the ESOP Committee ................................................. 60

ARTICLE XV　CLAIMS PROCEDURES ................................................. 62

15.1　Application for Benefits ............................................................................ 62

15.2　Appeals of Denied Claims for Benefits .................................................... 62

15.3　Appointment of the Review Committee .................................................... 63

15.4　Indemnification of the Review Committee ............................................... 63

ARTICLE XVI　AMENDMENT AND TERMINATION ........................... 64

16.1　Amendment ............................................................................................... 64

16.2　Plan Termination ....................................................................................... 64

16.3　Complete Discontinuance of Employer Contributions ............................ 65

16.4　Suspension of Employer Contributions .................................................... 65

16.5　Mergers and Consolidations of Plans ....................................................... 65

ARTICLE XVII　MISCELLANEOUS PROVISIONS ................................ 66

17.1　Nonalienation of Benefits ......................................................................... 66

17.2　Action of Employer and Company ............................................................ 66

17.3　No Contract of Employment ..................................................................... 66

17.4　Severability of Provisions ......................................................................... 66

17.5　Heirs, Assigns and Personal Representatives ........................................... 67

17.6　Headings and Captions .............................................................................. 67

17.7　Gender and Number .................................................................................. 67

17.8　Controlling Law ........................................................................................ 67

17.9　Funding Policy .......................................................................................... 67

17.10　Title to Assets .......................................................................................... 67

17.11　Payments to Minors, Etc ......................................................................... 67

17.12　Reliance on Data and Consents ............................................................... 67

17.13　Lost Payees ............................................................................................. 68

## TABLE OF CONTENTS
(continued)

**Page**

17.14  Missing Spouses.................................................................................. 68

17.15  Notices ............................................................................................... 68

17.16  Participation by Affiliated Companies.............................................. 69

17.17  Provisions with Respect to Uniformed Services Employment and
Reemployment Rights Act of 1994.................................................... 69

ARTICLE XVIII  CODE SECTION 409(p) provisions ................................. 70

18.1  Nonallocation Of Employer Securities To Disqualified Person
During Nonallocation Year ................................................................ 70

18.2  Transfers From ESOP to Non-ESOP Portion of Plan........................ 72

18.3  Stock Bonus Plan .............................................................................. 73

PART II    ............................................................................................................ 75

ARTICLE I        ESTABLISHMENT OF THE TRUST .......................... 77

1.1  Corpus of the Trust ........................................................................... 77

1.2  Collection of Funds ........................................................................... 77

1.3  Duties of the Trustee ......................................................................... 77

1.4  General Non-Reversion Provisions.................................................... 77

1.5  ERISA Section 403(c) Refunds ........................................................ 77

ARTICLE II        INVESTMENT OF THE FUND ............................... 79

2.1  Principal and Income ......................................................................... 79

2.2  Investment Direction.......................................................................... 79

2.3  Powers of the Trustee......................................................................... 80

2.4  Authorized Investments ..................................................................... 83

ARTICLE III        TRUSTEE ACCOUNTS ........................................ 84

3.1  Books and Records ............................................................................ 84

3.2  Accountings ....................................................................................... 84

3.3  Trustee Liability................................................................................. 84

3.4  Participant Records ............................................................................ 85

3.5  Suspense Account and Subfunds ....................................................... 85

ARTICLE IV        THE TRUSTEE .................................................... 86

4.1  Conditions of Acceptance of Trusteeship ......................................... 86

4.2  Changes in Plan Administrators; Investment Managers .................... 87

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 4.3 | Changes in Trustee | 87 |
| 4.4 | Resignation or Removal of Trustee | 87 |
| 4.5 | Action by Trustees | 87 |
| 4.6 | Trustee Qualification | 88 |
| 4.7 | Bonding | 88 |
| ARTICLE V | DELEGATION OF DUTIES AND RESPONSIBILITIES | 89 |
| 5.1 | Appointment of Investment Manager(s) | 89 |
| 5.2 | Trustee Allocation of Responsibility | 89 |
| 5.3 | Participant Investment Direction | 89 |
| ARTICLE VI | CONCERNING INSURANCE COMPANIES | 90 |
| 6.1 | Insurance Companies Not Parties | 90 |
| 6.2 | Acceptance of Certifications | 90 |
| 6.3 | Insurer Absolved | 90 |
| ARTICLE VII | AMENDMENTS TO TRUST AGREEMENT | 91 |
| 7.1 | Amendments | 91 |
| 7.2 | Discontinuance of the Plan | 91 |
| ARTICLE VIII | MISCELLANEOUS PROVISIONS | 92 |
| 8.1 | Reliance on Instruments | 92 |
| 8.2 | Exclusive Benefit | 92 |
| 8.3 | This Trust Agreement as Part of the Plan | 92 |
| 8.4 | Ratification of the Trustee's Acts | 92 |
| 8.5 | Controlling Law | 92 |
| 8.6 | Name of the Trust | 92 |
| 8.7 | Independent Fiduciary | 92 |

# EMPLOYEE STOCK OWNERSHIP PLAN AND TRUST
# FOR THE EMPLOYEES OF DEL-AIR HEATING,
# AIR CONDITIONING & REFRIGERATION, INC.

WHEREAS, the amendment and restatement of the existing employee stock ownership plan and trust, originally effective as of January 1, 2005, entitled the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. (the "Plan"), permits eligible employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. (the "Company") and certain participating affiliates, if any, to share in the growth of the Company through stock ownership; and

WHEREAS, the Plan is intended (1) to comply with the applicable requirements of the Employee Retirement Income Security Act of 1974, as amended, (2) to comply with the applicable requirements of Code Sections 401(a), 409 and 4975(e)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), (3) to be an employee stock ownership plan within the meaning of Code Section 4975(e)(7), and (4) to qualify as a stock bonus plan under Code Section 401(a); and

WHEREAS, the Plan is designed to invest primarily in "employer securities," as defined in Code Section 409(l); and

WHEREAS, the Plan is required to be amended and restated and submitted to the Internal Revenue Service for an updated determination letter not later than January 31, 2016 in order to comply with Cycle A requirements set forth in Revenue Procedure 2016-6.

NOW, THEREFORE, the Plan is hereby amended and restated as set forth in Part I and Part II, effective as of January 1, 2016.

\* \* \*

IN WITNESS WHEREOF, the Company and the Trustee have executed the Plan in multiple counterparts, each of which shall be deemed an original, on this _____ day of _____, 2016.

**TRUSTEE**                                          **DEL-AIR HEATING, AIR CONDITIONING & REFRIGERATION, INC.**

_____          By: _____
James R. Urbach, Trustee                                Thomas J. Starnes, President and CEO

# PART I

## EMPLOYEE STOCK OWNERSHIP PLAN AND TRUST
## FOR
## THE EMPLOYEES OF DEL-AIR HEATING, AIR CONDITIONING
## & REFRIGERATION, INC.

## PLAN PROVISIONS

# ARTICLE I
## STATEMENT OF PURPOSE

1.1   **General Purpose**.  Del-Air Heating, Air Conditioning & Refrigeration, Inc. (the "Company" or "Employer"), a Florida corporation, hereby amends and restates the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. (the "Plan") to enable each eligible person employed by the Employer to benefit, in accordance with the terms of the Plan, from an accumulation of stock of the Company and to provide for substantial Employee participation in the ownership of the Company.  It is a primary purpose of the Plan to establish for each Participant an ownership interest in the Company.  Accordingly, it is anticipated that the Trustee under the Plan will arrange from time to time for loans meeting the requirements of "exempt loans" under ERISA and the Code, that the proceeds of these loans will be used as soon as administratively feasible after receiving such loans to purchase Employer Securities (as defined in the Plan) from the Employer or from existing shareholders, that such Employer Securities will be held in a suspense account pending payments on such loans, that Employer contributions will be used to pay principal and interest on such loans, and that at the end of each Plan Year, Employer Securities will be released from the Suspense Account to reflect the payments on such loans and will be allocated to the accounts of Participants.

1.2   **Qualification Under the Code**.  It is intended that the Plan be a qualified employee stock ownership plan within the meaning of Code Sections 401(a) and 4975 (as hereinafter defined) and that the funding vehicle(s) associated with the Plan be exempt from federal income taxation pursuant to the provisions of Code Section 501(a).  Subject to the provisions of Article IV of the Plan (identifying certain circumstances authorized by statute or regulation the occurrence of which may result in refunds to the Employer of amounts contributed under the Plan), the assets of the Plan shall be applied exclusively for the purposes of providing benefits to Participants and Beneficiaries under the Plan and for defraying expenses incurred in the administration of the Plan and its corresponding funding vehicle(s).

1.3   **Plan Documents**.  The Plan shall consist of this instrument together with its corresponding Trust Agreement, all amendments to either of the foregoing, and all documents specifically incorporated in either of the foregoing by reference.  Descriptive materials published in connection with the Plan, such as plan descriptions, summaries of plan provisions, and notices relating to modification of the Plan, do not constitute part of the Plan and shall not give rise to rights or benefits not provided under the Plan.

# ARTICLE II
## DEFINITIONS

2.1 **Account**. "Account" means the entire interest of a Participant in the Plan. Unless otherwise specified, the value of a Participant's Account and the quantity of Employer Securities allocable to a Participant's Account shall be determined as of the Valuation Date of the Plan coincident with or next following the occurrence of the event to which reference is made. A Participant will have but one Account, which may consist of several "Subaccounts" in order to differentiate, as needed, among the categories of investments allocated to his/her Account (for example, the portion of an Account attributable to Employer Securities purchased with the proceeds of Exempt Loans, if any, versus the portion attributable to other Employer Securities or the respective portions of his/her Account attributable to Employer Securities purchased with the proceeds of different Exempt Loans) or for such other purposes as the Plan Administrator may consider advisable (for example, to facilitate compliance with changes in applicable law or regulations).

Within each Participant's Account, the Trustee shall identify on behalf of the Participant two separate parts. One such part shall consist of the Participant's interest in the Employer Securities held for the credit of that Account, and shall be called the Participant's "Company Stock Subaccount." The other part shall consist of the Participant's interest in the remaining assets, if any, of that Account and shall be called the Participant's "Other Investments Subaccount."

If the Employer is an S corporation and a separate Stock Bonus Plan is established pursuant to Article XVIII, a Participant's Account, if any, in the Stock Bonus Plan shall consist of a "Non-ESOP Company Stock Subaccount" which reflects the Participant's interest in Company Stock held by the Trust and which is not part of the ESOP but is allocated to the Stock Bonus Plan; and a "Non-ESOP Other Investments Subaccount" which reflects the Participant's interest in other assets other than Company Stock held by the Trust and which is not part of the ESOP but is allocated to the Stock Bonus Plan.

2.2 **Administrative Policy**. "Administrative Policy" means a policy regarding administration of the Plan, including investments in Company Stock and distributions to Participants and Beneficiaries, adopted by the Plan Administrator from time to time.

2.3 **Adoption Agreement**. "Adoption Agreement" means the document by which an entity not heretofore constituting an Employer adopts the Plan, joins in the corresponding Trust Agreement(s) and other funding vehicle(s), consents to the administration of the Plan, and becomes an entity constituting an Employer hereunder. Each executed Adoption Agreement is an integral part of the Plan.

2.4 **Affiliated Company**. "Affiliated Company" means any entity which, with any entity constituting the Employer, constitutes (a) a "controlled group of corporations" within the meaning of Code Section 414(b), (b) a "group of trades or businesses under common control" within the meaning of Code Section 414(c), (c) an "affiliated service group" within the meaning of Code Section 414(m), or (d) any other entity required to be

aggregated with the Employer under Code Section 414(o).  An entity shall be considered an Affiliated Company only with respect to such period as the relationship described in the preceding sentence exists.  When the term "Affiliated Company" is used in other Sections of the Plan (and only when the term is so used), Code Sections 414(b) and(c) shall be deemed modified by application of the provisions of Code Section 415(h) (which substitutes the phrase "more than 50 percent" for the phrase "at least 80 percent" in Code Section 1563(a)(1), which is then incorporated by reference in Code Section 414(b)).

2.5     **Age**.  "Age" means the chronological age attained by the Participant at his/her most recent birthday.

2.6     **Aggregation Group**.  "Aggregation Group" means the Permissive Aggregation Group if there be one in existence, and shall otherwise mean the Mandatory Aggregation Group.

2.7     **Alternate Payee**.  "Alternate Payee" means any person entitled to current or future payment of benefits under the Plan pursuant to a QDRO.

2.8     **Anniversary Date**.  "Anniversary Date" means the last day of the Plan Year.

2.9     **Annual Addition**.  "Annual Addition" means, as to any Participant for any Limitation Year, the sum of:

   (a)     Employer contributions allocated to his/her Account;

   (b)     the amount of the Participant's contribution to his/her Account(s) for such year;

   (c)     forfeitures reallocable to the Participant's Account; and

   (d)     as to any Key Employee, any amount credited to an account established under Code Section 419A(d)(1) for the provision of post-retirement medical benefits; and

   (e)     amounts allocated after March 31, 1984, to an individual medical account, which is part of a pension or annuity plan maintained by the Employer.

   For the purposes of this Section, contributions to any qualified defined contribution plan sponsored by the Employer or by an Affiliated Company and forfeitures reallocable under any such plan shall be considered contributions or forfeitures, as the case may be, to the Participant's Account under the Plan for purposes of determining compliance with Code Section 415.

2.10    **Beneficiary**.  "Beneficiary" means:

   (a)     Any Alternate Payee named in a QDRO to receive benefits in the event of the death of the Participant, to the extent of the rights granted in such QDRO;

   (b)     As to any Participant who is married at the time of his/her death, the Participant's Spouse, except as provided in Subsections (c) and (d) hereof;

4

(c)    As to any Participant who (1) is not married at the time of his/her death, or (2) is married, but whose Spouse has consented to the designation of a Beneficiary other than himself or herself (to the extent of such consent), the persons or entities designated by the Participant in writing to be his/her Beneficiaries hereunder; and

(d)    As to any Participant who dies not survived by a Spouse, whose death benefit is not subject to a QDRO, and who has not designated a Beneficiary (or who is not survived by any such designated Beneficiary), (1) the Participant's issue (including stepchildren and adopted persons), equally, with the issue of deceased issue to be by representation; (2) if there are no such issue or children of issue, then the surviving parents of the Participant (equally if there is more than one); and (3) if there are neither children nor issue of children, and if there are no surviving parents, then the Participant's estate.

(e)    For purposes of making a Direct Rollover, anyone who is designated as a Beneficiary (including a non-spouse Beneficiary) by the Participant shall be considered a designated Beneficiary.

**2.11**    **Benefit Commencement Date**.  "Benefit Commencement Date" means the date on which there is distributed to the Participant (or to the Beneficiary of a deceased Participant) the entire amount standing to his/her credit under the Plan, or, if distribution is to be made as an annuity or otherwise in more than one payment, the date on which the first such benefit payment is made to the Participant or to the Beneficiary of a deceased Participant.

**2.12**    **Board of Directors**.  "Board of Directors" means the board of directors of the Company.

**2.13**    **Code**.  "Code" means the Internal Revenue Code of 1986, as the same may be amended from time to time, and any successor statute of similar purpose.

**2.14**    **Company**.  "Company" means Del-Air Heating, Air Conditioning & Refrigeration, Inc. or any successor entity.  Effective January 1, 2016, the Company elected S corporation status.  Prior to January 1, 2016, the Company had been a C corporation.

**2.15**    **Company Stock**.  "Company Stock" shall mean either:

(a)    Common stock which is issued by the Company having a combination of voting power and dividend rights equal to or in excess of (i) that class of common stock of the Company having the greatest voting power and (ii) that class of common stock of the Company having the greatest dividend rights, or

(b)    Non-callable preferred stock which is convertible at any time into such common stock, provided that the conversion price is reasonable as of the date of acquisition by the Trust and the preferred stock will be treated as non-callable if after the call there will be a reasonable opportunity to convert the preferred stock into said common stock.

Company Stock is a type of Employer Securities.

5

2.16 __Compensation__. "Compensation" means the Participant's wages, salaries, fees for professional service and other amounts received for personal services actually rendered in the course of employment with an Employer (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips and bonuses), the same being the Participant's "compensation" as that term is defined at Code Section 415(c)(3), to include all such direct monetary remuneration paid to the payee during the computation period of reference as is included under Treasury Regulation Section 1.415-2(c)-2(b)(1) and any elective deferral (as defined in Code Section 402(g)(3)) and any amount contributed or deferred by the Employer at the election of the Participant and which is not includible in the gross income of the Participant by reason of Code Sections 125, 132(f) or 457, but to exclude all other remuneration, regardless of form. All commission income is included for total Compensation up to $75,000. No commission income greater than $75,000 will be included in Compensation. Compensation of any Employee or Participant in excess of the dollar amount prescribed under Code Section 401(a)(17) shall be disregarded for all purposes under the Plan. For allocation purposes, Compensation includes amounts received as Compensation for that portion of the Plan Year the employee is an active Participant.

The Compensation of each Participant taken into account in determining allocations shall not exceed $265,000 (in 2016), and as adjusted for increases in the cost-of-living in accordance with Code Section 401(a)(17)(B). Compensation means compensation during the Plan Year or such other consecutive 12-month period over which compensation is otherwise determined under the Plan (the determination period). The cost-of-living adjustment in effect for a calendar year applies to Compensation for the determination period that begins with or within such calendar year.

Payments made by the later of 2 ½ months after separation from employment or the end of the limitation year that includes the date of separation from employment are included in compensation for the limitation year if, absent a separation from employment, such payments would have been paid to the Employee while the Employee continued in employment with the Employer and are regular compensation for services during the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar compensation.

2.17 __Deferred Retirement Date__. "Deferred Retirement Date" means the date of a Participant's retirement from the service of the Employer subsequent to his/her Normal Retirement Date.

2.18 __Determination Date__. "Determination Date" means, as to any Plan Year other than the Plan Year which commenced with the Effective Date, the last day of the preceding Plan Year. As to the Plan Year which commenced with the Effective Date, the term "Determination Date" shall be a reference to the last day of such Plan Year.

2.19 __Direct Rollover__. "Direct Rollover" means a payment by the Plan to an Eligible Retirement Plan specified by the Participant or by a Distributee. Any individual who is a designated Beneficiary, but not the surviving spouse of the Participant, shall be eligible,

following the death of the Participant, to make a Direct Rollover from the Plan provided that the Direct Rollover is made to an IRA established on behalf of the designated Beneficiary and that the IRA will be treated as an inherited IRA pursuant to the provisions of Code Section 402(c)(11).

**2.20** **Distributee**.  "Distributee" means any Employee or former Employee who is eligible to receive or receives distributions from the Plan.  In the case of a Direct Rollover, it includes a designated Beneficiary.  In addition, it means the Employee's or former Employee's surviving spouse or other Beneficiary and the Employee's or former Employee's spouse or former spouse who is the Alternate Payee under a qualified domestic relations order, as defined in Code Section 414(p).  For distributions made after December 31, 2006, a Distributee shall include a non-spouse designated Beneficiary.

**2.21** **Effective Date**.  "Effective Date" means January 1, 2005.  The effective date of this amended and restated Plan is January 1, 2016.

**2.22** **Eligible Retirement Plan**.  "Eligible Retirement Plan" means an individual retirement account described in Code Section 408(a); an individual retirement annuity described in Code Section 408(b); an annuity plan described in Code Section 403(a); a qualified trust described in Code Section 401(a); an eligible deferred compensation plan described in Code Section 457(b) that separately accounts for amounts rolled into such plan from eligible retirement plans not described in Code Section 457(b); and an annuity contract described in Code Section 403(b), that accepts the Distributee's Eligible Rollover Distribution.  If any portion of an Eligible Rollover Distribution is attributable to payments or distributions from a designated Roth account (as defined in Code Section 402A), an Eligible Retirement Plan with respect to such portion shall include only another designated Roth account and Roth IRA.

**2.23** **Eligible Rollover Distribution**.  "Eligible Rollover Distribution" means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); any hardship distribution; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer Securities).

**2.24** **Employee**.  "Employee" means each person in the employ of the Employer.

**2.25** **Employer**.  "Employer" means the Company and the Company's subsidiaries who have adopted the Plan with respect to Employees of the Company and such subsidiaries of the Company, respectively; any Affiliated Companies that become participating Employers pursuant to Section 17.16; and any successors or related entities thereto which adopt the Plan and join in the corresponding Trust Agreement.  The term "Employer" also includes

any other entity that, with the consent of the Board of Directors, adopts the Plan and joins in the corresponding Trust Agreement.

2.26 **Employer Securities**.  "Employer Securities" shall have the following meanings when used herein:

    (a)    Other than as to Plan assets acquired with the proceeds of an Exempt Loan, Employer Securities means capital stock of any class issued by the Company (or by a corporation which is a member of the same controlled group of corporations as the Company with the term "controlled group of corporations" having the same meaning herein as in Code Section 409(l)(4)), or a "marketable obligation" within the meaning of Section 407(a) of ERISA.

    (b)    As to Plan assets acquired with the proceeds of such an Exempt Loan, Employer Securities means (1) preferred stock of the Company (or of a corporation which is a member of the same controlled group of corporations as the Company (utilizing the definition of "controlled group of corporations" set forth above in this Section)) which meets the requirements of Code Section 409(l)(3) or (2) common stock issued by the Company (or by a corporation which is a member of the same controlled group of corporations as the Company (utilizing the definition of "controlled group of corporations" set forth above in this Section)) which is readily tradable on an established securities market, or, where there is no such readily tradable common stock, then common stock of the Company (or of a corporation which is a member of the same controlled group of corporations as the Company (utilizing the definition of "controlled group of corporations" set forth above in this Section)) having a combination of voting power and dividend rights equal to or in excess of (A) that class of common stock of the Company (or other controlled group corporation, as aforesaid) having the greatest voting power, and (B) that class of common stock of the Company (or other controlled group corporation, as aforesaid) having the greatest dividend rights.

2.27 **ERISA**.  "ERISA" means the Employee Retirement Income Security Act of 1974, including all amendments thereto.

2.28 **ESOP Committee**.  "ESOP Committee" means a committee whose members shall be appointed by the Board of Directors and shall serve at the pleasure of the Board of Directors.  The number of members of the ESOP Committee shall be determined by the Board of Directors from time to time.  If members have been appointed to the ESOP Committee, it shall direct the Trustee as to voting of any shares of Employer Securities held by the Trust to the extent provided in Section 7.5.

2.29 **Exempt Loan**.  "Exempt Loan" means any loan which would otherwise be a prohibited transaction subject to excise tax under Code Section 4975 (by reason of such loan being taken from a "disqualified person" (within the meaning of Code Section 4975(e)(2)) or by reason of such loan being guaranteed by such a "disqualified person"), but which is exempt from the said prohibited transaction excise tax by operation of Code Section 4975(d)(3).  The proceeds of any Exempt Loan must be primarily for the benefit of the

Plan Participants and must be used within a reasonable time after their receipt by the Plan only for one or more of the following purposes: (1) to acquire Employer Securities, (2) to repay the loan, or (3) to repay a prior Exempt Loan. Proceeds from an Exempt Loan may not be used to purchase key man life insurance. An Exempt Loan may, but shall not be required to, constitute a "securities acquisition loan". An Exempt Loan must be for a specific term and may not be payable at the demand of any person, except in the case of default. The interest rate on an Exempt Loan must not be in excess of a reasonable rate of interest. The interest rate and price of stock to be acquired with an Exempt Loan shall not be such that Plan assets may be drained off from the Plan. No person entitled to payment under an Exempt Loan shall have any right to Plan assets other than (1) collateral given for the loan, (2) contributions (other than employer securities) that are made under the ESOP to meet its obligations under the Plan, and (3) earnings attributable to the collateral and the investment of such contributions. Until an Exempt Loan is repaid, contributions and earnings with respect to Company Stock acquired with the proceeds of the Exempt Loan must be accounted for separately. Payments made with respect to an Exempt Loan by the ESOP during the Plan Year must not exceed an amount equal to the sum of such contributions and earnings received during or prior to the year less such payments in prior years. Securities acquired with the proceeds of an Exempt Loan will not be subject to a put, call, or other option, or buy-sell or similar arrangement while held by and when distributed from the Plan. The Exempt Loan must be made without recourse against the Plan and the only assets that may be given as collateral on an Exempt Loan are qualifying employer securities acquired with the proceeds of an Exempt Loan or prior Exempt Loan paid with the proceeds of the current Exempt Loan. In the event of default of an Exempt Loan, the value of Plan assets transferred in satisfaction of the loan must not exceed the amount of default. In the case of a disqualified person, the assets transferred cannot exceed the payment schedule of the loan. An Exempt Loan must not be paid off prematurely with Plan assets. If more than one class of employer stock is acquired with an Exempt Loan, each Participant must receive substantially the same proportion of each class of employer stock.

Notwithstanding the prior paragraph, contributions and earnings must be accounted for separately until the Exempt Loan is repaid.

**2.30**  **Five-percent Owner**. "Five-percent Owner" means, as to any entity, any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent of the outstanding stock of the Employer (or any entity constituting an Employer) or stock possessing more than five percent of the total combined voting power of all of the stock of such entity. Where an entity is not a corporation, a person shall be considered a "Five-percent Owner" if he/she owns more than five percent of either the capital or the profits interest in the entity.

**2.31**  **Fund**. "Fund" means all of the assets of the Plan held by the Trustee (or any nominee thereof) at any time under the Trust Agreement. The Fund may consist of various "Subfunds" to the extent the Plan Administrator or Trustee may consider it advisable to keep separate account of various categories of investments that may be held under the Plan and Trust.

2.32 **Highly Compensated Employee**. A "Highly Compensated Employee" is an employee who either is a Five-percent Owner of the Company or who received more than $120,000 of Compensation in the prior Plan Year (in 2016 and as adjusted for inflation in following years).

2.33 **Hour of Service**. "Hour of Service" shall be defined in a manner consistent with regulations published by the Secretary of Labor at Title 29, Code of Federal Regulations, Section 2530.200b-2, and means (a) each hour for which an employee is paid or entitled to payment for the performance of duties for the Employer or an Affiliated Company during the applicable computation period, (b) each hour for which an employee is paid or entitled to payment by the Employer or an Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether or not the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury or military duty, or leave of absence (including leave for maternity or paternity reasons), and (c) each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer or an Affiliated Company. Hours of Service shall be credited to the computation period in which earned, regardless of when determined or awarded. Notwithstanding the foregoing, except as provided in the following sentence, (i) not more than 501 Hours of Service shall be credited to an employee on account of any single continuous period during which the employee performs no duties for the Employer or an Affiliated Company; (ii) no credit shall be granted for any period with respect to which an employee receives payment or is entitled to payment under a plan maintained solely for the purpose of complying with applicable workmen's compensation or disability insurance laws; and (iii) no credit shall be granted for a payment which solely reimburses an employee for medical or medically related expenses incurred by the employee. Each week of absence for military service in the armed forces of the United States from which service the employee returns to the Employer or an Affiliated Company within the period during which he or she has legally protected reemployment rights shall count as a number of Hours of Service equal to the number of Hours of Service that would have been credited to the employee with respect to the employee's customary week of employment during the month immediately preceding the date on which absence for military service commenced. Service rendered at overtime or other premium rates shall be credited at the rate of one Hour of Service for each hour for which pay is earned, regardless of the rate of compensation in effect with respect to such hour.

For the purposes of this Section, the term "employee" means any person with whom the Employer or an Affiliated Company maintains an employer-employee relationship under general principles of law, or under the provisions of Code Section 414(n) if Code Section 414(n)(5) does not apply to negate the applicability of Code Section 414(n).

If an employee's payroll records are normally kept on other than an hourly basis, Hours of Service may be credited on the basis of the manner in which the employee's payroll records are maintained, utilizing such of the following equivalencies as may be appropriate:

| **Basis upon Which the Participant's Payroll Records Are Maintained** | **Credit Granted if Participant Earns One or More Hours of Service During Period** |
|---|---|
| Shift | Actual hours for full shift |
| Day | 10 Hours of Service |

2.34 **Independent Appraiser**.    "Independent Appraiser" means any appraiser who is independent of the Employer and who meets the requirements of the regulations promulgated under Code Section 170(a)(1).    An Independent Appraiser shall be appointed by the Trustee, or by the Independent Fiduciary if applicable.

2.35 **Key Employee**.  "Key Employee" means any Employee or former Employee (including any deceased Employee) who at any time during the Plan Year that includes the determination date was an officer of the Employer having annual Compensation greater than $170,000 (for 2016, and as further adjusted under for subsequent years), a 5-percent owner of the Employer, or a 1-percent owner of the Employer having annual Compensation of more than $150,000.  For this purpose, annual Compensation means Compensation within the meaning of Section 415 (c)(3) of the Code.  The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

2.36 **Key Employee Ratio**.    "Key Employee Ratio" means the ratio for any Plan Year, calculated as of the Determination Date with respect to such Plan Year, determined by comparing the amount described in Subsection (a) of this Section with the amount described in Subsection (b) hereof, after deduction from both such amounts of the amount described in Subsection (c) hereof.

(a)    The amount described in this Subsection (a) is the sum of (1) the aggregate of the present value of all accrued benefits of Key Employees under all qualified defined benefit plans included in any Aggregation Group including the Plan, (2) the aggregate of the balances in all of the accounts standing to the credit of Key Employees under the Plan and, if the Plan is part of an Aggregation Group, all other qualified defined contribution plans included in the Aggregation Group, and (3) the aggregate amount distributed from the Plan and all other plans in such Aggregation Group to or on behalf of any Key Employee during the Plan Year ending on the Determination Date and any such distributions made for a reason other than severance from employment, death or disability during the four preceding Plan Years.

(b)    The amount described in this Subsection (b) is the sum of (1) the aggregate of the present value of all accrued benefits of all Participants under all qualified defined benefit plans included in any Aggregation Group of which the Plan is a part, (2) the aggregate of the balances in all of the accounts standing to the credit of all Participants under the Plan and, if the Plan is part of an Aggregation Group, all other qualified defined contribution plans included in the Aggregation Group, and (3) the aggregate amount distributed from the Plan and all plans in such

11

Aggregation Group to or on behalf of any Participant during the Plan Year ending on the Determination Date and any such distributions made for a reason other than severance from employment, death or disability during the four preceding Plan Years.

(c)    The amount described in this Subsection (c) is the sum of (1) all rollover contributions (or similar transfers) to the Plan, (2) any amount that would have been included under Subsection (a) or Subsection (b) with respect to any individual who has not received compensation from any entity constituting an Employer (other than benefits under the Plan) at any time during the Plan Year ending on the Determination Date, and (3) any amount that is included in Subsection (b) hereof for, on behalf of, or on account of, a person who is a Non-Key Employee as to the Plan Year of reference but who was a Key Employee as to any earlier Plan Year.

**2.37**    **Leased Employee**.  "Leased Employee" means any person (other than an Employee) engaged in performing services for the Employer or related persons determined in accordance with Code Section 414(n)(6) (the "recipient") pursuant to an agreement between the recipient and any other person who has performed services for the recipient on a substantially full-time basis for a period of at least one year, and such services are performed under the primary direction or control of the recipient.

**2.38**    **Limitation Year**.  "Limitation Year" means the Plan Year unless a different Limitation Year is designated by the Board of Directors by resolution.

**2.39**    **Mandatory Aggregation Group**.  "Mandatory Aggregation Group" means the group of qualified plans sponsored by the Employer or by an Affiliated Company formed by including in such group (1) all such plans in which a Key Employee is a Participant during the current Plan Year or has been a Participant during any of the four preceding Plan Years (regardless of whether the plan has terminated), and (2) all such plans which enable any plan described in clause (1) to meet the requirements of either Code Section 401(a)(4) or Code Section 410.

**2.40**    **Named Fiduciary**.  "Named Fiduciary" means the Company, the Trustee, and the Plan Administrator (if other than the Company).  Each Named Fiduciary shall have only those particular powers, duties, responsibilities and obligations as are specifically delegated to him/her under this Plan and/or the Trust Agreement.  Any fiduciary, if so appointed, may serve in more than one fiduciary capacity.

**2.41**    **Non-Key Employee**.  "Non-Key Employee" means any person who is employed by the Employer in any Plan Year, but who is not a Key Employee as to that Plan Year.

**2.42**    **Normal Retirement Age**.  "Normal Retirement Age" means Age 65 and 5 years after first beginning participation in the Plan.

**2.43**    **Normal Retirement Date**.  "Normal Retirement Date" means the last day of the month in which the Participant attains Normal Retirement Age and has terminated employment with the Employer following attainment of his Normal Retirement Age.

**2.44**  **One Year Break in Service**.  "One Year Break in Service" means a Plan Year in which the Participant has not completed more than 500 Hours of Service, except that in determining a One Year Break in Service for purposes of eligibility, the initial eligibility computation period is the 12–consecutive month period beginning on the date the Employee first performs an Hour of Service for the Employer ("employment commencement date"). For purposes of determining a One Year Break in Service, the succeeding 12–consecutive month periods commence with the first Plan Year which commences prior to the first anniversary of the Employee's employment commencement date (regardless of whether the Employee is entitled to be credited with 1,000 Hours of Service during the initial eligibility computation period).

Solely for purposes of determining whether a One Year Break in Service, as defined in this Section 2.44, for participation and vesting purposes has occurred in a computation period, an individual who is absent from work for maternity or paternity reasons shall receive credit for the Hours of Service which would otherwise have been credited to such individual but for such absence, or in any case in which such hours cannot be determined, 8 Hours of Service per day of such absence. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (1) by reason of the pregnancy of the individual, (2) by reason of a birth of a child of the individual, (3) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (4) for purposes of caring for such child for a period beginning immediately following such birth or placement. The Hours of Service credited under this paragraph shall be credited (1) in the computation period in which the absence begins if the crediting is necessary to prevent a One Year Break in Service in that period, or (2) in all other cases, in the following computation period.

**2.45**  **One-percent Owner**.  "One-percent Owner" means, as to any entity, any person who owns (or is considered as owning within the meaning of Code Section 318) more than one percent of the outstanding stock of the Employer (or any entity constituting an Employer) or stock possessing more than one percent of the total combined voting power of all of the stock of such entity.  Where an entity is not a corporation, a person shall be considered a "One-percent Owner" if he/she owns more than one percent of either the capital or the profits interest in the entity.

**2.46**  **Participant**.  "Participant" means any person who has been or who is an Employee and who has been admitted to participation in the Plan pursuant to the provisions of Article III.  An "active Participant" is a Participant who meets the requirements of Section 6.1(b) and is, therefore, eligible to receive an allocation for the Plan Year.

**2.47**  **Participating Employer**.  A "Participating Employer" is an Affiliated Company that participates in the Plan pursuant to Section 17.16.

**2.48**  **Permissive Aggregation Group**.  "Permissive Aggregation Group" means the group of qualified plans sponsored by the Employer or by an Affiliated Company formed by including in such group (a) all plans in the Mandatory Aggregation Group, and (b) such other qualified plans sponsored by the Employer or an Affiliated Company as the Employer elects to include in such group, as long as the group, including those plans

electively included, continues to meet the requirements of Code Sections 401(a)(4) and 410.

2.49  **Plan**.  "Plan" means the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. as set forth herein in Part I, and as the same may from time to time hereafter be amended.  The Plan is intended to constitute an "employee stock ownership plan" within the meaning of Section 407(d)(6) of ERISA and Code Section 4975(e)(7).

2.50  **Plan Administrator**.  "Plan Administrator" means the person or committee named as such pursuant to the provisions of Article XIII hereof, or, in the absence of any such appointment, the Company.

2.51  **Plan Year**.  "Plan Year" means the twelve-month calendar period commencing each January 1st and ending on the following December 31st.

2.52  **QDRO**.  "QDRO" means a "qualified domestic relations order" within the meaning of Code Section 414(p) and Section 206(d)(3)(B) of ERISA.

2.53  **Required Beginning Date**.  "Required Beginning Date" means, as to any Participant, the April 1 of the calendar year next following the calendar year in which the later of the following dates occurs:  (a) the date on which the Participant attains Age 70-1/2, or (b) the date on which the Participant retires.  Notwithstanding the foregoing, for a Participant who is a Five-percent Owner, the Required Beginning Date means the April 1 of the calendar year next following the calendar year in which the Participant attains Age 70-1/2, without regard to the date of the Participant's retirement.

2.54  **Review Committee**.  "Review Committee" refers to the committee described in Article XV to review benefit claims under the Plan.  If the Employer does not establish a Review Committee, the functions of the Review Committee shall be performed by the Employer.

2.55  **Spouse**.  "Spouse" means (a) the person to whom the Participant was married on his/her Benefit Commencement Date, or (b) if the Participant's Benefit Commencement Date had not occurred at the time of his/her death, the person to whom the Participant was married at the time of his/her death.  When the word "spouse" is used without an initial capital letter in the Plan, the term means the person to whom the Participant was married or is married as of the date of reference.  Effective September 16, 2013, "Spouse" includes a same-sex partner who is legally married to a Participant in a marriage ceremony performed in a state that permitted same-sex marriages at the time such ceremony was performed, even though the Participant and Spouse are living in a state that does not recognize the validity of same-sex marriages.

2.56  **Suspense Account**.  "Suspense Account" means the account created by the Trustee pursuant to Section 7.7 hereof to hold Employer Securities acquired with the proceeds of an Exempt Loan.

2.57  **Termination Date**.  "Termination Date" shall be the date on which the earliest of the following events occurs: (a) a Participant's retirement (Participant's termination of

employment on or after Participant's Normal Retirement Date), (b) a Participant's termination of employment as a result of Total Disability, (c) a Participant's death, or (d) a Participant's termination of employment for any other reason.

**2.58**    **Top-Heavy**.    "Top-Heavy" means the determination that a plan is "top-heavy," as determined according to Section 12.1.

**2.59**    **Top-Heavy Compensation**.    "Top-Heavy Compensation" means the Participant's wages, salaries, fees for professional service and other amounts received for personal services actually rendered in the course of employment with an Employer (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips and bonuses), the same being the Participant's "compensation" as that term is defined at Code Section 415(c)(3), to include all such direct monetary remuneration paid to the payee during the computation period of reference as is included under Treasury Regulation Section 1.415-2(d)(1) and any elective deferral (as defined in Code Section 402(g)(3)) and any amount contributed or deferred by the Employer at the election of the Participant and which is not includible in the gross income of the Participant by reason of Code Sections 125, 132(f) or 457, but to exclude all other remuneration, regardless of form.

**2.60**    **Total Disability**.    "Total Disability" means a Participant is suffering from a physical or mental condition of such severity and duration as to entitle the Participant (i) to disability retirement benefits under the federal Social Security Act, or (ii) to long-term disability income benefits under any long-term disability income plan or coverage provided by the Employer as a fringe benefit for the Participant after there has elapsed a period of six months or more from the date of the Participant's termination due to such condition. The determination of whether a Participant is totally disabled will be made with respect to the time when the Participant is an active Employee.

After either (i) or (ii) of the preceding paragraph has been satisfied, a physician who is acceptable to the Plan Administrator must certify that the Participant is suffering from a physical or mental condition which may be expected to result in death or be of long and indefinite duration and which renders the Participant incapable of performing any substantial gainful activity.

**2.61**    **Trust Agreement**.    "Trust Agreement" means the Trust Agreement for the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. (which Trust and Trust Agreement may also be referred to as "The Del-Air Heating, Air Conditioning & Refrigeration, Inc. Employee Stock Ownership Trust") as set forth in Part II hereof, as it may hereafter be amended, and such additional and successor trust agreements as may be executed for the purpose of providing for the management of the assets of the Plan.

**2.62**    **Trustee**.    "Trustee" means the party or parties so designated pursuant to the Trust Agreement and each of their respective successors.

2.63    **Valuation Date**.  "Valuation Date" means the last day of the Plan Year (the "Annual Valuation Date") and each other interim date during the Plan Year on which a valuation of the Fund is made.  In addition, the Valuation Date is the date of the transaction when the transaction involves the Plan and a "Disqualified Person", as defined in Code Section 4975(e)(2).

2.64    **Year of Participation for Diversification Election**.    "Year of Participation for Diversification Election" means, for purposes of determining an Employee's right to diversification of investments pursuant to Section 7.9, any Plan Year in which the Participant completes 1,000 or more Hours of Service and which begins on or after the first year in which the individual first becomes a Participant in the Plan, provided, however, that a Participant shall not be credited with a Year of Participation for Diversification Election for any Plan Year in which he/she resigns or is discharged (with or without cause) if he/she is not an Employee of the Employer on the last day of such Plan Year.

2.65    **Year of Service for Accrual of Benefits**.  "Year of Service for Accrual of Benefits" means a Plan Year during which the Employee had not less than 1,000 Hours of Service as a Participant. If the Participant entered the Plan other than on the first day of the Plan Year, all Hours of Service rendered by the Participant during that Plan Year, whether or not rendered as a Participant, shall be treated as if they were Hours of Service as a Participant.

2.66    **Year of Service for Participation**.  "Year of Service for Participation" means the 12–consecutive month period ("computation period") during which the Employee completes at least 1,000 Hours of Service, which shall be determined as follows:

For purposes of determining a Year of Service for Participation, the initial eligibility computation period is the 12–consecutive month period beginning on the date the Employee first performs an Hour of Service for the Employer ("employment commencement date").

The succeeding 12–consecutive month periods commence with the first Plan Year which commences prior to the first anniversary of the Employee's employment commencement date regardless of whether the Employee is entitled to be credited with 1,000 Hours of Service during the initial eligibility computation period.

2.67    **Year of Service for Vesting**.  "Year of Service for Vesting" means a Plan Year during which the Employee had not less than 1,000 Hours of Service which year occurs during the time the Plan has been in effect and which occurs after the Employee has attained the age of 18.  In the case of a Participant who has 5 consecutive One Year Breaks in Service, all Years of Service for Vesting after such 5 consecutive One Year Breaks in Service will be disregarded for the purpose of determining vesting in the Participant's Account for amounts that accrued before such breaks, but both pre-break and post-break service will count for the purposes of vesting amounts in the Account that accrued after such breaks. Both pre-break and post-break portions of the Account will share in the earnings and losses of the Trust Fund.  In the case of a Participant who does not have 5

consecutive One Year Breaks in Service, both the pre-break and post-break service will count in vesting both the pre-break and post-break amounts in the Participant's Account.

# ARTICLE III
## PARTICIPATION ELIGIBILITY

3.1 **Minimum Service Requirement**.  Every Employee who has attained the age of 21 and completed a Year of Service for Participation will be eligible to participate in the Plan on the first day of the Plan Year or the first day of the seventh month of the Plan Year which first occurs on or after such completion, provided that he/she is an Employee on such date, subject to Sections 3.2 and 3.3.  However, the following are not eligible to participate in the Plan: (i) Leased Employees, (ii) nonresident aliens who receive no U.S. source income from the Employer and (iii) any person whose terms and conditions of employment are determined through collective bargaining with a third party if the issue of retirement benefits has been a bona fide subject of collective bargaining unless the collective bargaining agreement provides for the inclusion of such person as a Participant of the Plan.  In the event an Employee who is not a member of an eligible class of Employees becomes a member of an eligible class, such Employee will participate immediately if such Employee has satisfied the minimum age and service requirements and would have otherwise been a Participant.

Any Employees who have attained the age of 21 on the Plan Effective Date, January 1, 2005, will automatically participate in the Plan effective January 1, 2005, regardless of their length of service.

3.2 **Procedure for and Effect of Admission**.  Each Employee who becomes eligible for admission to participation in the Plan shall complete such forms and provide such data as are reasonably required by the Plan Administrator as a precondition of such admission. By becoming a Participant, each Employee shall for all purposes be deemed conclusively to have assented to the terms and provisions of the Plan, the corresponding Trust Agreement, and to all amendments to such instruments.

3.3 **Waiver of Participation**.  An Employee, once having become eligible for participation in the Plan, shall not have the right to waive such participation unless the Plan Administrator, in its sole discretion, determines to allow written waivers of participation. If such waivers are permitted, they shall be permitted on a nondiscriminatory basis, provided, however, that no waiver shall be effective as to a Non-Key Employee in any Plan Year in which the Plan is Top-Heavy if such waiver would result in failure by the Plan, or, if applicable, all plans in an Aggregation Group, to meet the minimum accrual requirements of Code Section 416 as to such Non-Key Employee.  The Plan Administrator retains the right not to permit waivers in any year or years, even if such waivers were permitted in prior years.  Any Participant who waives participation shall be deemed to have bound his/her heirs, personal representatives and assigns by such waiver. No waiver shall be accepted from a Participant subject to a QDRO unless it is determined by the Plan Administrator that such waiver would not diminish the entitlement of the party or parties for the benefit of whom such QDRO exists.

Notwithstanding the preceding paragraph, a Participant may elect out of participating in the Plan on a one time, irrevocable basis.

**3.4**   **<u>Resumption of Participation</u>**.    A former Participant may re-enter the Plan after completing one Hour of Service and meeting the requirements of Section 6.2(a)(3), (regarding restoration of his/her Account).  If a Participant incurs at least a One Year Break in Service, his/her active participation in the Plan shall be suspended until the time he/she completes one Hour of Service following such One Year Break in Service and the Participant will be readmitted to active participation in the Plan retroactive to the beginning of such Year of Service for Participation.

## ARTICLE IV
## EMPLOYER CONTRIBUTIONS

4.1    **Contributions to Pay Principal and Interest on Exempt Loans**.  For each Plan Year during which an Exempt Loan is outstanding, the Employer shall make contributions under the Plan with respect to such Plan Year as follows:  On or before the date on which any principal or interest payment is due under the terms of any Exempt Loan then outstanding (to the extent that such payment due exceeds the income generated by the Employer Securities held in the Suspense Account with respect to the Loan on which payments are being made), the Employer shall make such contributions as shall be necessary so that the Trustee can timely make the payments on that Loan, provided that such contribution is currently deductible with respect to the Plan Year within which or for which made, unless the Employer determines, in its absolute discretion, to make such contribution whether or not it is currently deductible.

4.2    **Additional Employer Contributions**.  In addition to the contributions, if any, which it makes pursuant to Section 4.1, the Employer may make such contributions to the Trust in respect of the fiscal year of the Employer during which this Plan is first adopted and in respect of each fiscal year thereafter during which the Plan is in effect, in such amounts as the Board of Directors, in its absolute discretion, shall timely determine, provided that any such additional contribution may not be made if it would exceed the amount which is deductible by the Employer for that fiscal year after giving effect to the contributions it has made for that fiscal year pursuant to Section 4.1.  In allocating any such additional contribution among the Accounts of active Participants eligible to share in such allocation, the contribution shall be allocated separately from the contribution made pursuant to Section 4.1, shall be allocated to a separate Subaccount of the Accounts of such active Participants, and shall otherwise be allocated as provided in Section 6.1.  Additional Employer contributions may be made in cash, in stock or marketable obligations of the Employer (as defined in Section 407(e) of ERISA), or in any combination of cash and/or stock and/or marketable obligations of the Employer (or any parent or wholly-owned subsidiary thereof).  This Section shall not be construed as requiring the Employer to make contributions in any specific fiscal year, provided, however, that notwithstanding any other provision of the Plan to the contrary, the Employer shall make such contributions as may be required to meet the minimum accrual requirements under the Code relating to Top-Heavy plans for any period during which the Plan is Top-Heavy, to the extent such minimum accrual requirements are not satisfied by the allocation of the Employer's contributions, if any, made pursuant to Section 4.1.

4.3    **Timing of Contributions**.  Except as otherwise provided in Section 4.1, the Employer shall pay its contribution made with respect to any Plan Year to the Trustee on or before the date established for the filing of the Employer's federal income tax return (including any extensions of that date) for the fiscal year of the Employer ending with or within the Plan Year with respect to which such contribution is made.

4.4    **Exclusive Benefit; Refund of Contributions**.  All contributions made by the Employer are made for the exclusive benefit of the Participants and their Beneficiaries, and such contributions shall not be used for nor diverted to purposes other than for the exclusive

20

benefit of the Participants, their Beneficiaries and, where applicable, their respective Alternate Payees (including the costs of maintaining and administering the Plan and Trust).  Notwithstanding the foregoing, to the extent that such refunds do not, in themselves, deprive the Plan of its qualified status, refunds of contributions shall be made to the Employer under the following circumstances and subject to the following limitations:

(a)  **Nonqualification of Plan**.  If the Plan is determined not to initially satisfy the qualification requirements of Code Section 401(a), and if the Employer declines to amend the Plan to satisfy such qualification requirements, contributions made with respect to any period of nonqualification and prior to the determination that the Plan has failed to qualify shall be returned to the Employer within one year.

(b)  **Disallowance of Deduction**.  To the extent that a federal income tax deduction is disallowed for any contribution made by Employer, other than a contribution which, pursuant to Sections 4.1 and 4.2, the Employer has committed itself to make notwithstanding failure of deductibility, the Trustee shall refund to the Employer the amount so disallowed within one year of the date of such disallowance.

(c)  **Mistake of Fact**.  In the case of a contribution which is made in whole or in part by reason of a mistake of fact (for example, incorrect information as to the eligibility or compensation of an Employee, or a mathematical error), so much of the Employer contribution as is attributable to the mistake of fact shall be returnable to the Employer upon demand, upon presentation of evidence of the mistake of fact to the Trustee and of calculations as to the impact of such mistake. Demand and repayment must be effectuated within one year after the payment of the contribution to which the mistake applies.

In the event that any refund is paid to the Employer hereunder, such refund shall be made without interest and shall be deducted from among the Accounts of the Participants only to the extent that the amounts to be refunded were credited to such Accounts.

Notwithstanding any other provision of this Section, no refund shall be made to the Employer which is specifically chargeable to the Account(s) of any Participant(s) in excess of 100 percent of the amount in such Account(s), nor shall a refund be made by the Trustee of any funds, otherwise subject to refund hereunder, which have been distributed to Participants, Beneficiaries and Alternate Payees.  In the case that such distributions become refundable, the Employer shall have a claim directly against the distributees to the extent of the refund to which it is entitled.

All refunds pursuant to this Section shall be limited in amount, circumstance and timing to the provisions of Section 403(c) of ERISA, and no such refund shall be made if, solely on account of such refund, the Plan would cease to be a qualified plan pursuant to Code Section 401(a).

**ARTICLE V**
**PARTICIPANT CONTRIBUTIONS**

**5.1**    **Participant Contributions**.    No contributions shall be required of, nor shall any contributions be accepted from, any Participant.

## ARTICLE VI
## ALLOCATION OF CONTRIBUTIONS

6.1 **Allocation of Employer Contributions**.  As of each Anniversary Date, the Employer's contribution for the Plan Year ending on that date shall be allocated among the Accounts of active Participants entitled to share therein (as determined pursuant to Subsection (b) hereof) as follows:

(a) **Initial Allocation**.  Subject to the limitation of Subsection (e) below, the amount to be allocated to the Account of each such active Participant shall be determined by multiplying the total of the Employer's contribution for that computation period by a fraction, the numerator of which is the Participant's Compensation for such computation period and the denominator of which is the aggregate Compensation for such computation period of all such active Participants.

(b) **Entitlement to Share in Allocation**.  A Participant shall be an active Participant for purposes of this Section and shall be entitled to share in the allocation of the Employer contribution for a particular Plan Year pursuant to this Section only if (i) he/she is an Employee on the last day of the Plan Year and (ii) has a Year of Service for Accrual of Benefits for the Plan Year.  However, requirement (i) in the preceding sentence shall not apply to an Employee who has terminated employment during the Plan Year on account of death, Total Disability, or retirement.  However, requirement (ii) in the preceding sentence shall apply to an Employee even if the Employee has terminated employment during the Plan Year on account of death, Total Disability, or retirement.

(c) **Effect of Status Change**.  Any Participant who remained in the employ of the Employer through the end of the Plan Year, but who changed from an eligible to an ineligible classification (or vice-versa) during the Plan Year shall be eligible to share in the allocation of the Employer's contribution pursuant to this Section only with respect to his/her Compensation paid for Hours of Service completed in an eligible status during such Plan Year.

(d) **Allocation of Released Employer Securities**.  Employer Securities released from the Suspense Account as of the end of a Plan Year by reason of payments on any Exempt Loan shall be allocated among the Accounts of active Participants for such computation period (determined pursuant to Subsection (b) hereof) pro-rata in accordance with the allocation pursuant to Subsections (a) above and (e) below of the Employer's contribution made pursuant to Section 4.1, except to the extent that Section 7.7 may provide for a different method of allocating a portion of the Employer Securities released from the Suspense Account as of the end of a particular Plan Year.  In the event that Employer Securities released pursuant to this Subsection (d) consist of the Employer Securities of more than one Employer, each type of Employer Securities shall be allocated among the Accounts of active Participants (determined pursuant to this Subsection) in the same ratio as the ratio of each such type of Employer Securities released from the Suspense Account

23

bears to the aggregate amount of Employer Securities released from the Suspense Account as of the end of a Plan Year.

(e) **Restricted Group Limitation**. Unless the Employer elects otherwise, the limitation of this Subsection will apply to the allocation of the Employer's contribution for any Plan Year in which the Employer is considered a C-corporation and the aggregate of the Compensation for that period of all such active Participants who are members of the "Restricted Group" (as defined in this Subsection) for that period is more than one-third of the aggregate Compensation for such period of all such active Participants for such period. If this Subsection applies to a Plan Year, (1) the Compensation for such period of all active Participants who are members of the Restricted Group for such period shall be reduced, pro-rata according to such Compensation, so that the aggregate Compensation of such Restricted Group members shall not be more than one-third of the aggregate Compensation of all active Participants for such period, and (2) such "reduced Compensation" shall be used for purposes of both the numerator and denominator in the fractions used pursuant to Subsection (a) in allocating the Employer's contribution for such Period to the Accounts of active Participants eligible to share therein. Following the redetermination of the allocation of Employer Contributions pursuant to this Subsection for a Plan Year, the Plan Administrator shall make such adjustments in the redetermined allocations, pro-rata according to Compensation (reduced for a Restricted Group member as provided in this Subsection), so that no more than one-third of the Employer's contribution for such period has been allocated to the Accounts of active Participants who are members of the Restricted Group for that period. A Participant shall be a member of the Restricted Group for a Plan Year if he/she is considered a "highly compensated employee" as defined in Code Section 414(q) for that Plan Year.

**6.2 Forfeitures**.

(a) **Timing of Forfeitures**. Except as provided below, no portion of a Participant's Account shall be deemed forfeited and available for allocation until the earlier of (i) initial distribution of vested amounts, or (ii) such time as the Participant has experienced five One Year Breaks in Service.

(1) **Death**. In the case of a Participant who is not in the employ of the Employer at the time of his/her death, the non-vested portion of the deceased Participant's Account will be deemed forfeited and available for allocation for the Plan Year of the Participant's death.

(2) **Lost Participants**. In the case of a benefit that is forfeited under Section 17.13 because the Plan Administrator is unable to locate the person to whom payment is due, the benefit shall be deemed forfeited and available for allocation for the Plan Year following the Plan Year in which the payment is due; provided, however, that the benefit will be reinstated

24

under Section 17.13 if a claim is made by the party to whom the forfeited benefit is properly payable.

(3) **Restoration of Account**.  If a Participant returns to employment with the Employer or any Affiliated Company prior to his/her having experienced five consecutive One Year Breaks in Service, his/her Account shall be reinstated in accordance with Section 10.4 (if it has been forfeited) upon his/her completion of one Hour of Service following such reemployment and the repayment to the Other Investments Subaccount of any amount received pursuant to Sections 11.1 or 11.2.  Such repayment must be made before the earlier of the date which is five years after the date on which the Participant is subsequently reemployed by the Employer or the date which is the close of the period of five consecutive One Year Breaks in Service commencing after a distribution or withdrawal.

(b) **Forfeiture of Employer Securities**.  If any Participant forfeits a portion of his/her Account under the Plan, but not all of such Account, Employer Securities shall be deemed forfeited only after all other assets held in such Participant's Account have been forfeited.  If Employer Securities allocated to the Account of such Participant consist of more than one class of such securities, and if any portion of such Employer Securities is forfeited, the Participant shall be treated as forfeiting the same proportion of each such class.  If Employer Securities allocated to the Account of such Participant consist of Employer Securities of more than one Employer, and if any portion of such Employer Securities is forfeited, the Participant shall be treated as forfeiting the same proportion of each such type of Employer Securities.

(c) **Reallocation of Forfeitures**.  Forfeitures that become available for allocation during a Plan Year shall be allocated among the Accounts of Participants entitled to share in the allocation of the Employer's contribution, if any, for that computation period pursuant to Section 6.1.  The allocation shall be made as provided in Section 6.1(a) without regard to the limitation of Section 6.1(e).

**6.3    Omission of Eligible Employee**.  If, in any Plan Year, any person who should be included as an active Participant in the Plan is erroneously omitted and discovery of such omission is not made until after the Employer contribution for the corresponding Plan Year has been made, the Employer will make any necessary corrections in accordance with the requirements of the Employee Plans Compliance Resolution System (EPCRS) program for which the Plan is eligible.

**6.4    Inclusion of Ineligible Employee**.  If, in any Plan Year, any person who should not have been included as an active Participant in the Plan is erroneously included and discovery of such incorrect inclusion is not made until after the Employer contribution for the corresponding Plan Year has been made, the Employer will make any necessary corrections in accordance with the requirements of the Employee Plans Compliance Resolution System (EPCRS) program for which the Plan is eligible.

6.5 **Special Rules for Top-Heavy Plans**.

   (a)    **General Rule**.  Notwithstanding any provision of Section 6.1 of the Plan to the contrary, and except as provided in Section 6.5(b), any person who was eligible to be an active Participant at any time during a Plan Year during which the Plan was Top-Heavy shall share in the allocation provided for in Section 6.1 of the Plan for the Plan Year ending in such Plan Year if he or she remained in the employ of the Employer or an Affiliated Company through the end of the Plan Year with respect to which such allocation applies.

   (b)    **Exceptions to the General Rule**.  The provisions of Section 6.5(a) shall not apply to any Participant for a Plan Year if, with respect to that Plan Year:

      (1)    such Participant was an active Participant in a qualified defined benefit pension plan sponsored by the Employer or by an Affiliated Company under which plan the Participant's accrued benefit is not less than the minimum accrued pension benefit that would be required under Code Section 416(c)(1), treating such defined benefit pension plan as a Top-Heavy plan and treating all such defined benefit pension plans as constitute an Aggregation Group as a single plan; or

      (2)    such Participant was an active Participant in a qualified defined contribution plan sponsored by the Employer or by an Affiliated Company under which plan the amount of the employer contribution allocable to the account of the Participant for the Plan Year of such plan ending with or within the Plan Year is not less than the contribution allocation that would be required under Code Section 416(c)(2) under the plan; or

      (3)    the requirements of Code Section 416(c) are otherwise satisfied by a combination of benefit accruals under plans of the types described in paragraphs (b)(1) and (b)(2) hereof.

6.6 **Top-Heavy Plan Minimum Allocation**.  The allocation made under Section 6.1 of the Plan to the Account of each active Participant who is a Non-Key Employee for any Plan Year in which the Plan is Top-Heavy shall be not less than the least of:

   (a)    Three percent of the Top-Heavy Compensation of each such Participant for such Plan Year; or

   (b)    The percentage of Compensation so allocated under Section 6.1 to the Account of the Key Employee for whom such percentage is the highest for such Plan Year; or

   (c)    The amount which, when added to benefits accrued under other qualified plans sponsored by the Employer or by an Affiliated Company, satisfies the lesser of the amounts described in Subsections (a) and (b) hereof.

Provided, however, no contribution for the Plan Year shall be required if three percent of the Top-Heavy Compensation of a Participant for any Plan Year in which the Plan is

Top-Heavy is contributed on behalf of the Participant in another defined contribution plan maintained by the Employer or by an Affiliated Company.

For the purposes of determining whether or not the provisions of this Section have been satisfied, (i) contributions or benefits under Chapter 2 of the Code (relating to tax on self-employment income), Chapter 21 of the Code (relating to Federal Insurance Contributions Act), Title II of the Social Security Act, or any other federal or state law shall be disregarded; and (ii) all defined contribution plans in the Aggregation Group shall be treated as a single plan. For the purposes of determining whether or not the requirements of this Section have been satisfied, contributions allocable to the account of the Participant under any other qualified defined contribution plan that is part of the Aggregation Group shall be deemed to be contributions made under the Plan, and, to the extent thereof, no duplication of such contributions shall be required hereunder solely by reason of this Section. This Section shall not apply in any Plan Year in which the Plan is part of an Aggregation Group containing a defined benefit pension plan (or a combination of such defined benefit pension plans) if the Plan enables a defined benefit pension plan required to be included in such Aggregation Group to satisfy the requirements of either Code Section 401(a)(4) or Code Section 410.

6.7    **Annual Additions Limitations**.  The Annual Addition that may be contributed or allocated to a Participant's Account under the Plan for any Limitation Year shall not exceed the lesser of:

(a)    $53,000 (in 2015), as adjusted for increases in the cost-of-living under Code Section 415(d), or

(b)    100 percent of the Participant's Compensation, within the meaning of Code Section 415(c)(3), for the Limitation Year.

The compensation limit referred to in (b) above shall not apply to any contribution for medical benefits after severance from employment (within the meaning of Code Section 401(h) or Section 419A(f)(2)) which is otherwise treated as an Annual Addition.

Compensation under the Plan includes compensation that is paid after an Employee severs employment with the Employer, provided the compensation is paid by the later of 2½ months after severance from employment with the Employer or the end of the Limitation Year that includes the date of severance from employment with the Employer and those amounts would have been included as compensation if they were paid prior to the Employee's severance from employment. For this purpose, the following amounts will be included in compensation: compensation for services during the Employee's regular working hours, or compensation for services outside the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments. The following amounts will not be included in the definition of Compensation: (i) payment for unused accrued bona fide sick, vacation, or other leave; (ii) payments received by an Employee pursuant to a nonqualified unfunded deferred compensation plan, and (iii) other post-severance payments, such as severance pay, parachute payments within the meaning of Code Section 280G(b)(2), or post-severance

27

payments under a nonqualified unfunded deferred compensation plan that would not have been paid if the Employee had continued in employment, even if such amounts are paid within the time period described in this paragraph.

Compensation includes amounts that are includible in the gross income of an Employee under the rules of Code Section 409A or Section 457(f)(1)(A) or because the amounts are constructively received by the Employee.

Compensation for a Limitation Year includes amounts earned during that Limitation Year but not paid during that Limitation Year solely because of the timing of pay periods and pay dates if: (i) These amounts are paid during the first few weeks of the next Limitation Year; (ii) The amounts are included on a uniform and consistent basis with respect to all similarly situated Employees; and (iii) No compensation is included in more than one Limitation Year.

Restorative payments allocated to a Participant's account, which include payments made to restore losses to a Plan resulting from actions (or a failure to act) by a fiduciary for which there is a reasonable risk of liability under Title I of ERISA or under other applicable federal or state law, where similarly situated Participants are similarly treated, do not give rise to an annual addition for any Limitation Year.

In determining the Annual Additions to a Participant's Account, with respect to Employer Securities the Plan will use the lesser of the Employer's contribution or the fair market value of the Employer Securities allocated to the Participant's Account, determined as of the date with respect to which the allocation is made.

In the event that the amount tentatively available for allocation to the Account of any Participant in any Limitation Year exceeds the maximum permissible hereunder, the Participant's share of Employer contributions and reallocable forfeitures shall be reduced to the extent necessary to result in conformity to the limitations expressed herein, provided that for any Limitation Year in which the Plan meets the requirements of Code Section 415(c)(6), the limitations described in this Section shall not apply to any portion of a Participant's Annual Additions representing either forfeitures of any Employer Securities which were acquired with the proceeds of an Exempt Loan or Employer contributions made pursuant to Sections 4.1 and 7.1 to enable the Trustee to make interest payments on Exempt Loans. Amounts released pursuant to the preceding sentence shall then be reallocated among the Accounts of the remaining active Participants as though an additional Employer contribution were made for allocation for the Plan Year ending with or within said Limitation Year, provided, however, that such amounts shall be credited to the Accounts of Participants only to the extent that is permissible without causing any such Accounts to experience Annual Additions in excess of the maximum allowable hereunder. If, after all such reallocations have been completed, there remains a reallocable amount which cannot be reallocated to the Accounts of any of the active Participants (because all such Accounts have been credited with the maximum allowable Annual Addition for the Limitation Year in issue) such remaining reallocable amount shall be placed in a suspense account, to be held and applied as an additional Employer contribution in the next succeeding Limitation Year(s) until exhausted. Notwithstanding

the foregoing and the other provisions of this Section, effective with respect to any Limitation Years beginning on or after July 1, 2007, if the Annual Additions are exceeded for any Participant, then the Plan shall correct such excess in accordance with the Employee Plans Compliance Resolution System (EPCRS) as set forth in Revenue Procedure 2013-12 or any superseding IRS guidance.

This paragraph applies if, in addition to this Plan, the Participant is covered under another qualified defined contribution plan or welfare fund, as defined in Code Section 419(e), maintained by the Company during any Limitation Year (the "Other Plans"). The Annual Additions which may be credited to a Participant's Accounts under this Plan for any such Limitation Year will not exceed the maximum permissible amount reduced by the Annual Additions credited to a Participant's Account under the Other Plans for the Limitation Year. If the Participant's Annual Additions under this Plan and the Other Plans would exceed the maximum permissible amount, before any adjustment is made in this Plan, any excess amount for the Limitation Year attributable to 401(k) or Roth deferrals made to an Other Plan by a Participant in this Plan will be disposed of by returning to the Participant any such deferrals (and earnings thereon), to the extent of the lesser of the amount necessary, as to the Participant, (i) to eliminate the excess amount, or (ii) to reduce the deferral contributions of the Participant to zero. If, after the adjustment specified in the preceding sentence has been made, the Annual Additions with respect to the Participant under this Plan and the Other Plans in the aggregate are greater than the maximum permissible amount, no further amounts will be contributed or allocated to the Participant's Accounts under this Plan for the Limitation Year, and any excess amount attributed to this Plan will be disposed in the manner described in the previous paragraph.

**6.8**  **Restrictions on Allocations**.  Notwithstanding any provision of the Plan to the contrary, if shares of Employer Securities are sold to the Plan by a shareholder in a transaction for which special tax treatment is elected by such shareholder pursuant to Code Section 1042, no assets attributable to such Employer Securities may be allocated (i) during the Nonallocation Period (as defined below) to the Account of such shareholder, any person who is related to such shareholder (within the meaning of Code Section 267(b), but excluding lineal descendants of such shareholder as long as no more than five percent of the aggregate amount of all Employer Securities sold by such shareholder in a transaction to which Code Section 1042 applies is allocated to lineal descendants of such shareholder), or (ii) at any time, to any other person who owns (after application of Code Section 318(a)) more than 25 percent in value of the outstanding securities of the Employers or more than 25% of any class of outstanding Company Stock. Further, no allocation of contributions may be made to the Accounts of such persons unless additional allocations are made to other Participants, in accordance with the provisions of Code Sections 401(a) and 410. The phrase "Nonallocation Period" means the period beginning on the date of sale and ending on the later of ten years after the date of sale or the date of the allocation attributable to the final payment on the Exempt Loan incurred with respect to the sale.

A 1042 election, as described above, can only be made if the Employer is a C corporation.

**ARTICLE VII**
**ADMINISTRATIVE PROVISIONS**

7.1     **Application of Employer Contributions**.  All contributions made by the Employer for the purpose of making payments on an Exempt Loan shall be paid over to the Trustee and shall be timely applied by the Trustee, to the principal and interest payments on the Exempt Loan for which the contribution is made.

7.2     **Valuations**.  The Fund (and each of its Subfunds) shall be valued by the Trustee at fair market value annually as of the close of business on the Annual Valuation Date.  A similar valuation (or the partial valuation of one or more Subfunds, if appropriate) may occur at the end of any calendar month upon the direction of the Plan Administrator.  The Plan's Employer Securities shall be valued in accordance with applicable law by an Independent Appraiser as of each Valuation Date and at such other times as determined necessary by either the Plan Administrator or the Trustee.

7.3     **Crediting of Contributions**.  Any contribution made in respect of any Plan Year by the Employer shall be deemed to have been made, for purposes of allocating the contribution among eligible Participants' Accounts pursuant to Article VI, immediately after the valuation occurring at the end of the Plan Year in which ends the Plan Year with respect to which such contribution was made.

7.4     **Crediting of Investment Results, Adjustment of Accounts, and Dividends**.

(a)     There shall be credited to the Participant's Company Stock Subaccount in his/her Account his/her interest in the Employer Securities held by the Fund for that Account (which shall be so credited in full and fractional shares to the fourth decimal place) together with all distributions (whether in the form of Employer Securities (as, for example, stock dividends and shares issued pursuant to "stock splits") or in the form of other assets (as for example, cash dividends)) attributable to the Employer Securities so credited.  The Trustee may debit a Participant's Company Stock Subaccount with one type of Employer Securities provided the Trustee credits such Participant's Company Stock Subaccount with another type of Employer Securities equal in fair market value as determined by the Independent Appraiser as of such date.  The Trustee may debit a Participant's Company Stock Subaccount provided the Trustee credits such Participant's Other Investments Subaccount on the date of such debit with assets equal to the fair market value of the Employer Securities debited as determined by the Independent Appraiser as of such date.

(b)     There shall be credited to the Participant's Other Investments Subaccount in his/her Account his/her interest in the assets held by the Fund other than in the form of Employer Securities (excluding cash dividends distributed to the Participant or reinvested in Employer Securities, as provided in Subsection (d)) and other distributions in respect of the Employer Securities).  The Trustee may debit a Participant's Other Investments Subaccount provided the Trustee credits such Participant's Company Stock Subaccount on the date of such debit with

30

Employer Securities equal in fair market value as determined by the Independent Appraiser as of such date.

(c)     As of any Valuation Date, the earnings and accretions of the Fund attributable to investment of Fund assets other than Employer Securities, reduced by losses experienced (whether or not realized) and expenses incurred since the preceding Valuation Date shall be credited to the Other Investments Subaccounts of the Participants and Beneficiaries who had unpaid balances in their Other Investments Subaccount parts of their respective Accounts as of such Valuation Date in proportion to the balances in such Other Investments Subaccount parts as of the prior Valuation Date, after reducing such prior Valuation Date balances by the amounts withdrawn or distributed to or on account of the Participant or Beneficiary since such immediately past Valuation Date, if any. For the purposes of this Subsection, the balance in any Participant's or Beneficiary's Other Investments Subaccount shall not include values contained in the contracts of life insurance, if any, held as a general asset of the Fund.

(d)     As promptly as practicable following the initial crediting to the Company Stock Subaccount part of a Participant's Account of distributions received on account of assets held in such Company Stock Subaccount part, all such assets so credited that do not consist of Employer Securities shall be credited to the Participant's Other Investments Subaccount part of the same Account, except that the Plan Administrator may (1) direct the Trustee to pay to each Participant any cash dividends with respect to shares of Employer Securities allocated to his/her Account that are not applied to repay an Exempt Loan or credited to the Participant's Other Investments Subaccount and accumulated in the Trust, or (2) direct the Trustee either to pay such cash dividends as provided in clause (1) or to reinvest such cash dividends in Employer Securities, as elected by the Participant. Reinvested dividends shall be 100% vested.

**7.5    Exercise of Shareholder Voting Rights**.

Except as otherwise provided in this Section 7.5, all Employer Securities held by the Trust shall be voted by the Trustee at the direction of the ESOP Committee. If the ESOP Committee fails or refuses to give the Trustee timely instructions, the Trustee will exercise its power to vote such Employer Securities. Provided, however, any voting instructions given by the ESOP Committee to the Trustee shall be subject to the independent review of the Trustee as to whether such instructions are in accordance with ERISA and in the best interest of the Participants and, based on such review, the Trustee may vote (or determine to withhold its vote) in a manner which differs from the instructions received from the ESOP Committee.

(a)     Notwithstanding the foregoing, Participants and/or Beneficiaries shall be entitled to direct the voting of any Employer Securities allocated to their Accounts with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution,

sale of substantially all the assets of a trade or business, or other similar transactions prescribed by Code Section 409(e) or regulations thereunder.

(b)     Subject to the direction of the ESOP Committee, if applicable, the Trustee shall exercise the voting rights with respect to Employer Securities held in the Suspense Account described in Section 7.7 as it in its sole discretion shall determine, except to the extent such exercise would, in the judgment of the Trustee, be imprudent or otherwise conflict with its understanding of its fiduciary responsibilities under ERISA.

7.6     **Purchase of Employer Securities**.  The Trustee shall have the right to purchase Employer Securities on behalf of Participants.  Such purchases shall be made with assets of the Fund, if any, held from time to time in the Other Investments Subaccount portions of Participants' Accounts.  Any such purchase shall be accomplished in such a manner as to give each Participant an interest in the Employer Securities so purchased (which shall then be credited to a separate Subaccount (and respective Company Stock Subaccount parts thereof) of each such Participant's Account) so that the Company Stock Subaccount part of a Participant's Account can reflect separately his/her share of Employer Securities purchased with the proceeds of Exempt Loans and his/her share of Employer Securities purchased from time to time with the Other Investments Subaccount portion of his/her Account and Subaccount.  The Employer Securities purchased in each such transaction shall be allocated among Participants' Subaccounts in the same ratio of all Employer Securities purchased in that transaction as the value of each Participant's Other Investments Subaccount part of his/her Account as of the Valuation Date coincident with or last preceding such purchase bore to the aggregate values of the Other Investments Subaccounts of all Participant Accounts of the Participants as of that Valuation Date.  In the event Employer Securities of more than one Employer are purchased in accordance with Section 7.6, each type of Employer Securities shall be allocated among Participants' Subaccounts in the same ratio as each type of Employer Securities purchased bears to the aggregate amount of Employer Securities purchased.

7.7     **Suspense Account**.  In the event that an Exempt Loan is made to the Trust for the purpose of purchasing Employer Securities, all assets acquired with the proceeds of the Exempt Loan shall be added to and maintained in a Suspense Account established by the Trustee for such purpose.  For each Plan Year during the duration of an Exempt Loan, the securities released from encumbrance, or, if there be no such encumbrance, the securities becoming available for allocation with respect to such Plan Year, shall be allocated in non-monetary units (in full and fractional shares to the fourth decimal place) to the Company Stock Subaccounts of the Accounts of Participants as of the end of such Plan Year in accordance with Section 6.1(d).

Notwithstanding the foregoing provisions of this Section, that portion of the released Employer Securities for that Year attributable to the payments made on an Exempt Loan from dividends paid with respect to Employer Securities acquired with that Exempt Loan that had been allocated to Company Stock Subaccounts of a Participants prior to the payment of such dividends shall be credited to that Participant's Company Stock

Subaccount in an amount equal to the value of the dividends so paid, in accordance with subsection 7.4(b).

Employer Securities held in the Suspense Account on account of any Exempt Loan shall be released from the Suspense Account for allocation to Participants' Accounts as of the end of each Plan Year by multiplying the number of Employer Securities held in the Suspense Account as of the end of that Plan Year with respect to that Exempt Loan by a fraction selected by the Plan Administrator: (i) the numerator of which is the amount of the principal and interest paid on that Exempt Loan for that Plan Year, and the denominator of which is the sum of the numerator plus the principal and interest to be paid for all future years on that Exempt Loan; or (ii) the numerator of which is the amount of principal paid on that Exempt Loan for that Plan Year, and the denominator of which is the sum of the numerator plus the principal to be paid for all future years on that Exempt Loan.  For any Exempt Loan, only the fraction described in (i) or (ii) shall be used, not both.  The number of future years under the Exempt Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods.  If the interest rate under any Exempt Loan is variable, the interest to be paid in future years shall be computed by using the interest rate applicable as of the end of the Plan Year.  If the Employer Securities held in the Suspense Account with respect to a particular Exempt Loan includes more than one class of such securities, the number of such securities of each class to be released for a Plan Year shall be determined by applying the same fraction to each class.  This paragraph shall be applied in accordance with the principles of Code Section 4975 and the regulations thereunder.

Any dividends or other income received by the Plan in connection with Employer Securities held in the Suspense Account shall be applied to the repayment of principal and interest on the Exempt Loan with respect to which such Employer Securities are held (or if such income exceeds the principal and interest payments due in the Plan Year in which an Exempt Loan is repaid in its entirety, then such excess shall be treated as allocable pursuant to Section 7.4 of the Plan).  Cash dividends on shares allocated to a Participant may be used to repay an Exempt Loan as long as the Participant receives Employer Securities with a fair market value at least equal to the dividend.

Notwithstanding the preceding paragraphs, a loan will not fail to be an Exempt Loan merely because the number of securities to be released from encumbrance is determined solely with reference to principal payments.  However, if release is determined with reference to principal payments only, the following additional requirements apply:  (i) The loan must provide for annual payments of principal and interest at a cumulative rate that is not less rapid at any time than level annual payments of such amounts for 10 years; (ii) Interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables; and (iii) In the event of any renewal, extension, or refinancing, the sum of the expired duration of the Exempt Loan, the renewal period, the extension period, and the duration of a new Exempt Loan may not exceed 10 years.

7.8    **Domestic Relations Orders**.

(a)    **Determination of QDRO Status**.  Upon receipt of notification of any judgment, decree or order (including approval of a property settlement agreement) which relates to the provision of child support, alimony payments, or marital property rights of a spouse, former spouse, child, or other dependent of a Participant and which is made pursuant to a state domestic relations law (including a community property law) (herein referred to as a "domestic relations order"), the Plan Administrator shall (a) notify the Participant and any prospective Alternate Payee named in the order of the receipt and date of receipt of such domestic relations order and of the Plan's procedures for determining the status of the domestic relations order as a QDRO, and (b) within a reasonable period after receipt of such order, determine whether it constitutes a QDRO.  The Plan's procedures for the determination of QDRO status of a domestic relations order shall be set forth by the Plan Administrator in writing, shall provide for the notification of each person specified in that order as entitled to payment of benefits under the Plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the Plan Administrator of such domestic relations order, and shall permit the prospective Alternate Payee to designate a representative for receipt of copies of notices that are sent to the prospective Alternate Payee with respect to a domestic relations order.  A domestic relations order shall be determined to be a QDRO only if such order (i) does not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan, (ii) does not require the Plan to commence payment of benefits any earlier than they would otherwise be payable to the Participant with respect to whom the QDRO is issued, (iii) does not require the Plan to provide increased benefits, and (iv) does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another order previously determined to be a QDRO.

Effective April 6, 2007, a domestic relations order that otherwise satisfies the requirements for a QDRO will not fail to be a QDRO: (i) solely because the order is issued after, or revises, another domestic relations order or QDRO; or (ii) solely because of the time at which the order is issued, including issuance after the annuity starting date or after the Participant's death.  Such a domestic relations order is subject to the same requirements and protections that apply to QDROs.

(b)    **Determination Period**.  During any period in which the issue of whether a domestic relations order is a QDRO is being determined (by the Plan Administrator, by a court of competent jurisdiction, or otherwise), including the period beginning on the date of the Plan Administrator's receipt of the order, the Plan Administrator shall segregate in a separate account in the Plan or in an escrow account held by a Trustee the amounts, if any, which would have been payable to the Alternate Payee during such period if the order had been determined to constitute a QDRO, provided that, if no payments would otherwise

34

be made under the Plan to the Alternate Payee or to the Participant or a Beneficiary of the Participant while the status of the order as a QDRO is being determined, no segregation into a separate or escrow account shall be required. If a domestic relations order is determined to be a QDRO within eighteen months of the date of its receipt by the Plan Administrator (or from the beginning of any other period during which the issue of its being a QDRO is being determined by the Plan Administrator), the Plan Administrator shall cause to be paid to the persons entitled thereto the amounts, if any held in the separate or escrow account referred to above. If a domestic relations order is determined not to be a QDRO, or if the status of the domestic relations order as a QDRO is not finally resolved within such eighteen month period, the Plan Administrator shall cause the separate account or escrow account balance, as determined after the next following Valuation Date, to be returned to the Participant's Account or to be paid to the person or persons to whom such amount would have been paid if there had been no such domestic relations order, whichever shall apply. Any subsequent determination that such domestic relations order is a QDRO shall be prospective in effect only.

(c)     **Provisions Relating to Alternate Payees**.

(1)     Benefits payable to an Alternate Payee shall be permitted after the affected Participant has separated from service and at such time as the affected Participant could have commenced distribution. Distributions to Alternate Payees shall be subject to the provisions of Article XI regarding method of distribution and limitations on the amount of annual distribution.

(2)     None of the payments, benefits or rights of any Alternate Payee shall be subject to any claim of any creditor, and, in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Alternate Payee. No Alternate Payee shall have the right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he/she may expect to receive, contingently or otherwise, under the Plan.

(3)     Alternate Payees shall not have any right to (A) borrow money under any Participant loan provisions under the Plan, (B) exercise any Participant investment direction rights or privileges under the Plan, except to the extent diversification is elected by the Participant pursuant to Section 7.9, (C) exercise any other election, privilege, option or direction rights of the Participant under the Plan except as specifically provided in the QDRO, or (D) receive communications with respect to the Plan except as specifically provided by law, regulation or the QDRO.

(4)     Each Alternate Payee shall advise the Plan Administrator in writing of each change of his/her name, address or marital status, and of each change in the provisions of the QDRO or of any circumstance set forth therein

which may be material to the Alternate Payee's entitlement to benefits thereunder or the amount thereof. Until such written notice has been provided to the Plan Administrator, the Plan Administrator shall be (i) fully protected in not complying with, and in conducting the affairs of the Plan in a manner inconsistent with, the information set forth in such notice, and (ii) required to act with respect to such notice prospectively only, and then only to the extent provided for in the QDRO. The Plan Administrator shall not be required to modify or reverse any payment, transaction or application of funds occurring before the receipt of any notice that would have affected such payment, transaction or application of funds, nor shall the Plan Administrator or any other party be liable for any such payment, transaction or application of funds.

(5)     Except as specifically provided for in the QDRO, an Alternate Payee shall have no right to interfere with the exercise by the Participant or by any Beneficiary of their respective rights, privileges and obligations under the Plan.

**7.9**     **Diversification of Investments**. Within 90 days after the close of each Plan Year in the Qualified Election Period, each Qualified Participant shall be permitted to direct the Plan as to the investment of not more than 25 percent of the value of the Participant's Employer Securities allocated to his/her Account to the extent such value exceeds the amount to which a prior election, if any, applies. In the case of the sixth year of the Qualified Election Period, the preceding sentence shall be applied by substituting "50 percent" for "25 percent." The Participant's direction shall be completed no later than 90 days after the close of the 90-day election period.

The Plan Administrator shall either (i) offer at least three investment options (not inconsistent with regulations prescribed by the Internal Revenue Service) to each Participant who makes an election under this Section, or (ii) in lieu of offering such investment options, the Plan Administrator may direct that all amounts subject to Participant elections under this Section be distributed to Qualified Participants. All such distributions shall be distributed within 90 days after the close of the 90-day election period. If the Employer maintains a 401(k) plan that offers at least three diversified investment options, the Employer may, in its discretion and at the election of the Qualified Participant, provide the election specified in this Section by transferring the diversified funds to a rollover account in the 401(k) plan to be invested by the Qualified Participant.

For purposes of this Section, the following terms shall have the following meanings:

(a)     "Qualified Election Period" means the six Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant.

(b)     "Qualified Participant" means any Participant who has completed ten Years of Participation for Diversification Election in the Plan and has attained age 55.

**7.10** <u>**Cash Dividends**</u>.  Cash dividends, if any, on shares of Employer Securities allocated to Participants' Accounts may be (1) accumulated in the Trust, (2) used to repay an Exempt Loan as provided below, (3) paid to Participants currently, or (4) at the election of a Participant, paid as provided in clause (3) or reinvested in Employer Securities, as determined in the sole discretion of the Plan Administrator, exercised in a uniform and nondiscriminatory manner.  Provided the Company is classified as a C corporation, it is intended that the Employer shall be allowed a deduction with respect to any dividends paid on allocated shares of Employer Securities of any class held by the Plan on the record date to the extent such dividends (i) are paid in cash directly to the Participants, or their Beneficiaries, or are paid to the Plan and are distributed from the Plan to the Participants or their Beneficiaries not later than 90 days after the close of the Plan Year in which paid, or (ii) are reinvested in Employer Securities at the election of a Participant; provided, however, that the Employer shall not be required to pay or distribute any dividends with respect to the nonvested portion of the Account of a Participant who has terminated employment prior to the date such dividends are paid directly to Participants, or are distributed from the Plan to the Participants, or are reinvested in Employer Securities at the election of a Participant.  It is also intended that the Employer shall be allowed a deduction for any dividends used to make payments on an Exempt Loan the proceeds of which were used to acquire the Employer Securities (whether or not allocated) with respect to which the dividend is paid, provided that in the case of dividends paid on allocated shares, Employer Securities with a value equal to such dividends are allocated to such Participants for the year in which such dividends would otherwise have been allocated to such Participants.

Reinvested dividends shall be 100% vested.

Notwithstanding anything to the contrary in this Section 7.10, any cash dividends paid on shares of Employer Securities shall first be used to repay an Exempt Loan used to acquire the Employer Securities with respect to which the cash dividends are paid.

## ARTICLE VIII
## RETIREMENT AND DISABILITY BENEFITS

8.1     **Normal Retirement Benefit**.  The normal retirement benefit payable with respect to any Participant retiring at his/her Normal Retirement Date shall be equal to 100 percent of his/her Account as of the Valuation Date coincident with or next following the Participant's Normal Retirement Date.

8.2     **Deferred Retirement Benefit**.  The deferred retirement benefit shall be payable with respect to any Participant who retires after his/her Normal Retirement Date, and shall be equal to 100 percent of his/her Account as of the Valuation Date coincident with or next following the Participant's actual retirement, or, if earlier, the Valuation Date preceding the Participant's Required Beginning Date.  There shall be added to the Participant's deferred retirement benefit all amounts allocated to his/her Account after the Valuation Date as of which the amount thereof is initially determined.

8.3     **Disability Benefit**.  The disability benefit shall be payable with respect to any Participant who has suffered Total Disability and who has a Separation from Service Date by reason of such Total Disability.  The disability benefit shall be equal to 100 percent of the Participant's Account as of the Valuation Date coincident with or next following the Participant's disability separation date, subject, however, to continued investment participation to the Valuation Date immediately preceding the date of distribution in the case of any Participant with respect to whom the distribution of the disability benefit described herein is deferred for a period in excess of one year after the Valuation Date coincident with or next following the date of his/her disability termination of employment.

8.4     **Effect of QDRO**.  All benefits provided under this Article are subject to the provisions of any QDRO in effect with respect to the Participant at the Participant's Benefit Commencement Date, and are subject to diminution thereby.  A QDRO will not fail to be a QDRO: (i) solely because the order is issued after, or revises, another domestic relations order or QDRO; or (ii) solely because of the time at which the order is issued, including issuance after the annuity starting date or after the Participant's death.

## ARTICLE IX
## DEATH BENEFITS AND SURVIVING SPOUSE'S BENEFITS

9.1     Pre Distribution Death Benefit.  If the death of the Participant occurs prior to his/her Benefit Commencement Date, there shall be paid a benefit equal to 100 percent of his/her Account to be distributed at the discretion of the Employer (i) in a lump sum or (ii) in approximately equal installments over a period of not more than five years (except as provided in Section 11.1(c)), and determined as of the Valuation Date of the Plan coincident with or next following the date of his/her death, subject, however, to continued investment participation to the Valuation Date immediately preceding the date of distribution in the case of any death benefit with respect to which distribution is deferred for a period in excess of one year after the Valuation Date coincident with or next following the date of the Participant's death.  The person or persons to whom such benefit shall be payable shall be determined as follows:

(a)     **Surviving Spouse's Benefit**.  If the Participant is survived by his/her Spouse, the benefit hereunder shall be paid to such surviving Spouse except (1) to the extent that the Spouse has consented, in a written instrument complying with all of the provisions of Section 9.3, to the payment of such benefit to another Beneficiary (or Beneficiaries) designated by the Participant, and (2) to the extent that there is a QDRO applicable to such benefit.

(b)     **Benefit Payable to Others**.  If the Participant (1) is not survived by a Spouse, (2) is survived by a Spouse who has consented, in accordance with the provisions of Section 9.3, to the designation of a Beneficiary or Beneficiaries other than such Spouse (but only to the extent of the portion of the Participant's Account subject to such consent), or (3) is subject to a QDRO at the time of his/her death (but only to the extent of the QDRO), the benefit hereunder shall be paid to the Participant's Beneficiary determined in accordance with the provisions of Section 9.4 hereof, subject, however, to the provisions of any QDRO then in force.

(c)     **Coincidental Death of Participant and Spouse**.  If the spouse of a Participant dies at the same time as the Participant, or if the Participant and his/her spouse die under circumstances such that it is difficult to determine the order of their deaths, the Participant shall be deemed to have survived his/her spouse for the purposes of the Plan.

9.2     **Post Distribution Commencement Death Benefit**.  In the event of the death of a Participant whose benefits are in a "pay status" (*i.e.*, after his/her Benefit Commencement Date), the death benefit shall be determined by the provisions of any installment payout arrangements in force at the time of his/her death.  If there be no such provisions in force, the death benefit shall be 100 percent of the undistributed vested balance of his/her Account, which undistributed balance shall be treated in the same manner as a pre-distribution death benefit under Section 9.1.

9.3     **Spousal Consent to Designation of Alternative Beneficiary**.  A spouse may consent to the designation by the Participant of one or more Beneficiaries other than such spouse to

receive benefits in the event of the death of the Participant.  Any such consent shall be in writing, and shall:

(a)     acknowledge the effect of such consent;

(b)     be witnessed by a representative of the Plan or by a notary public;

(c)     be subject to any QDRO applicable to the Participant at the time of his/her death or at the Benefit Commencement Date;

(d)     be subject to limitations expressed therein by the spouse as to the portion of the Participant's Account (expressed as a percentage or in dollar terms) to which it applies;

(e)     acknowledge the specific non-spouse Beneficiary, including any class of Beneficiaries or any contingent Beneficiaries to which it applies;

(f)     be subject to revocation in writing by such spouse if the revocation is delivered to the Plan Administrator not later than (1) the Participant's Benefit Commencement Date, or (2) in the case of a Participant who had not reached the earlier of (A) his/her Benefit Commencement Date or (B) his/her Normal Retirement Age, the date of the Participant's death; and

(g)     become null and void upon the termination of the marriage between the Participant and such spouse.

**9.4**     **Beneficiary Designation**.

(a)     **Spouse as Beneficiary**.  The primary Beneficiary of each married Participant shall be his/her Spouse except to the extent that there is in force a consent, executed by such Spouse and complying with the provisions of Section 9.3, to the designation of one or more Beneficiaries other than such Spouse.

(b)     **Beneficiary Designation Right**.  Each unmarried Participant and each married Participant whose spouse has consented to designation of persons or entities other than such spouse as Beneficiaries in accordance with the provisions of Section 9.3, shall have the right to designate one or more primary and one or more contingent Beneficiaries to receive any benefit becoming payable pursuant to this Article IX.  All Beneficiary designations shall be in writing in form satisfactory to the Plan Administrator.  Each Participant shall be entitled to change his/her Beneficiaries at any time and from time to time, subject to such spousal consent requirements as may then be applicable.  To complete or change a Beneficiary designation, the Participant shall complete a form supplied by the Plan Administrator and return the completed form to the Plan Administrator.  Only satisfactorily completed forms returned to the Plan Administrator will be sufficient to designate or change the Beneficiary.

**9.5**  **Effect of QDRO**.  Notwithstanding any other provision of this Article, the Plan Administrator and the Trustee shall give full effect to any QDRO applicable at the time of the death of the Participant, even to the extent that giving effect to such QDRO defeats or diminishes the interest of any Spouse or other Beneficiary hereunder.

**9.6**  **Death Benefits While in Qualified Military Service**.  If a Participant dies while performing qualified military service (as defined in Code Section 414(u)), the survivors of the Participant are entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan as if the Participant had resumed and then terminated employment on account of death.

## ARTICLE X
## NONFORFEITURE PROVISIONS (VESTING)

**10.1** **Deferred Vested Interests**.  A Participant's vested interest in his/her Account shall be determined from the following table:

| Years of Service for Vesting | Vested Percentage |
|---|---|
| Fewer than 3 years | None |
| 3 years or more | 100% |
| | |
| Participant attains Normal Retirement Age, dies, or incurs a Total Disability while in the employ of the Employer | 100% |

**10.2** **Amendments to the Vesting Schedule**.

(a)    **Automatic Amendment**.  In the event that the Plan is or becomes Top Heavy, the table set forth below shall be substituted for that portion of the table set forth in Section 10.1 that relates vesting solely to Years of Service.

| Years of Service for Vesting | Vested Percentage |
|---|---|
| Fewer than 3 years | None |
| 3 years or more | 100% |

(b)    **Participant's Election**.

(1)    If the vesting schedule under the Plan is amended, each Participant who has completed at least three Years of Service with the Employer may elect, during the election period specified in this Section, to have the vested percentage of his/her Account derived from Employer contributions determined without regard to such amendment.

(2)    For the purposes of this Section, the election period shall begin as of the date on which the amendment changing the vesting schedule is adopted, and shall end on the latest of the following dates:

(A)    the date occurring 60 days after the Plan amendment is adopted; or

(B)    the date which is 60 days after the day on which the Plan amendment becomes effective; or

(C)    the date which is 60 days after the day the Participant is issued written notice of the Plan amendment by the Plan Administrator or by the Employer; or

(D)    such later date as may be specified by the Plan Administrator.  The election provided for in this Section shall be made in writing and shall be irrevocable when made.

(c)    **Amendment of Vesting Schedule.**

If the Plan's vesting schedule is amended or the Plan is amended in any way that directly or indirectly affects the computation of a Participant's nonforfeitable percentage, or if the Plan is deemed amended by an automatic change to or from a top-heavy vesting schedule, in the case of an Employee who is a Participant as of the later of the date such amendment or change is adopted or the date it becomes effective, the nonforfeitable percentage (determined as of such date) of such Employee's Account balance will not be less than the percentage computed under the Plan without regard to such amendment or change.  With respect to benefits accrued as of the later of the adoption or effective date of the amendment, the vested percentage of each Participant will be the greater of the vested percentage under the old vesting schedule or the vested percentage under the new vesting schedule.

10.3    **Effect of QDRO**.  All benefits provided under this Article are subject to the provisions of any QDRO in effect with respect to the Participant at the Participant's Benefit Commencement Date, and are subject to diminution thereby.

10.4    **Restoration of Forfeitures**.  If a distribution is made to a Participant who has not severed employment and who is not fully vested in his Account and the Participant may increase the Vested percentage in such Account, then, at any relevant time the Participant's vested portion of the Account will be equal to an amount ("X") determined by the formula:

$$X = P(AB \text{ plus } D) - D$$

For purposes of applying the formula: P is the vested percentage at the relevant time, AB is the Account balance at the relevant time, and D is the amount of the distribution.

## ARTICLE XI
## METHODS AND TIMING OF BENEFIT DISTRIBUTIONS

11.1 **Form of Benefit Payments**.  All benefits payable under the Plan from the Company Stock Subaccount shall be paid in the discretion of the Employer (i) in a lump sum or (ii) in five annual installments of cash or Company Stock (except as provided in Section 11.1 (c) below), in accordance with Subsections (a) through (c) below (or such additional annual installments as are required by Subsection (c)); and all benefits payable from the Other Investments Subaccount shall be paid in a lump sum or in annual installments of cash at the discretion of the Employer over the same number of years as the annual installments of Company Stock.  The Participant has the right to demand that his/her entire distribution be in Company Stock.  Notwithstanding the foregoing, if the Employer's charter or bylaws restrict ownership of substantially all shares of Company Stock to Employees and the Trust, as described in Code Section 409(h)(2), the distribution of a Participant's benefit may be made entirely in cash without granting the Participant the right to demand distribution in shares of Company Stock.  Also, if the Employer has in effect an election to be taxed as an S corporation, the distribution of a Participant's benefit shall be made entirely in cash without granting the Participant the right to demand distribution in shares of Company Stock from his/her Company Stock Subaccount.

If the Account of a Participant entitled to a distribution consists in whole or in part of Company Stock, if distribution is to be made in whole or in part of such Company Stock, and if such Company Stock consists of more than one class of securities, the distribution of such Company Stock shall consist of substantially the same proportion of each such class of Company Stock as such classes of Company Stock represent proportions of the Participant's Account.

(a)     If a Participant's Plan Benefit does not exceed $1,000, the Participant will be entitled to a distribution of a lump sum payment as soon as administratively feasible in the Plan Year after the Participant has terminated service with the Employer and any non-vested Account Balance shall be reallocated according to Sections 6.1 and 6.2; or

(b)     If a Participant's Plan Benefit is greater than $1,000, but does not exceed $1,070,000 (in 2016 and as adjusted for increases in the cost of living), his/her Plan Benefit shall be payable in five substantially equal annual installments; or

(c)     In the case of a Participant with an account balance attributable to Company Stock in excess of $1,070,000 (in 2016 and as adjusted for increases in the cost of living), the five year period shall be extended one additional year (but not more than five additional years) for each $210,000 (in 2015) or fraction thereof by which such balance exceeds $1,070,000.  The dollar limits shall be adjusted at the time and in the same manner as provided in Code Section 415(d).

**11.2** __Benefit Commencement Dates__.  Subject to the limitations of Subsection (e) (regarding Company Stock allocated to a Participant's Account pursuant to any repayments of any Exempt Loan), benefits shall commence on the following dates:

(a)  __Zero Vested Account Balance__.  Notwithstanding the provisions of Subsection (e), if the value of an Employee's vested Account is zero upon his/her Termination Date, the Employee shall be deemed to have received a distribution of such Account on such date.

(b)  __Retirement and Disability Benefits__.  Subject to the limitations of Subsection (e) (regarding Company Stock allocated to a Participant's Account pursuant to any repayments of any Exempt Loan), benefits payable by reason of a Participant's termination of employment after attainment of Normal Retirement Age or Total Disability shall, if the Participant so elects, commence as soon as administratively feasible after the close of the Plan Year in which the Participant's Termination Date by reason of such retirement or Total Disability occurs.  If the Participant does not so elect, payment of the Participant's retirement and disability benefits shall commence not later than the 60th day after the latest of the close of the Plan Year in which (1) occurs the date on which the Participant attains the earlier of Age 65 or the Normal Retirement Age specified hereunder (if other than Age 65), (2) occurs the tenth anniversary of the year in which the Participant commenced participation in the Plan, or (3) occurs the Participant's Termination Date, provided that the Participant may, without spousal consent, elect to defer further the commencement of his/her or her retirement or disability benefits. Notwithstanding the foregoing, the Participant's Benefit Commencement Date shall in no event be later than his/her Required Beginning Date.

(c)  __Death Benefits__.  Subject to the limitations of Subsection (e) (regarding Company Stock allocated to a Participant's Account pursuant to any repayments of any Exempt Loan), installment benefits payable by reason of the death of the Participant shall begin to be distributed as soon as administratively feasible after the close of the Plan Year in which the Participant dies.  If any portion of the Account of a Participant is payable after the death of the Participant's Spouse, if the Participant's Spouse was the sole primary Beneficiary with respect to such portion, and if the Participant did not designate a contingent Beneficiary who survives the Participant's Spouse to receive such portion, the Participant's Spouse shall have the right to act on behalf of the deceased Participant to designate one or more Beneficiaries to receive such portion upon the death of such Spouse.  Failure on the part of the Spouse to exercise this power of Beneficiary designation and failure of the Participant's designated contingent Beneficiaries to survive the Spouse shall result in payment to the estate of the deceased Spouse of the amount subject to the Spouse's power of Beneficiary designation.

(d)  **Deferred Vested Benefits**.  Subject to the limitations of Subsection (e) (regarding Company Stock allocated to a Participant's Account pursuant to any repayments of any Exempt Loan), benefits payable to a living Participant by reason of the Participant's Termination Date (other than due to retirement, death or Total Disability) prior to his/her Normal Retirement Age shall, if the Participant so elects, commence as soon as administratively feasible after the close of the Plan Year which is the fifth Plan Year following the Plan Year in which the Participant's Termination Date occurs; provided that, if the Participant is reemployed by the Employer or an Affiliated Company before distribution is required to begin under this sentence, no distribution shall be made of his/her deferred vested benefits until the Participant again has a Termination Date, and the Benefit Commencement Date for such subsequent distribution of the Participant's benefits shall be determined pursuant to whichever provisions of this Section 11.2 shall be applicable to such subsequent Termination Date.  The following additional rules shall apply:

(1)  If the value of the Participant's Account exceeds $1,000 (or such higher amount permitted by Code Section 417(e)), no distribution will be made to the Participant prior to his/her attainment of Normal Retirement Age without his/her written consent;

(2)  If the value of the Participant's Account is $1,000 or less, the Participant's distribution will occur as soon as administratively feasible in the Plan Year following the year in which the Participant terminates employment.

(e)  **Exception for Financed Securities**.  Notwithstanding the foregoing, with respect to all Company Stock allocated to Accounts pursuant to any repayments of any Exempt Loan, the Benefit Commencement Date for the portion of the benefit payable to a Participant attributable to Company Stock purchased with the proceeds of an Exempt Loan shall not be earlier than the earliest of (1) the last day of the Plan Year in which such Exempt Loan is fully repaid pursuant to Code Section 409(o)(1)(B), (2) the Participant's Required Beginning Date or in the case of a deceased Participant, the Required Beginning Date specified in Section 11.8(b)(2), (3) the date on which an eligible Participant elects, at age 55 or later, to diversify investments in accordance with provisions contained in Section 7.9, or (4) the date on which a former Employee is due a cash out distribution of $1,000.  In the case of (2) or (3), the amount distributable with respect to Company Stock will be the amount required for purposes of (2) or (3), respectively.

(f)  **Commencement Date of Distributions When Participant Does Not Sooner Elect**.  Notwithstanding the preceding provisions of Subsections 11.2 (a) – (d), if the Participant does not sooner elect, payment of the Participant's benefits shall commence not later than 90 days (or as soon thereafter as practicable) following the date on which the annual evaluation is complete after the latest of the Plan Year in which (1) occurs the date on which the Participant attains the earlier of Age 65 or the Normal Retirement Age specified hereunder (if other than Age 65),

46

(2) occurs the tenth anniversary of the year in which the Participant commenced participation in the Plan, or (3) occurs the Participant's Termination Date, provided that the Participant may, without spousal consent, elect to defer further the commencement of his/her retirement or disability benefits. Notwithstanding the foregoing, the Participant's Benefit Commencement Date shall in no event be later than his/her Required Beginning Date.

11.3    **Post-Distribution Credits**.   In the event that, after the payment of a single-sum distribution under this Plan, there shall remain in the Participant's Account any funds, or any funds shall be subsequently credited to such Account, such additional funds, to the extent vested, shall be paid to the Participant or applied for the Participant's Account as promptly as practicable.  In the event that after an installment payout has commenced there shall be additional funds credited to the Account of a Participant, the Plan Administrator shall direct adjustment of the remaining installment payments so as to include all such credited amounts, as nearly evenly as possible, in the remaining installment payments.

11.4    **Conditions Attaching to All Distributed Company Stock**.  Unless there exists an active, organized and substantial public market for the class of Company Stock (not including Over the Counter Bulletin Board (OTCBB)) distributed pursuant to this Plan, all such Company Stock shall be subject to the following conditions:

    (a)    **Right of First Refusal**.  No such Company Stock shall be transferable by the Distributee or any person taking by or through the Distributee unless both the Trustee and the Employer have been offered an opportunity to acquire all such Company Stock with respect to which transfer is proposed.  Such right of first refusal shall be subject to the following conditions:

        (1)    the offer of Company Stock by the proposed seller ("the offer") shall be made in writing, delivered by registered or certified mail to both the Trustee and the Employer, and shall be valid for fourteen days after receipt by the Trustee and/or the Employer;

        (2)    the offer may be made simultaneously to both the Trustee and the Employer and shall be subject to acceptance by the Employer only to the extent not accepted by the Trustee;

        (3)    if the offer is not accepted in whole by the Trustee, by the Employer, or by both, it shall be deemed to have been rejected;

        (4)    the purchase price of the Company Stock, and the terms of purchase shall be as follows:

            (A)    the price shall be the greater of:

                (i)    the fair market value of the Company Stock as determined by an Independent Appraiser as of the Anniversary Date coinciding with or immediately preceding the date of

exercise (except in the case of a purchase by a disqualified person within the meaning of Code Section 4975(e)(2) in which case fair market value shall be determined as of the actual date of the transaction by an Independent Appraiser); or

(ii)     the amount offered to the proposed seller in a binding writing by a bona fide prospective purchaser; and

(B)     the terms of purchase shall be:

(i)     cash at closing if at the price established in (A)(i) above, or

(ii)     under the same terms and conditions as set forth in the written offer specified in (A)(ii) above (or, at the Trustee's and/or Employer's option, in cash at closing).

(5)     Each offer pursuant to this Section 11.4(a) shall be accompanied by a true, correct and complete copy of the offer that the Trustee or Employer must match.

(6)     For the purposes of this Section and for all other Plan purposes, "fair market value" means the value determined by an Independent Appraiser as of the Anniversary Date coinciding with or immediately preceding the date of the transaction.  However, for all purposes under the Plan, in the case of a "transaction with a disqualified person" within the meaning of Code Section 4975(e)(2), fair market value shall be determined as of the actual date of the transaction by an Independent Appraiser.

(b)     **Put Option**.  If, at the time of distribution from the Fund, Company Stock is not treated as "readily tradable on an established market" within the meaning of Code Section 409(h), then such Company Stock shall be subject to a put option in the hands of a Qualified Holder.  The put option shall enable the Qualified Holder to sell any or all of the Company Stock received in the distribution to the Employer that employs or employed the Participant or, if either the Plan or Fund so elects, to the Plan or Fund at the fair market value of the Company Stock.

(1)     The put option shall provide that, for a period of 60 days after such shares are distributed to the Qualified Holder (and, if the "put" is not exercised within such 60-day period, for an additional period of 60 days in the following Plan Year), the Qualified Holder will have the right to have the Employer purchase such shares at their fair market value, as defined above.

(2)     The Employer of the Participant, upon the exercise of a put option with respect to a total distribution of a Participant's Account, may satisfy the put option by issuing a note from the Employer to the Qualified Holder in

the amount required to be paid pursuant to the put option.  Such note shall be subject to the following conditions:

(A)     Payment on the note shall be made in substantially equal periodic payments over a period of time not to exceed five years;

(B)     Payments on the note shall begin no later than 30 days after the exercise of the put option;

(C)     The note shall be adequately secured; and

(D)     Reasonable interest shall be paid on the unpaid amount of the note.

(3)     The term "Qualified Holder" means the Participant or Beneficiary receiving the distribution of Company Stock transferred by gift or reason of death, and any trustee of an individual retirement account (as defined under Code Section 408) to which all or any portion of the distributed Company Stock is transferred.

(4)     Any such put option shall be effective solely against the Employer that employs or employed the Participant and shall not obligate the Plan, any other Employer, the Company or the Fund in any manner.  Nonetheless, the Plan and the Fund have the right to elect to purchase any Company Stock that otherwise must be purchased by such Employer pursuant to a Qualified Holder's exercise of any such option, in which case, Subsection (2) shall apply to the Plan or Fund, as the case may be.

(c)     The provisions of Sections 11.4(a) and (b), to the extent that either applies to Company Stock, shall survive (i) repayment of the Exempt Loan with which such Company Stock was acquired, or (ii) cessation of the Plan to meet the requirements applicable to a leveraged employee stock ownership plan.  The provisions of Sections 11.4(a) and (b) regarding the protections and rights of the put option and buy-sell arrangements are non-terminable.

**11.5    Certain Securities Law Restrictions**.  Any distribution of Company Stock pursuant to this Article shall be subject to all applicable laws, rules and regulations and to such approvals by stock exchanges or governmental agencies as may be deemed necessary or appropriate by the Board of Directors.  Each Distributee may be required to give the Employer a written representation that the distribution will not involve a violation of state or federal securities laws, including the Securities Act of 1933, as amended; the form of such written representation will be prescribed by the Board of Directors.

**11.6    Share Certificates**.  Share certificates representing Company Stock distributed pursuant to this Article shall be embossed or inscribed with such legends as the Board of Directors deems necessary or appropriate in respect of the matters referred to in Sections 11.4 and 11.5 above, and stop transfer instructions may be issued in connection therewith.

**11.7** **Eligible Rollover Distributions**.   Except for the restrictions on the distribution of Company Stock set forth in Section 11.1, notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Plan, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.   If the Participant's named Beneficiary is a trust, the Plan may make a direct rollover to an individual retirement account on behalf of the trust, provided the trust satisfies the requirements to be a designated beneficiary within the meaning of Code Section 401(a)(9)(E).

**11.8** **Required Minimum Distributions**.   The requirements of this Section shall apply to any distribution of a Participant's interest and will take precedence over any inconsistent provisions of this Plan to the extent required to make such other distributions or form of distributions conform to the requirements of the regulations under Code Section 401(a)(9) and the minimum distribution incidental benefit requirement of Code Section 401(a)(9)(G).

   (a)    As of the first distribution calendar year, distributions to a Participant, if not made in a single-sum, may only be made over one of the following periods:

   (1)    the life of the Participant,

   (2)    the  joint lives of the Participant and a designated Beneficiary,

   (3)    a period certain not extending beyond the life expectancy of the Participant, or

   (4)    a period certain not extending beyond the joint life and last survivor expectancy of the Participant and a designated Beneficiary.

   (b)    Time and Manner of Distribution.

   (1)    The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

   (2)    If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

   (A)    If the Participant's surviving spouse is the Participant's sole designated Beneficiary, distributions to the surviving spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70-1/2 if later.

(B)     If the Participant's surviving spouse is not the Participant's sole designated Beneficiary, the Participant's entire interest will be distributed to the designated Beneficiary by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(C)     If there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(D)     If the Participant's surviving spouse is the Participant's sole designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse are required to begin, this paragraph (b)(2), other than subparagraph (b)(2)(A), will apply as if the surviving spouse were the Participant.

For purposes of this paragraph (b)(2) and Subsection (d), unless subparagraph (b)(2)(D) applies, distributions are considered to begin on the Participant's Required Beginning Date.  If subparagraph (b)(2)(D) applies, distributions are considered to begin on the date distributions are required to begin to the surviving spouse under subparagraph (b)(2)(A).  If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under subparagraph (b)(2)(A)), the date distributions are considered to begin is the date distributions actually commence.

(c)     Determination of Annual Distribution.

(1)     During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

(A)     the quotient obtained by dividing the Participant's account balance by the distribution period in the Uniform Lifetime Table set forth in Code Section 1.401(a)(9)-9, Q&A-2, of the regulations, using the Participant's age as of the Participant's birthday in the distribution calendar year; or

(B)     if the Participant's sole designated Beneficiary for the distribution calendar year is the Participant's spouse, the quotient obtained by dividing the Participant's account balance by the number in the Joint and Last Survivor Table set forth in Code Section 1.401(a)(9)-9, Q&A-3, of the regulations, using the Participant's

51

and spouse's attained ages as of the Participant's and spouse's birthdays in the distribution calendar year.

(2) Lifetime Required Minimum Distributions Continue Through Year of Participant's Death. Required minimum distributions will be determined under this Subsection (c) beginning with the first distribution calendar year and continuing up to and including, the distribution calendar year that includes the Participant's date of death.

(d) Required Minimum Distributions After Participant's Death.

(1) Death On or After Date Distributions Begin.

(A) If the Participant dies on or after the date distributions begin and there is a designated Beneficiary, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's designated Beneficiary, determined as follows:

(i) The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(ii) If the Participant's surviving spouse is the Participant's sole designated Beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For distribution calendar years after the year of the surviving spouse's death, the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(iii) If the Participant's surviving spouse is not the Participant's sole designated Beneficiary, the designated Beneficiary's remaining life expectancy is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(B) If the Participant dies on or after the date distributions begin and there is no designated Beneficiary as of the September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each distribution calendar year after the

52

year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the Participant's remaining life expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(2)    Death Before Date Distributions Begin.

    (A)    If the Participant dies before the date distributions begin and there is a designated Beneficiary, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's designated Beneficiary, determined as provided in paragraph (d)(1).

    (B)    If the Participant dies before the date distributions begin and there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

    (C)    If the Participant dies before the date distributions begin, the Participant's surviving spouse is the Participant's sole designated Beneficiary, and the surviving spouse dies before distributions are required to begin to the surviving spouse under subparagraph (b)(2)(A), this paragraph (d)(2) will apply as if the surviving spouse were the Participant.

(e)    Definitions.

(1)    The "designated Beneficiary" means the individual who is designated by the Participant (or the Participant's surviving spouse) as the Beneficiary of the Participant's interest under the Plan and who is the designated Beneficiary under Code Section 401(a)(9) and Code Section 1.401(a)(9)-4 of the regulations.

(2)    The "distribution calendar year" means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin under subparagraph (b)(2). The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's Required Beginning Date. The required minimum distribution for the distribution

calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that distribution calendar year.

(3)    The "life expectancy" is the life expectancy as computed by use of the Single Life Table in Code Section 1.401(a)(9)-9, Q&A-1, of the regulations.

(4)    The "Participant's Account balance" is the Account balance as of the last valuation date in the calendar year immediately preceding the distribution calendar year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the Account as of dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date.

**11.9**    **Substitution of Company Stock in Accounts of Terminated Participants**.  If a Participant separates from Service for any reason, the Committee may direct the Employer to substitute cash for Company Stock in the Participant's Company Stock Subaccount (and to transfer such cash to the Participant's Other Investments Subaccount) in accordance with a nondiscriminatory administrative policy adopted by the Employer.

**ARTICLE XII**
**PROVISIONS RELATING TO TOP HEAVY PLANS**

12.1    **Determination of Top-Heavy Status**.  The Plan shall be deemed "Top-Heavy" as to any Plan Year if, as of the Determination Date with respect to such Plan Year, any of the following conditions are met:

(a)    The Plan is not part of an Aggregation Group and the Key Employee Ratio under the Plan exceeds 60 percent.

(b)    The Plan is part of an Aggregation Group, there is no Permissive Aggregation Group of which the Plan is a part, and the Key Employee Ratio of the Mandatory Aggregation Group of which the Plan is a part exceeds 60 percent.

(c)    The Plan is part of an Aggregation Group, there is a Permissive Aggregation Group of which the Plan is a part, and the Key Employee Ratio of the Permissive Aggregation Group of which the Plan is a part exceeds 60 percent.

If the Plan is deemed Top-Heavy, the requirements with respect to minimum allocations contained in Section 6.6 shall apply.

12.2    **Additional Top-Heavy Rules**.  This Section 12.2 shall apply for purposes of determining whether the Plan is a top-heavy plan under Code Section 416(g) for Plan Years beginning after December 31, 2001, and whether the Plan satisfies the minimum benefits requirements of Code Section 416(c) for such years.

(a)    This Section 12.2 shall apply for purposes of determining the present values of accrued benefits and the amounts of Account balances of Employees as of the determination date.

(b)    The present values of accrued benefits and the amounts of Account balances of an Employee as of the determination date shall be increased by the distributions made with respect to the Employee under the Plan and any plan aggregated with the Plan under Code Section 416(g)(2) during the 1-year period ending on the determination date.  The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code Section 416(g)(2)(A)(i).  In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period".

(c)    The accrued benefits and Accounts of any individual who has not performed services for the Employer during the 1-year period ending on the determination date shall not be taken into account.

## ARTICLE XIII
## PLAN ADMINISTRATOR

13.1 **Appointment and Tenure**. The Plan Administrator shall consist of a committee of one or more persons who shall serve at the pleasure of the Board of Directors. Any committee member may resign by delivering his/her written resignation to the Employer. Vacancies arising by the death, resignation or removal of a committee member shall be filled by the Board of Directors. If the Board fails to act, and in any event, until the Board so acts, the remaining members of the committee may appoint an interim committee member to fill any vacancy occurring on the committee. If no person has been appointed to the committee, or if no person remains on the committee, the Company shall be deemed to be the Plan Administrator.

13.2 **Meetings; Majority Rule**. Any and all acts of the Plan Administrator taken at a meeting shall be by a majority of all members of the committee. The Plan Administrator may act by vote taken in a meeting (at which a majority of members shall constitute a quorum) if all members of the committee have been given at least ten days' written notice of such meeting or have waived notice. The Plan Administrator may also act by unanimous consent in writing without the formality of convening a meeting.

13.3 **Delegation**. The Plan Administrator may, by written majority decision, delegate to each or any one of its number, or to its secretary, authority to sign any documents on its behalf, or to perform ministerial acts, but no person to whom such authority is delegated shall perform any act involving the exercise of any discretion without first obtaining the concurrence of a majority of the members of the committee, even though he/she alone may sign any document required by third parties.

The Plan Administrator shall elect one of its number to serve as chairperson. The chairperson shall preside at all meetings of the committee or shall delegate such responsibility to another committee member. The committee shall elect one person to serve as secretary to the committee. All third parties may rely on any communication signed by the secretary, acting as such, as an official communication from the Plan Administrator.

13.4 **Authority and Responsibility of the Plan Administrator**. The Plan Administrator shall have the following duties and responsibilities:

(a)    to maintain and preserve records relating to Plan Participants, former Participants, and their Beneficiaries;

(b)    to prepare and furnish to Participants all information and notices required under federal law or the provisions of the Plan;

(c)    to prepare and furnish to the Trustee sufficient Employee data and the amount of contributions received from all sources so that the Trustee may maintain separate Accounts for Participants and make required payments of benefits;

(d)    to prepare and file or publish with the Secretary of Labor, the Secretary of the Treasury, their delegates and all other appropriate government officials all reports and other information required under law to be so filed or published;

(e)    to provide directions to the Trustee with respect to the purchase of life insurance, methods of benefit payment, valuations at dates other than Annual Valuation Dates and on all other matters where called for in the Plan or requested by the Trustee;

(f)    to construe the provisions of the Plan, to correct defects therein and to supply omissions thereto;

(g)    to engage assistants and professional advisers;

(h)    to arrange for bonding, if required by law;

(i)    to provide procedures for determination of claims for benefits and to make factual determinations relating thereto;

(j)    to determine whether any domestic relations order constitutes a QDRO and to take such action as the Plan Administrator deems appropriate in light of such domestic relations order; and

(k)    to retain records on elections and waivers by Participants, their spouses and their Beneficiaries, all as further set forth herein.

13.5    **Reporting and Disclosure**.  The Plan Administrator shall keep all individual and group records relating to Plan Participants, and Beneficiaries, and all other records necessary for the proper operation of the Plan.  Such records shall be made available to the Employer and to each Participant and Beneficiary for examination during business hours except that a Participant or Beneficiary shall examine only such records as pertain exclusively to the examining Participant or Beneficiary and those records and documents relating to all Participants generally.  The Plan Administrator shall prepare and shall file as required by law or regulation all reports, forms, documents and other items required by ERISA, the Code and every other relevant statute, each as amended, and all regulations thereunder.  This provision shall not be construed as imposing upon the Plan Administrator the responsibility or authority for the preparation, preservation, publication or filing of any document required to be prepared, preserved or filed by the Trustee or by any other Named Fiduciary to whom such responsibilities are delegated by law or by the Plan.

13.6    **Construction of the Plan**.  The Plan Administrator shall take such steps as are considered necessary and appropriate to remedy any inequity that results from incorrect information received or communicated in good faith or as the consequence of an administrative error.  The Plan Administrator shall interpret the Plan and shall determine the factual questions arising in the administration, interpretation and application of the Plan.  It shall endeavor to act, whether by general rules or by particular decisions, so as not to discriminate in favor of, or against, any person and so as to treat all persons in similar circumstances uniformly.  The Plan Administrator shall correct any defect,

reconcile any inconsistency, or supply any omission with respect to the Plan.  All such corrections, reconciliations, interpretations and completions of Plan provisions shall be final and binding upon the parties.

**13.7**  **Engagement of Assistants and Advisors**.  The Plan Administrator shall have the right to hire such professional assistants and consultants as it, in its sole discretion, deems necessary or advisable, including, but not limited to:

(a)  investment managers and/or advisers;

(b)  accountants;

(c)  actuaries;

(d)  attorneys;

(e)  consultants;

(f)  clerical and office personnel;

(g)  medical practitioners.

The expenses incurred by the Plan Administrator in connection with the operation of the Plan, including, but not limited to, the expenses incurred by reason of the engagement of professional assistants and consultants, shall be expenses of the Plan and shall be payable from the Fund at the direction of the Plan Administrator.  The Employer shall have the option, but not obligation, to pay any such expenses, in whole or in part, and by so doing, to relieve the Fund from the obligation of bearing such expenses.  Payment of any such expenses by the Employer on any occasion shall not bind the Employer thereafter to pay any similar expenses.

**13.8**  **Bonding**.  The Plan Administrator shall arrange for such bonding as is required by law, but no bonding in excess of the amount required by law shall be considered required by the Plan.

**13.9**  **Compensation of the Plan Administrator**.  The Plan Administrator shall serve without compensation for its services as such, but all expenses of the Plan Administrator shall be paid or reimbursed by the Employer, and if not so paid or reimbursed, shall be proper charges to the Trust Fund and shall be paid therefrom.

**13.10**  **Indemnification of the Plan Administrator**.  Each member of the Committee constituting the Plan Administrator shall be indemnified by the Employer against costs, expenses and liabilities (other than amounts paid in settlement to which the Employer does not consent) reasonably incurred by him/her in connection with any action to which he/she may be a party by reason of his/her service as Plan Administrator except in relation to matters as to which he/she shall be adjudged in such action to be personally guilty of gross negligence or willful misconduct in the performance of his/her duties.  The foregoing right to indemnification shall be in addition to such other rights as the

Committee member may enjoy as a matter of law or by reason of insurance coverage of any kind, but shall not extend to costs, expenses and/or liabilities otherwise covered by insurance.  Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the committee member may be entitled pursuant to the by-laws of the Employer.  Service on the committee as a Plan Administrator shall be deemed in partial fulfillment of the committee member's function as an Employee, officer and/or director of the Employer, if he/she serves in that capacity as well as in the role of committee member.

## ARTICLE XIV
## ALLOCATION AND DELEGATION OF AUTHORITY

14.1    **Authority and Responsibilities of Company**.  The Company, as Plan sponsor, shall serve as a Named Fiduciary having the following (and only the following) authority and responsibility:

(a)    to establish and communicate to the Trustee a funding policy for the Plan;

(b)    to appoint the Trustee and the Plan Administrator and to monitor each of their performances;

(c)    to communicate such information to the Plan Administrator and to the Trustee as each needs for proper performance of its duties; and

(d)    to provide channels and mechanisms through which the Plan Administrator and/or the Trustee can communicate with Participants and their Beneficiaries.

In addition, the Company shall perform such duties as are imposed by law or by regulation and shall serve as Plan Administrator in the absence of an appointed Plan Administrator.

14.2    **Authority and Responsibilities of the Plan Administrator**.  The Plan Administrator shall have the authority and responsibilities imposed by Article XIII hereof.  With respect to the said authority and responsibility, the Plan Administrator shall be a Named Fiduciary, and as such, shall have no authority and responsibility other than as granted in the Plan, or as imposed by law.

14.3    **Authority and Responsibilities of the Trustee**.  The Trustee shall be the Named Fiduciary with respect to investment of the Fund assets and shall have the powers and duties set forth in the Trust Agreement.

14.4    **Limitations on Obligations of Named Fiduciaries**.  No Named Fiduciary shall have authority or responsibility to deal with matters other than as delegated to it under the Plan, under the Trust Agreement, or by operation of law.  A Named Fiduciary shall not in any event be liable for breach of fiduciary responsibility or obligation by another fiduciary (including Named Fiduciaries) if the responsibility or authority of the act or omission deemed to be a breach was not within the scope of the said Named Fiduciary's authority or delegated responsibility.

14.5    **Duties of the ESOP Committee**.  The ESOP Committee shall have the duties specified in Section 7.5 of the Plan.

14.6    **Indemnification of the ESOP Committee**.  Each member of the ESOP Committee shall be indemnified by the Employer against costs, expenses and liabilities (other than amounts paid in settlement to which the Employer does not consent) reasonably incurred by him/her in connection with any action to which he/she may be a party by reason of his/her service as a member of the ESOP Committee except in relation to matters as to

60

which he/she shall be adjudged in such action to be personally guilty of gross negligence or willful misconduct in the performance of his/her duties.  The foregoing right to indemnification shall be in addition to such other rights as the Committee member may enjoy as a matter of law or by reason of insurance coverage of any kind, but shall not extend to costs, expenses and/or liabilities otherwise covered by insurance.  Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the committee member may be entitled pursuant to the by-laws of the Employer.

## ARTICLE XV
## CLAIMS PROCEDURES

**15.1**  **Application for Benefits**.  Each Participant and/or Beneficiary believing himself or herself eligible for benefits under the Plan shall apply for such benefits by completing and filing with the Plan Administrator an application for benefits on a form supplied by the Plan Administrator.  Before the date on which benefit payments commence, each such application must be supported by such information and data as the Plan Administrator deems relevant and appropriate.  Evidence of age, marital status (and, in the appropriate instances, health, death or disability), and location of residence shall be required of all applicants for benefits.  Written or electronic notice of the disposition of a claim shall be furnished to the claimant within 180 days (45 days for claim based on Total Disability) after the application is filed, or such period as is required by applicable law or Department of Labor regulations.

**15.2**  **Appeals of Denied Claims for Benefits**.  In the event that any claim for benefits is denied in whole or in part, the Participant or Beneficiary whose claim has been so denied shall be notified of such denial in writing by the Plan Administrator.  The notice advising of the denial shall specify the reason or reasons for denial, make specific reference to pertinent Plan provisions, describe any additional material or information necessary for the claimant to perfect the claim (explaining why such material or information is needed), and shall advise the Participant or Beneficiary, as the case may be, of the procedure for the appeal of such denial.  All appeals shall be made by the following procedure:

(a)  The Participant or Beneficiary whose claim has been denied shall file with the Plan Administrator a notice of desire to appeal the denial.  Such notice shall be filed within 60 days (180 days for a claim based on Total Disability) of notification by the Plan Administrator of claim denial, shall be made in writing, and shall set forth all of the facts upon which the appeal is based.  Appeals not timely filed shall be barred.

(b)  The Plan Administrator shall, within 60 days (45 days for a claim based on Total Disability) of receipt of the Participant's or Beneficiary's notice of appeal, conduct a hearing at which the Participant or Beneficiary may make an oral presentation to the Review Committee (as described below) in support of his/her appeal.  The Participant or Beneficiary shall be given not less than ten days' notice of the date set for the hearing.

(c)  The Review Committee shall consider the merits of the claimant's written and oral presentations, the merits of any facts or evidence in support of the denial of benefits, and such other facts and circumstances as the Review Committee shall deem relevant.  If the claimant elects not to make an oral presentation, such election shall not be deemed adverse to his/her interest, and the Review Committee shall proceed as set forth below as though an oral presentation of the contents of the claimant's written presentation had been made.

(d)     The Review Committee shall render a determination upon the appealed claim which determination shall be accompanied by a written statement as to the reasons therefor.  The determination so rendered shall be binding upon all parties.

(e)     Following a determination by the Review Committee or Plan Administrator as applicable, the Participant or Beneficiary must file suit within one year after the Review Committee's or Plan Administrator's decision is final and if a suit is not filed within one year, the Participant and/or Beneficiary shall be barred forever from filing a suit contesting the decision of the Review Committee or Plan Administrator.

**15.3**    **Appointment of the Review Committee**.  The Review Committee shall be the person or persons named as such by the Board of Directors.  Any person named to the Review Committee by the Board of Directors may be removed by the Board of Directors.  All such removals may be with or without cause and shall be effective on the date stated in the notice of removal.  The Review Committee shall be a "named fiduciary" within the meaning of ERISA, and, unless appointed to other fiduciary responsibilities, shall have no authority, responsibility, or liability with respect to any matter other than the proper discharge of the functions of the Review Committee as set forth herein.

**15.4**    **Indemnification of the Review Committee**.  Each member of the Review Committee shall be indemnified by the Employer against costs, expenses and liabilities (other than amounts paid in settlement to which the Employer does not consent) reasonably incurred by him/her in connection with any action to which he/she may be a party by reason of his/her service in connection as a member of the Review Committee except in relation to matters as to which he/she shall be adjudged in such action to be personally guilty of gross negligence or willful misconduct in the performance of his/her duties.  The foregoing right to indemnification shall be in addition to such other rights as the committee member may enjoy as a matter of law or by reason of insurance coverage of any kind, but shall not extend to costs, expenses and/or liabilities otherwise covered by insurance.  Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the committee member may be entitled pursuant to the by-laws of the Employer.

# ARTICLE XVI
## AMENDMENT AND TERMINATION

**16.1** **Amendment**.  The provisions of the Plan may be amended at any time and from time to time by the Board of Directors, provided, however, that:

    (a)    No amendment shall increase the duties or liabilities of the Plan Administrator or of the Trustee without the consent of that party;

    (b)    No amendment shall deprive any Participant or Beneficiary of any of the benefits to which he/she is entitled under the Plan with respect to contributions previously made, nor shall any amendment decrease the balance in any Participant's Account;

    (c)    No amendment shall provide for the use of funds or assets held to provide benefits under the Plan other than for the benefit of Participants and their Beneficiaries or to meet the administrative expenses of the Plan, except as may be specifically authorized by statute or regulation.

Each amendment shall be approved by the Board of Directors by resolution. Notwithstanding the foregoing, any amendment necessary to initially qualify the Plan under Code Section 401(a), or to maintain such qualification, may be made without the further approval of the Board of Directors if signed by the proper officers of the Employer.

**16.2** **Plan Termination**.

    (a)    **Right Reserved**.  While it is the Company's intention to continue the Plan indefinitely in operation, the right is, nevertheless, reserved to terminate the Plan in whole or in part.  Whole or partial termination of the Plan shall result in full and immediate vesting for each affected Participant (whose Termination Date has not occurred or a terminated Participant who has not received a complete distribution of his/her Account) of the entire amount standing to his/her credit in his/her Account, and there shall not thereafter be any forfeitures with respect to any such affected Participant for any reason.  Plan termination shall be effective as of the date specified by resolution of the Board of Directors, subject, however, to the provisions of Section 16.4.

    (b)    **Effect on Retired Persons, Etc.**  Termination of the Plan shall have no effect upon payment of benefits to former Participants, their Beneficiaries and their estates, where benefit payments commenced prior to Plan termination.

    (c)    **Effect on Remaining Participants**.  The Company shall instruct the Trustee either (1) to continue to manage and administer the assets of the Trust for the benefit of the Participants and their Beneficiaries pursuant to the terms and provisions of the Trust Agreement, or (2) to pay over to each Participant (and former Participant) the value of his/her interest, and to thereupon dissolve the Trust.

**16.3**    **Complete Discontinuance of Employer Contributions**.  While it is the Employer's intention to make substantial and recurrent contributions to the Fund pursuant to the provisions of the Plan, the right is, nevertheless, reserved at any time completely to discontinue Employer contributions.  Such complete discontinuance shall be established by resolution of the Board of Directors and shall have the effect of a termination of the Plan, as set forth in Section 16.2, except that the Trustee shall not have the authority to dissolve the Fund except upon adoption of a further resolution by the Board of Directors to the effect that the Plan is terminated and upon receipt from the Employer of instructions to dissolve the Fund pursuant to Section 16.2(c).

**16.4**    **Suspension of Employer Contributions**.  The Employer shall have the right at any time, and from time to time, to suspend Employer contributions to the Fund pursuant to the Plan.  Such suspension shall have no effect on the operation of the Plan except as set forth below:

(a)    If the Board of Directors determines by resolution that such suspension shall be permanent, a permanent discontinuance of contributions will be deemed to have occurred as of the date of such resolution or such earlier date as is therein specified.

(b)    If such suspension becomes a Plan termination, a complete discontinuance of contributions will be imputed.  In such case, the permanent discontinuance, with resultant full vesting for all affected Participants, shall be deemed to have occurred on the earlier of:

(1)    the date specified by resolution of the Board of Directors or established as a matter of equity by the Plan Administrator, or

(2)    the last day of the first Plan Year which meets both of the following criteria:  (A) no Employer contributions were made for that or for any subsequent Plan Year, and (B) there existed for such Plan Year net income out of which Employer contributions could have been made, and the existence of such net income was known to the Board of Directors in time to make deductible contributions for such Plan Year.

**16.5**    **Mergers and Consolidations of Plans**.  In the event of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant shall have a benefit in the surviving or transferee plan (determined as if such plan were then terminated immediately after such merger, consolidation or transfer) that is equal in value to or greater in value than the benefit he/she would have been entitled to receive immediately before such merger, consolidation or transfer in the plan in which he/she was then a Participant (had such plan been terminated at that time).  For the purposes hereof, former Participants and Beneficiaries shall be considered Participants.

**ARTICLE XVII**
**MISCELLANEOUS PROVISIONS**

17.1 <u>**Nonalienation of Benefits**</u>.  None of the payments, benefits or rights of any Participant, Beneficiary or Alternate Payee shall be subject to any claim of any creditor, and in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Participant, Beneficiary or Alternate Payee.  No Participant, Beneficiary or Alternate Payee shall have the right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he/she may expect to receive, contingently or otherwise, under the Plan, except the right reserved to Participants, and in certain circumstances to their surviving Spouses, to designate a Beneficiary or Beneficiaries as hereinabove provided.  Compliance with the provisions and conditions of any QDRO shall not be considered a violation of this provision.  Notwithstanding the foregoing, a Participant's benefit shall be offset by the amount the Participant is required to pay to the Plan under the circumstances set forth in Code Section 401(a)(13)(C).

17.2 <u>**Action of Employer and Company**</u>.  Any action permitted or required to be taken by the Employer hereunder may be taken by the president or any vice president (and if required, attested to by any officer), except that amendment or termination of the Plan by the Company, the permanent or complete discontinuance of contributions by the Employer, the determination of Employer contributions for any Plan Year and the removal or appointment of the Plan Administrator or the Trustee shall be by resolution of the Board of Directors or any committee thereof, or by any person or persons authorized to take such action (or whose action so taken is ratified) by resolution of the Board or such committee.  Notwithstanding the foregoing, any amendment necessary initially to qualify the Plan under Code Section 401(a), or to maintain such qualification, may be made without the further approval of the Board of Directors if signed by the officers or other persons authorized pursuant to this Section.

Each entity constituting the Employer hereby delegates to the Board of Directors (and to the officers and other persons authorized to act on behalf of the Employer pursuant to this Section) the full authority to act in its stead and on its behalf on all matters with respect to the Plan and the Trust Agreement.

17.3 <u>**No Contract of Employment**</u>.  Neither the establishment of the Plan, nor any modification thereof, nor the creation of any fund, trust or account, nor the payment of any benefits shall be construed as giving any Participant or Employee, or any person whomsoever, the right to be retained in the service of the Employer, and all Participants and other Employees shall remain subject to discharge to the same extent as if the Plan had never been adopted.

17.4 <u>**Severability of Provisions**</u>.  If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and the Plan shall be construed and enforced as if such provision had not been included.

**17.5    Heirs, Assigns and Personal Representatives**.  The Plan shall be binding upon the heirs, executors, administrators, successors and assigns of the parties, including each Participant and Beneficiary, present and future and all persons for whose benefit there exists any QDRO with respect to any Participant (except that no successor to the Employer shall be considered a Plan sponsor unless that successor adopts the Plan).

**17.6    Headings and Captions**.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

**17.7    Gender and Number**.  Except where otherwise clearly indicated by context, the masculine and the neuter shall include the feminine and the neuter, the singular shall include the plural, and vice-versa.

**17.8    Controlling Law**.  The Plan shall be construed and enforced according to the laws of the State of Florida to the extent not preempted by federal law, which shall otherwise control.

**17.9    Funding Policy**.  The Plan is designed to invest primarily in Company Stock so as to give Participants an ownership interest in the Employer.

**17.10   Title to Assets**.  No Participant, Beneficiary or Alternate Payee shall have any right to, or interest in, any assets of the Fund upon termination of his/her employment or otherwise, except as provided from time to time under the Plan, and then only to the extent of the benefits payable under the Plan to such Participant, Beneficiary or Alternate Payee out of the assets of the Fund.  All payments of benefits as provided for in the Plan shall be made from the assets of the Fund, and neither the Employer nor any other person shall be liable therefor in any manner.

**17.11   Payments to Minors, Etc.**  Any benefit payable to or for the benefit of a minor, an incompetent person or other person incapable of receipting therefor shall be deemed paid when paid to such person's guardian or to the party providing or reasonably appearing to provide for the care of such person, and such payment shall fully discharge the Trustee, the Plan Administrator, the Employer and all other parties with respect thereto.

**17.12   Reliance on Data and Consents**.  The Employer, the Trustee, the Plan Administrator, all fiduciaries with respect to the Plan, and all other persons or entities associated with the operation of the Plan, the management of its assets, and the provision of benefits thereunder, may reasonably rely on the truth, accuracy and completeness of any representations or data provided by any Participant, any Beneficiary, any spouse of a Participant or any Alternate Payee, including, without limitation, representations or data as to age, health, and marital status.  Any such representations made and data submitted are binding on any party seeking to claim a benefit through a Participant, Beneficiary, spouse of a Participant, Alternate Payee or the representatives of any such persons. Similarly, the Employer, the Trustee, the Plan Administrator, all fiduciaries with respect to the Plan and all such other aforementioned persons or entities, each shall have the right to rely on consents, elections, designations and waivers received, and may treat any such consent, election, designation or waiver as genuine and as having been executed with full

67

comprehension of the significance thereof by the party purported to have signed the same.

**17.13** <u>**Lost Payees**</u>.  Pursuant to Treasury Regulation Section 1.411(a)-4(b)(6), a benefit shall be deemed forfeited, in the discretion of the Employer, if the Plan Administrator is unable to locate the person to whom payment is due within one year; however, subject to Section 17.14, the benefit shall be reinstated if a claim is made by the party to whom the forfeited benefit is properly payable.  Such reinstatement will be made from forfeitures, earnings of the Fund, and, if necessary, additional Employer contributions.

**17.14** <u>**Missing Spouses**</u>.  Notwithstanding any other provision of the Plan to the contrary, if a Participant certifies in writing to the Plan Administrator that he/she is unable to locate his/her spouse after diligent effort to determine his or her whereabouts, and if the Plan Administrator, having written to such spouse at the address at which such spouse was last known to the Participant or the Plan Administrator to reside (or to the said spouse's legal representative if the Plan Administrator has been advised of the existence of such legal representative), receives no response that could reasonably be expected to result in the location of such spouse, the Participant shall be treated as an unmarried person for purposes of the Plan until such time, if ever, as such spouse is located and his or her whereabouts made known to the Plan Administrator.  If such a missing spouse subsequently appears or is located, such spouse's rights, if any, to future benefit payments shall be restored, but such spouse shall have no claim against any party with respect to benefits already paid, regardless of to whom paid.

**17.15** <u>**Notices**</u>.  Each Participant, Beneficiary, Alternate Payee or other person entitled to benefits under the Plan shall be responsible for furnishing the Plan Administrator with the current and proper address for the mailing of notices, statements, reports, other communications from the Plan Administrator and benefit payments.  Any notice, statement, report or communication required or permitted to be given to any such person shall be deemed to have been duly given if delivered to, or if mailed by first-class mail, postage prepaid and addressed to, such person at the address so furnished to the Plan Administrator.  If any check or Company Stock mailed to such address is returned as undeliverable to the addressee, mailing of checks or such Securities shall be suspended until the person entitled to such payment furnishes, or the Plan Administrator is otherwise furnished, the proper address.  This Section shall not be construed as requiring the mailing of any notice or communication if the regulations issued under ERISA or the Code deem sufficient notice to be given by the posting of notice in appropriate places, or by any other publication method.  All elections, designations, requests, notices, instructions and other communications from a Participant, Beneficiary, Alternate Payee or other person to the Plan Administrator, required or permitted under the Plan, shall be in such form as prescribed by the Plan Administrator and shall be mailed by first-class mail or delivered to such location as prescribed by the Plan Administrator and shall be deemed to have been given and delivered only upon actual receipt thereof by the Plan Administrator at such location.

**17.16    Participation by Affiliated Companies**.

    (a)    Any Affiliated Company presently existing or hereafter acquired may, with the consent of the Company, adopt the Plan and Trust as a participating Employer and thereby enable its employees to participate in the Plan.  As of the Effective Date, the Company consents to the adoption of the Plan as a participating Employer by Del Air Appliance Centers, LLC.  The participating Employer in the preceding sentence has adopted the Plan as participating Employer.

    (b)    In the event any Participant is transferred to an Affiliated Company that is a participating Employer, such Participant shall continue to participate hereunder in the allocation of Employer contributions and the Participant's Account shall continue to vest in accordance with Article X.  Any Participant who is transferred to an Affiliated Company that is not a participating Employer shall not continue to participate hereunder in the allocation of Employer contributions but the Participant's Account shall continue to vest in accordance with Article X.

**17.17    Provisions with Respect to Uniformed Services Employment and Reemployment Rights Act of 1994**.  Notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code Section 414(u).

An individual receiving from the Employer a differential wage payment, as defined by Code Section 3401(h)(2), is treated as an Employee of the Employer, (i) the differential wage payment shall be treated as Compensation, and (ii) the Plan will not be treated as failing to meet the requirements of any provision described in Code Section 414(u)(1)(C) by reason of any contribution or benefit which is based on the differential wage payment, provided that all Employees of the Employer performing service in the uniformed services described in Code Section 3401(h)(2)(A) are entitled to receive differential wage payments on reasonably equivalent terms and, if eligible to participate in a retirement plan maintained by the Employer, to make contributions based on the payments on reasonably equivalent terms (taking into account Code Sections 410(b)(3), (4), and (5)).

The provisions in Section 9.6 shall apply to a Participant who dies while in qualified military service, as defined in Code Section 414(u).

## ARTICLE XVIII
### CODE SECTION 409(P) PROVISIONS

**18.1**    **Nonallocation Of Employer Securities To Disqualified Person During Nonallocation Year**.    Notwithstanding any other provision in the Plan, for any year in which the Employer is an S corporation, the following additional limitations shall be applied and interpreted in such a manner as to avoid a Nonallocation Year for purposes of Code Section 409(p) and Code Section 4979A:

(a)    No portion of the assets of the Plan attributable (or allocable in lieu thereof) to Employer Securities may, during a Nonallocation Year, have a Prohibited Allocation or an accrual (or be allocated directly or indirectly under any plan of the Employer meeting the requirements of Code Section 401(a)) for the benefit of any Disqualified Person under the ESOP portion of this Plan.  However, any such amount shall be allocated to the Non-ESOP Company Stock Account or the Non-ESOP Other Investments Account of the Participant, as applicable, and shall be part of the Stock Bonus Plan described in Article XVIII.  Allocations to a Participant which would be likely to cause a Nonallocation Year may be allocated to the Non-ESOP Company Stock Subaccount or the Non-ESOP Other Investments Subaccount of a Participant and shall be part of the Stock Bonus Plan described in this Article XVIII.

(b)    For purposes applying the terms Disqualified Person and Nonallocation Year, in the case of a person who owns Synthetic Equity in the S corporation, except to the extent provided in Regulations, the shares of stock in the corporation on which the Synthetic Equity is based shall be treated as outstanding stock in the corporation and as Deemed-Owned Shares of such person if such treatment of Synthetic Equity of one or more such persons results in (i) the treatment of any person as a Disqualified Person, or (ii) the treatment of any year as a Nonallocation Year.

(c)    For purposes of this Section 18.1, the following definitions shall apply:

(1)    "Disqualified Person" means any person with respect to whom –

(A)    The aggregate number of Deemed-Owned Shares of such person and the members of such person's family is at least 20 percent of the number of Deemed-Owned Shares of stock in the S corporation; or

(B)    In the case of a person not described in (i), the number of Deemed-Owned Shares of such person is at least 10 percent of the number of deemed owned shares of stock in the S corporation

(2)    "Deemed-Owned Shares" means, with respect to any person—

(A)    the stock in the S corporation constituting Employer Securities of the Plan which are allocated to such person under the Plan (i.e., the Company Stock Subaccount); and

(B)    the person's share of the stock in the S corporation which is held by the Plan but which is not allocated under the Plan to Participants.

(3)    "Employer Securities" means Employer Securities as defined in Section 2.26 of this Plan document.

(4)    "Family member" means, with respect to any individual—

(A)    the individual's spouse,

(B)    an ancestor or lineal descendant of the individual or the individual's spouse,

(C)    a brother or sister of the individual or the individual's spouse and any lineal descendant of the brother or sister, and

(D)    the spouse of any individual described in (B) or (C).

A spouse of an individual who is legally separated from the individual under a decree of divorce or separate maintenance shall not be treated as the individual's spouse for purposes of this paragraph (4).

(5)    "Nonallocation Year" means any Plan Year in which, at any time during the Plan Year (i) the Plan holds Employer Securities consisting of stock in an S corporation, and (ii) Disqualified Persons own at least 50 percent of the total number of shares of stock in the Employer, taking into account the attribution rules of Code Section 409(p)(3)(B).

(6)    "Synthetic Equity" means any stock option, warrant, restricted stock, deferred issuance stock right, or similar interest or right that gives the holder the right to acquire or receive stock of the S corporation in the future. Except to the extent provided in regulations, Synthetic Equity also includes a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value. Synthetic Equity also includes non-qualified deferred compensation within the meaning of Treasury Regulation 1.409(p)-1(f). For purposes of Subsection 18.1(b) and this Subsection (c)(6), Synthetic Equity shall be treated as owned by a person in the same manner as stock is treated as owned by a person under the rules of paragraphs (2) and (3) of Code Section 318(a). If, without regard to Subsection 18.1(b) and this Subsection (c)(6), a person is treated as a Disqualified Person or a year is treated as a Nonallocation Year, Subsection 18.1(b) and this Subsection (c)(6) shall not be construed to result in the person or year not being so treated.

(7)    "Impermissible Accrual" means the extent that Employer Securities consisting of stock in an S corporation owned by the Plan and any assets

attributable thereto are held under the Plan for the benefit of a Disqualified Person during a "Nonallocation Year." For this purpose, assets attributable to stock in an S corporation owned by the Plan include any distributions, within the meaning of Code Section 1368, made on S corporation stock held in a "Disqualified Person's" account in the Plan (including earnings thereon), plus any proceeds from the sale of S corporation securities held for a "Disqualified Person's" account in the Plan (including any earnings thereon).

(8)    "Impermissible Allocation" means with respect to a Nonallocation Year, the extent that a contribution or other annual addition (within the meaning of Code Section 415(c)(2)) is made with respect to the account of a Disqualified Person, or the Disqualified Person otherwise accrues additional benefits, directly or indirectly under the Plan or any other plan of the Employer qualified under Code Section 401(a) (including a release and allocation of assets from a suspense account, as described at Regulations Section 54.4975-11(c) and (d)) that, for the Nonallocation Year, would have been added to the account of the Disqualified Person under the Plan and invested in Company Stock owned by the Plan but for a provision in the Plan that precludes such addition to the account of the Disqualified Person, and investment in Company Stock during a Nonallocation Year.

(9)    "Prohibited Allocation", for purposes of Code Section 409(p), a Prohibited Allocation means an Impermissible Accrual or an Impermissible Allocation.

## 18.2   Transfers From ESOP to Non-ESOP Portion of Plan.

(a)    In the case of any event that the Plan Administrator determines would cause a Nonallocation Year to occur (referred herein as a "nonallocation event"), shares of Company Stock held under the Plan before the date of the nonallocation event, shall be transferred from the ESOP portion of the Plan to the Non-ESOP portion of the Plan as provided in this Subsection 18.2(a). Actions that may cause a nonallocation event, include, but are not limited to, a contribution to the Plan in the form of shares of Company Stock, a distribution from the Plan in the form of shares of Company Stock, a change of investment within a Plan account of a Disqualified Person that alters the number of shares of Company Stock held in the account of the Disqualified Person, or the issuance by the employer of Synthetic Equity as defined by Code Section 409(p)(6)(C) and Treasury Regulations Section 1.409(p)-1(f). A nonallocation event occurs only if (i) the total number of shares of Company Stock that, held in the ESOP account of those Participants who are or who would be Disqualified Persons after taking into account the Participant's Synthetic Equity and the nonallocation event, exceeds (ii) 49.9% of the total number of shares of Company Stock outstanding after taking the nonallocation event into account. No transfer under this section shall be greater than the excess, if any, of (i) over (ii). Before the nonallocation event occurs, the

Plan Administrator shall determine the extent to which a transfer is required to be made and shall take steps to ensure that all action necessary to implement the transfer are taken before the nonallocation event occurs.

(b)   (1)   Except as provided for in Subsection (b)(2), at the date of the transfer, the total number of shares transferred, as provided for in Subsection (a)(1), shall be charged against the accounts of Participants who are Disqualified Persons (i) by first reducing the ESOP account of the Participant who is a Disqualified Person whose account has the largest number of shares (with the addition of Synthetic Equity shares) and (ii) thereafter by reducing the ESOP accounts of each succeeding Participant who is a Disqualified Person who has the largest number of shares in his or her their account (with the addition of Synthetic Equity shares). Immediately following the transfer, the number of transferred shares charged against any Participant's account in the ESOP portion of the Plan shall be credited to an account established for that Participant in the Non-ESOP portion of the Plan.

(2)   Notwithstanding Subsection (b)(1), the number of shares transferred shall be charged against the accounts of Participants who are Disqualified Persons by first reducing the account of the Participant with the fewest shares (including Synthetic Equity) who is a Disqualified Person and who is a Highly Compensated Employee to cause the Participant not to be a Disqualified Person, and thereafter reducing the account of each other Participant who is a Disqualified Person and a Highly Compensated Employee, in order of who has the fewest ESOP shares (including Synthetic Equity). A transfer under this (b)(2) only applies to the extent that the transfer results in fewer shares being transferred than in a transfer under (b)(1).

(c)   (1)   If two or more Participants described in Subsection (b) above have the same number of shares, the account of the Participant with the shortest service shall be reduced first.

(2)   Beneficiaries of the Plan are treated as Plan Participants for purposes of this section.

**18.3**   **Stock Bonus Plan**. This document creates a Stock Bonus Plan as well as an ESOP, as permitted by Treasury Regulation Section 54.4975-11(a)(5) and Temporary Treasury Regulation Section 1.409(p)-1T(b)(2)(v). The Stock Bonus Plan is not intended to qualify as an Employee Stock Ownership Plan.

(a)   The provisions in Articles I through XVIII apply to the Stock Bonus Plan, mutatis mutandis (with changes in the changes), except as otherwise specifically provided.

(b)   Any income tax which is due with respect to Company Stock held in the Non-ESOP Company Stock Subaccount or the Non-ESOP Other Investments

73

Subaccount of a Participant shall be paid from the Non-ESOP Accounts of that Participant.  If the Trust owes income taxes as a result of unrelated business taxable income under Code Section 512(e) with respect to shares of Company Stock held in the Non-ESOP portion of the Plan, the income tax payments made by the Trustee shall be charged against the accounts of each Participant or Beneficiary who has an account in the Non-ESOP portion of the Plan in proportion to the ratio of the shares of Company Stock in such Participant's or Beneficiary's account in the non-ESOP portion of the Plan to the total shares of Company Stock in the non-ESOP portion of the Plan. The Employer shall purchase shares of Company Stock from the Trustee with cash (based on the fair market value of the shares so purchased) from each such account to the extent necessary for the Trustee to make the Income tax payments.

(c)     The statements provided to Participants and Beneficiaries to show their respective interests in the Plan shall separately identify the amounts held in the ESOP and Non-ESOP portions of the Plan.

# PART II

# EMPLOYEE STOCK OWNERSHIP PLAN AND TRUST
## FOR THE EMPLOYEES OF
## DEL-AIR HEATING, AIR CONDITIONING &
## REFRIGERATION, INC.

# TRUST AGREEMENT

# EMPLOYEE STOCK OWNERSHIP PLAN AND TRUST
# FOR THE EMPLOYEES OF DEL-AIR HEATING,
# AIR CONDITIONING & REFRIGERATION, INC.

## TRUST AGREEMENT

THIS TRUST AGREEMENT, effective January 1, 2005, amended/restated effective January 1, 2016 by and between Del-Air Heating, Air Conditioning & Refrigeration, Inc., a corporation duly created and existing under the laws of the State of Florida (the "Plan Sponsor"), which term shall include all other enterprises which have adopted the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. and agreed to be bound by this Trust Agreement, and Robert G. Dello Russo, as trustee (the "Trustee," which term shall include all the Trustees herein named and all additional and successor Trustees who may hereafter be appointed in accordance with the provisions hereof).

W I T N E S S E T H:

WHEREAS, the Plan Sponsor has adopted the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning & Refrigeration, Inc. (hereinafter, together with all amendments thereto from time to time in effect, referred to as the "Plan"); and

WHEREAS, under the Plan, funds in the form of cash or Employer Securities (as defined in the Plan) or in combination, will be contributed to the Trustee by the Plan Sponsor to be held as a trust fund (the "Fund") in the Del-Air Heating, Air Conditioning & Refrigeration, Inc. Employee Stock Ownership Trust for the benefit of persons who are Participants, Beneficiaries and Alternate Payees (as those terms are defined in the Plan); and

WHEREAS, the Plan Sponsor has appointed a Plan Administrator as provided in the Plan; and

WHEREAS, the Plan Sponsor desires the Trustee to hold and administer such money and other property as now and hereafter may constitute the Fund, and the Trustee is willing to do so under the terms of this Trust Agreement,

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed by and between the Plan Sponsor and the Trustee as follows:

# ARTICLE I
## ESTABLISHMENT OF THE TRUST

1.1    **Corpus of the Trust**.  The Plan Sponsor hereby amends and restates with the Trustee the Del-Air Heating, Air Conditioning & Refrigeration, Inc. Employee Stock Ownership Trust consisting of such sums of money, Employer Securities (as defined in the Plan) and other property as shall from time to time be paid to the Trustee under the Plan, and such earnings, profits, increments, additions and appreciation thereto and thereon as may accrue from time to time.  All such sums of money, all investments made therewith or proceeds thereof, and all earnings, profits, increments, appreciation and additions thereto and thereon, less the payments that shall have been made by the Trustee, as authorized herein to carry out the Plan, are referred to herein as the "Fund."

1.2    **Collection of Funds**.  The Trustee shall not be responsible for the collection of any funds or Employer Securities required by the Plan to be paid by the Plan Sponsor to the Trustee.

1.3    **Duties of the Trustee**.

     (a)    **Investment Duties**.  It shall be the duty of the Trustee to hold, to invest, to reinvest, to manage and to administer the Fund for the exclusive benefit of the Participants and their respective Beneficiaries and Alternate Payees (as those terms are defined in the Plan) in accordance with the provisions of this Trust Agreement.

     (b)    **Benefit Payment Duties**.  It shall be the duty of the Trustee, on written direction of the Plan Administrator, to make payments out of the Fund to such persons, in such manner, in such amounts, and for such purposes as may be specified in such written direction.  The Trustee shall be under no liability for any payment made by it pursuant to such a direction.

     (c)    **Administrative Duties**.  It shall be the duty of the Trustee to account for the assets of the Fund as further set forth in this Trust Agreement, and to apply the assets of the Fund, to the extent necessary, to defray the reasonable administrative costs of the Plan and of the Trust established hereunder.

1.4    **General Non-Reversion Provisions**.  Except as hereinafter provided in Section 1.5, the Plan Sponsor shall not have any right, title, interest, claim or demand whatsoever in or to the Fund held by the Trustee, other than the right to a proper application thereof and accounting therefor by the Trustee as provided herein, nor shall any assets of the Fund revert to the Plan Sponsor, except only to the extent permitted by Treas. Reg. Section 54.4975(b)(5).

1.5    **ERISA Section 403(c) Refunds**.  Neither the provisions of Section 1.4 hereof nor any other provision of this Trust Agreement or of the Plan shall prohibit any of the following transactions, each of which is specifically authorized hereby, to the extent permitted by Section 403(c) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"):

(a)  **<u>Mistake of Fact Refunds</u>**.  The return to the Plan Sponsor of all or any part of one or more contributions made by the Plan Sponsor by reason of a mistake of fact if such return is made within one year after the payment of such contribution; and

(b)  **<u>Deduction Disallowed</u>**.  The return to the Plan Sponsor of any contribution for which deduction is wholly or partially disallowed under Code Section 404, to the extent of such disallowance, if (1) the contribution, when made, was conditioned upon its deductibility, and (2) the return of the contribution occurs within one year after the disallowance of the deduction.

This Section shall not be construed to permit any payment that would deprive the Trust of its exempt status for federal income tax purposes.

## ARTICLE II
## INVESTMENT OF THE FUND

2.1     **Principal and Income**.  The Trustee shall invest and reinvest the principal and income of the Fund and shall keep the same invested without distinction between principal and income.  The Plan is designed to invest primarily in Employer Securities (as defined in the Plan).  Accordingly, unless otherwise instructed by the Plan Sponsor or pursuant to Section 2.2, the Trustee shall invest the assets of the Fund in Employer Securities to the extent it is reasonably possible to do so; provided, however, that to the extent the law grants to Participants the right to direct the liquidation of assets held for their benefit under the Plan and the reinvestment of the proceeds of such liquidation, the Trustee shall be authorized to do so.  In the event that it is not reasonably possible to invest assets of the Fund in Employer Securities, or the Plan Sponsor instructs the Trustee not to invest assets of the Fund in Employer Securities, it shall be the duty of the Plan Sponsor to instruct the Trustee as to the acquisition, retention and disposition of assets of the Fund.  The Trustee shall be fully protected and shall not be liable in any respect to any party for (i) following any instruction of the Plan Sponsor with respect to the acquisition, retention or disposition of assets of the Fund, or (ii) holding uninvested any portion of the Fund with respect to which the Plan Sponsor has not given any such instruction.  As to assets of the Fund which are not invested in Employer Securities and with respect to which investment direction is not received from the Plan Sponsor, the selection and retention or disposition of any investment shall be determined by the Trustee, who shall have the exclusive authority to manage and control the assets of the Fund except to the extent that the Plan provides that the Trustee is subject to the investment direction of a Named Fiduciary, Participants or the Plan Sponsor.

2.2     **Investment Direction**.

    (a)     **Trustee Investment Determination**.  Except as provided in Subsection (b) hereof, the selection, retention or disposition of any investment of assets of the Fund shall be determined by the Trustee, who shall have exclusive authority to manage and control the assets of the Fund.

    (b)     **Investment Direction by Others**.  Notwithstanding the provisions of Subsection (a) hereof, the Trustee shall be bound to observe investment directions communicated to it in writing as to the acquisition, retention and disposition of assets of the Fund:

        (1)     from any Named Fiduciary who, pursuant to the provisions of the Plan, shall have authority to direct the acquisition, retention and disposition of assets of the Fund;

        (2)     from any investment manager, as defined in Section 3(38) of ERISA ("Investment Manager"), who has been appointed pursuant to the provisions of the Plan; or

(3)     from any Participant, Beneficiary or Alternate Payee in the Plan to the extent such person is exercising investment direction privileges afforded to him/her under the Plan.

**2.3     Powers of the Trustee**.  The Trustee shall have the following powers (except to the extent such powers are modified by the provisions of Section 2.2(b) hereof) in addition to the powers customarily vested in trustees by law, and in no way in derogation thereof but subject to the vote of Participants where voting rights have been passed through to the Participants in connection with Employer Securities, and further subject to the response direction provisions of the Plan, if any, in the event of tender offers:

(a)     With any cash at any time held by him, to purchase or subscribe for any authorized investment, and to retain such authorized investment in the Fund;

(b)     To sell for cash or on credit, convert, redeem, exchange for another authorized investment, or otherwise dispose of, any authorized investment at any time held by him;

(c)     To retain uninvested all or any part of the Fund and to deposit the same in an interest-bearing account in any banking or savings institution;

(d)     To exercise any option appurtenant to any authorized investment in which the Fund is invested for conversion thereof into another authorized investment, or to exercise any rights to subscribe for additional authorized investments, and to make all necessary payments therefor;

(e)     To join in, consent to, dissent from or oppose the reorganization, recapitalization, consolidation, sale, merger, foreclosure, or readjustment of the finances of any corporations, entities or properties in which the Fund may be invested, or the sale, mortgage, pledge or lease of any such property or the property of any such corporation or entity on such terms and conditions as the Trustee may deem wise; to do any act (including the exercise of options, making of agreements or subscriptions, and payment of expenses, assessments, or subscriptions) which may be deemed necessary or advisable in connection therewith; and to accept any authorized investment which may be issued in or as a result of any such proceeding, and thereafter to hold the same;

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any authorized investment held in the Fund.  Except as otherwise provided in Section 7.5 of the Plan, all Employer Securities held by the Trust shall be voted by the Trustee at the direction of the ESOP Committee; provided, however, that at any meeting of the shareholders of the Plan Sponsor the Trustee shall cause any Employer Securities held in the Fund for the account of any Participant in the Plan to be voted only as directed by that Participant to the extent that a voting right pass-through to

80

Participants in the Plan is required by law or as a precondition to retention of tax-qualified status of the Plan under Code Section 401(a);

(g)  To sell, either at public or private sale, option to sell, mortgage, lease for a term of years less than or continuing beyond the possible date of the termination of the Trust created hereunder, partition or exchange any real property which may from time to time constitute a portion of the Fund, for such prices and upon such terms as it may deem best, and to make, execute and deliver to the purchasers thereof good and sufficient deeds of conveyance therefor and all assignments, transfers and other legal instruments, either necessary or convenient for the passing of the title and ownership thereof to the purchaser, free and discharged of all trusts and without liability on the part of such purchasers to see to the proper application of the purchase price;

(h)  To repair, alter, improve or demolish any buildings that may be on any real estate forming part of the Fund or to erect entirely new structures thereon;

(i)  To renew, extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable, and to agree to a reduction in the rate of interest on any mortgage or to any other modification or change in the terms of any mortgage or of any guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for the protection of the Fund or the preservation of the value of the investment; to waive any default, whether in the performance of any covenant or condition of any mortgage or in the performance of any guarantee, or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid on property in foreclosure, to take a deed in lieu of foreclosure with or without paying a consideration therefor, and in connection therewith to release the obligation on the bond or note secured by the mortgage; and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect to any mortgage or guarantee;

(j)  To purchase any authorized investment at a premium or at a discount;

(k)  To employ for the benefit of the Fund suitable agents, actuaries, accountants, evaluators, investment counselors, legal counsel and consultants, and to pay their reasonable expenses and compensation;

(l)  To purchase, to sell, to exercise, to allow to expire without exercise, and to honor the exercise of, options to purchase or sell stock, commodities or other assets subject to such options;

(m)  To purchase or sell commodities or interests therein;

(n)  To borrow, raise or lend moneys, for the purposes of the Trust in such amounts and upon such terms and conditions as the Trustee may deem advisable, and for any such moneys so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging or mortgaging all or any part of the

Fund, provided that no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing;

(o)   To incur Plan loans that are Exempt Loans to carry out the purposes of the Plan and Trust.  Any such Exempt Loan shall be primarily for the benefit of Plan Participants and their Beneficiaries.  No other Trust assets may be pledged as collateral by the Trustee, and no lender shall have recourse against Trust assets other than any shares of Employer Securities remaining subject to pledge.  Any pledge of Employer Securities must provide for the release of shares so pledged pursuant to the provisions of Article VII of the Plan.  Shares of Employer Securities released from the Suspense Account shall be allocated to Participants' Accounts in shares of Employer Securities or other nonmonetary units. Repayments of principal and interest on any Exempt Loan that is a securities acquisition loan shall be made by the Trustee only from Employer Contributions in cash to the Trust, from any cash dividends received by the Trust on such Employer Securities or from any earnings attributable to the investment of Employer Contributions made to the Trust in cash to meet its obligations under the Exempt Loan.  Such Contributions, dividends and earnings shall be accounted for separately in the books of accounts of the Plan until the Exempt Loan that is a securities acquisition loan is repaid.  The proceeds of an Exempt Loan that is a securities acquisition loan may be used only to acquire Employer Securities, to repay such loan or to repay a prior Exempt Loan constituting a securities acquisition loan.  The Plan may not obligate itself to acquire securities from a particular security holder at an indefinite time determined upon the happening of an event such as the death of the holder.  Should the Plan cease to be an employee stock ownership plan, or should the Exempt Loan that is a securities acquisition loan be repaid, all Employer Securities will continue to be subject to the provisions of Section 11.4 of the Plan.

In the event of a default upon an Exempt Loan that is a securities acquisition loan, the value of Plan assets transferred in satisfaction of the Exempt Loan must not exceed the amount of default.  If the lender is a "disqualified person" within the meaning of Code Section 4975(e)(2), the Exempt Loan must provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the Exempt Loan.  For purposes hereof, the making of a guarantee does not make a person a lender;

(p)   To cause any investment in the Fund to be registered in, or transferred into, his/her name as Trustee or the name of his/her nominee or nominees or to retain such investments unregistered or in form permitting transfer by delivery, but the books and records of the Trustee shall at all times show that all such investments are part of the Fund, and the Trustee shall be fully responsible for any misappropriation or defalcation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States,

82

except as may otherwise be permitted pursuant to regulations promulgated by the Secretary of Labor.

All assets of an employee benefit plan shall be held in trust by one or more trustees pursuant to a written trust agreement, but that these requirements shall be satisfied if such securities are held in the name of a nominee or in street name provided such securities are held on behalf of the plan by (i) a bank or trust company that is subject to supervision by the United States or a State, or a nominee of such bank or trust company; (ii) a broker or dealer registered under the Securities Exchange Act of 1934, or a nominee of such broker or dealer; (iii) a clearing agency as defined in section 3(a)(23) of the Securities Exchange Act, or its nominee;

(q)    To do all acts which the Trustee deems necessary or proper and to exercise any and all powers of the Trustee under this Trust Agreement upon such terms and conditions as the Trustee deems to be in the best interests of the Fund; and

(r)    To apply for, purchase, hold, transfer, pay premiums on, surrender, and exercise all incidents of ownership of any life insurance, retirement income or annuity contract (including group annuities, deposit administration, immediate participation guaranteed, guaranteed income, guaranteed investment and similar contracts) which he/she is properly directed to purchase; provided, however, that if the Trustee shall borrow against the cash surrender values of any individual insurance, retirement income or annuity contracts for the general purposes of the Fund, he/she shall borrow and repay the amounts so borrowed on a pro rata basis so as to preclude discrimination.

2.4    **Authorized Investments**.  "Authorized investments" as used in this Article means bonds, debentures, notes, or other evidences of indebtedness; stocks (regardless of class), or other evidences of ownership, in any corporation, partnership, mutual investment fund, investment company, association, joint venture or business trust; life insurance, retirement income or annuity contracts; investment contracts issued by legal reserve insurance companies; real and personal property of all kinds, including leaseholds on improved and unimproved real property; and the types of investment assets to which reference is made in the preceding Section.  "Authorized investments" shall not be limited to that class of investments that are defined as legal investments for trust funds under the laws of any jurisdiction.  Obligations or securities of the Plan Sponsor, including Employer Securities (as defined in the Plan), but other than equity securities of the Plan Sponsor at any time when the Plan Sponsor is either an electing small business ("subchapter S") corporation or a professional service corporation, shall not be excluded from the term "authorized investments;" provided, however, that this provision shall not be construed as purporting to exempt Employer Securities or Employer real property from any limitation on investment therein imposed by federal law.  Notwithstanding the previous provisions, the Trustee may invest in any form of property, including common and preferred stocks, and including employer securities as defined by Section 407(d)(1) of ERISA as long as they are not publicly traded.

# ARTICLE III
## TRUSTEE ACCOUNTS

**3.1** **Books and Records**.  The Trustee shall keep accurate and detailed accounts of all investments, receipts and disbursements and other transactions hereunder, including such specific records as shall be required by law and such additional records as may be agreed upon in writing between the Plan Administrator and the Trustee.  All accounts, books and records relating thereto shall be open to inspection and audit by any person or persons designated by the Plan Administrator or the Plan Sponsor at all reasonable times.

**3.2** **Accountings**.  Within 90 days following the close of each year of the Plan or the receipt of the Plan Sponsor's contribution (or notice that there shall be no such contribution) for such year, whichever is the later, and within 90 days after the effective date of the removal or resignation of the Trustee, the Trustee shall file with the Plan Administrator a written account, setting forth all investments, receipts and disbursements, and other transactions effected by him/her during such year of the Plan or during the period from the close of the last preceding year of the Plan to the date of such removal or resignation, including a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales, and showing all cash, securities and other property held at the end of such year or as of the date of removal or resignation, as the case may be.  Where there is more than one Trustee and one but not all of the Trustees are removed or resign, the accounting described in the preceding sentence shall be deemed to be waived unless the Employer notifies the Trustee in writing within 30 days following the removal or resignation of the Trustee that it will not waive the accounting.  The Trustee shall include in such report a valuation of the Fund in accordance with Section 3.4.  Neither the Plan Sponsor nor the Plan Administrator nor any other person shall have the right to demand or to be entitled to any further or different accounting by the Trustee, except as may be required by statute or by regulations published by federal government agencies with respect to reporting and disclosure.

**3.3** **Trustee Liability**.  Except with respect to alleged breaches of fiduciary responsibility under ERISA or other applicable law, upon the expiration of 90 days from the date of filing such annual or other account, the Trustee shall be forever released and discharged from any liability or accountability to anyone with respect to the propriety of his/her acts or transactions shown in such account, except with respect to any acts or transactions which the Plan Administrator or Plan Sponsor shall within such 90 day period file with the Trustee a written statement claiming negligence, willful misconduct, lack of good faith, breach of fiduciary responsibility or other violation of applicable law on the part of the Trustee.  In the event such a statement is filed, the Trustee shall, unless the matter is compromised by agreement between the Plan Administrator or Plan Sponsor (whichever filed such statement) and the Trustee, file his/her account covering the period from the date of the most recent annual account to which no objection was made in any court of competent jurisdiction for audit or adjudication.  With respect to alleged breaches of ERISA, the Trustee shall be entitled to rely upon the statutes of limitations set forth therein.

**3.4**    **<u>Participant Records</u>**.  If directed by the Plan Administrator and agreed to by the Trustee, the Trustee shall maintain one or more separate accounts on his/her books for each Participant in the Plan and shall allocate to such Participants' accounts the Plan Sponsor's contributions to the Fund, the contributions made by each Participant (if any), rollover contributions and direct trustee-to-trustee transfers made by or on behalf of each Participant (if any), and the net income and losses of the Fund and any reallocable forfeitures as provided under the Plan.  The Trustee shall determine the fair market value of the Fund as of the last day of each Plan Year and at such other dates as may be necessary under the Plan, and, if the Trustee accepts the responsibility for maintaining the individual accounts of the Participants, shall also determine the value of each such individual account as of the last day of each Plan Year and at such other dates as may be necessary under the Plan.

**3.5**    **<u>Suspense Account and Subfunds</u>**.  The Trustee shall establish a Suspense Account for Employer Securities purchased with the proceeds of any Exempt Loan, shall make credits to and debits to such Account, and shall transfer Employer Securities into or from such Account, all as provided in and in accordance with the Plan.  The Trustee also may establish separate subfunds as required by the Plan in either the Suspense Account or the Fund in order to separately account for Employer Securities acquired with the proceeds of Exempt Loans or different Exempt Loans, Employer Securities contributed to the Plan or acquired by the Plan as part of an Employer contribution with respect to which an income tax credit was claimed, and all other Plan assets allocable to the Account of any Participant.

## ARTICLE IV
## THE TRUSTEE

4.1    **Conditions of Acceptance of Trusteeship**.  The Trustee, as a Named Fiduciary, accepts the Trust hereby created and agrees to perform the duties hereby required of him/her subject, however, to the following conditions:

(a)    The Trustee shall incur no liability to anyone for any action taken pursuant to a direction, request or approval given by the Plan Administrator, the Investment Manager, or by any other party to whom authority to give such directions, requests or approvals is delegated under the powers conferred upon the Plan Administrator, Investment Manager, or such other party under the Plan or this Trust Agreement.  Any such direction, request or approval shall be evidenced by delivery to the Trustee of a statement in writing signed by the authorized initiator thereof.

(b)    The Trustee shall receive as compensation for his/her services such amounts as may be agreed upon at the time of execution of this Trust Agreement, subject to change at any time and from time to time by agreement between the Plan Sponsor and the Trustee.  The Trustee's compensation shall be paid by the Plan Sponsor, and shall be a proper charge against the Fund, except to the extent that the Plan Sponsor elects to pay such amount or any part thereof.  All other proper expenses of the Fund (unless payable out of the Trustee's compensation), including, without limitation, all real and personal property taxes, income taxes, transfer taxes, and other taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws of any jurisdiction upon or in respect of the Trust hereby created, or any money, property or securities forming a part thereof, shall be paid out of the Fund.  Notwithstanding the foregoing, no person who is either an Employee of the Plan Sponsor or a Participant in the Plan shall receive any compensation for his/her or her services as a Trustee.

(c)    The Trustee shall not be answerable for any action taken pursuant to any direction, consent, request, or other paper or document on the belief that the same is genuine and signed by the proper person if such direction, consent, request or other paper or document relates to a matter with respect to which the purported initiator or signatory has authority under the Plan or this Trust Agreement.

(d)    The Trustee shall not be liable for having relied in good faith on any valuation of Employer Securities conducted by an Independent Appraiser.

(e)    The Trustee shall be indemnified by the Employer or Plan Sponsor against costs, expenses and liabilities (other than amounts paid in settlement to which the Employer does not consent) reasonably incurred by him/her in connection with any action to which he/she may be a party by reason of his/her service as a Trustee except in relation to matters as to which he/she shall be adjudged in such action to be personally guilty of gross negligence or willful misconduct in the performance of his/her duties.  The foregoing right to indemnification shall be in

addition to such other rights as the Trustee may enjoy as a matter of law or by reason of insurance coverage of any kind, but shall not extend to costs, expenses and/or liabilities otherwise covered by insurance.  Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the Trustee may be entitled pursuant to the by-laws of the Employer.

(f)     Nothing in this Trust Agreement shall preclude the purchase by or for the Trustee of one or more policies of insurance to protect the Trustee from liability for breach of fiduciary or co-fiduciary duty; provided, however, that if such insurance shall be purchased by the Fund utilizing the assets thereof to pay any premiums, such insurance must permit recourse by the insurer against the Trustee in the case of a breach by the Trustee of his/her fiduciary duties.

**4.2**     **Changes in Plan Administrators; Investment Managers**.  Upon the appointment of the Plan Administrator and of any Investment Manager, and upon any change or dismissal of the Plan Administrator or any Investment Manager, the Plan Sponsor shall notify the Trustee in writing of such appointment, change or dismissal in writing, and the Trustee shall be fully protected in assuming that there has been no such change until so advised by the Plan Sponsor.

**4.3**     **Changes in Trustee**.  The Plan Sponsor may, by action of its Board of Directors, from time to time change the number of Trustees hereunder and appoint additional Trustees to fill the vacancies caused by any such increase.  The Trustees may be members of the Board of Directors of the Plan Sponsor, officers or Employees of the Plan Sponsor, or any other person.

**4.4**     **Resignation or Removal of Trustee**.  The Trustee acting hereunder (or any such Trustee if there be more than one) may resign at any time by giving 60 days' written notice to the Plan Sponsor and may be removed at any time, with or without cause, by the Board of Directors of the Plan Sponsor.  Upon the death, resignation or other removal of any Trustee, a successor Trustee may be appointed by the Board of Directors of the Plan Sponsor, and such successor Trustee, upon qualifying as such by delivering to the Plan Sponsor a written acceptance of such appointment, shall, without further act, become vested with all the rights, powers, discretion and duties of the predecessor Trustee, with the same effect as though such successor Trustee had been originally named as Trustee herein.  Notwithstanding the foregoing, a successor Trustee shall not in any event be liable for breach of fiduciary responsibility or obligation by the predecessor Trustee if the act or omission deemed to be a breach was committed before the successor Trustee became a Named Fiduciary.

**4.5**     **Action by Trustees**.  The Trustees, if there be more than one, may act by a majority of their number, either at a meeting, or by writing, telegram, cablegram or other communication without a meeting.  The Trustees, if there be more than one, may elect a chairperson from among their number and may appoint a secretary who need not be a Trustee.  Any act of the Trustees shall be sufficiently evidenced if certified by not less than a majority of the Trustees then serving or by the person then holding the office of

secretary.  Any Trustee may authorize any other Trustee to act in his/her stead and on his/her behalf in his/her absence.

**4.6**    **Trustee Qualification**.    No person shall serve or continue to serve as a Trustee in violation of Section 411 of ERISA.

**4.7**    **Bonding**.  Each Trustee shall be bonded to the extent required by law, and the premiums for such bonds shall be treated as expenses of the Plan.

## ARTICLE V
## DELEGATION OF DUTIES AND RESPONSIBILITIES

5.1    **Appointment of Investment Manager(s)**.  The Plan Sponsor (or, if so provided in the Plan, the Plan Administrator) may appoint one or more Investment Managers, may terminate such appointments, and may decline to make any such appointments, all as provided in the Plan.

5.2    **Trustee Allocation of Responsibility**.  The Trustees, if there be more than one, may enter into a written agreement among themselves, a copy of which shall be furnished to the Plan Sponsor, to allocate specific responsibilities, obligations and duties among themselves, in which event those Trustees to whom a specific responsibility, obligation or duty has not been delegated shall be free from liability for breach of the same by a co-fiduciary to the fullest extent permitted by law.

5.3    **Participant Investment Direction**.  To the extent that any Participant, Beneficiary or Alternate Payee exercises control over the assets held for his/her benefit in the Fund, the Trustee shall not be liable for any loss or by reason of any breach which results, directly or indirectly, from any action taken by such Participant, Beneficiary or Alternate Payee, or by the failure of any such person to take any action.

## ARTICLE VI
## <u>CONCERNING INSURANCE COMPANIES</u>

6.1    **<u>Insurance Companies Not Parties</u>**.  If, on any occasion as provided in the Plan, the Trustee shall be directed to purchase one or more individual or group life insurance, retirement income, annuity, deposit administration, immediate participation guaranteed, guaranteed income or other type of contract from an insurance company, the insurance company from which such contract is purchased shall not be deemed a party to this Trust Agreement.  No insurance company shall have any obligation to determine that any person with respect to whom the Trustee makes an application for a contract is, in fact, eligible for benefits or participation under the Plan, nor shall the insurer have any obligation to determine any fact, the determination of which is necessary or desirable for the proper issuance of such contracts.  Any such insurance company shall be fully protected in acting upon any advice, representation or other instrument executed by the Trustee.  In no event shall the insurer be responsible for any lack or failure of proper authority in the establishment or maintenance of the Plan.  The responsibilities of the insurer shall be limited to the terms of its policies.  Notice of modification, change or termination of this Trust Agreement shall not be effective notice to the insurer until actual receipt thereof at its home office.  The insurer may expect the Trust established under this Trust Agreement to continue in force as is, and the named Trustee to continue as the Trustee of the Trust until notified otherwise in writing at its home office.

6.2    **<u>Acceptance of Certifications</u>**.  A certification in writing to the insurer by the Trustee, by the Plan Administrator or by the Plan Sponsor as to the occurrence of any event contemplated by this Trust Agreement or the Plan shall constitute conclusive evidence of such occurrence, and the insurer shall be fully protected in accepting and relying upon such certification and shall incur no liability or responsibility for so doing.

6.3    **<u>Insurer Absolved</u>**.  The insurer shall not be responsible to see that any action taken by the Trustee with respect to any contract is authorized by the terms of this Trust Agreement or by the Plan.  Any change made or action taken by the insurer under any contract upon the written direction of the Trustee shall fully discharge such insurer from all liability with respect thereto, and the insurer shall not be obligated to see to the distribution or further application of any moneys paid by it to the Trustee or in accordance with the written direction of the Trustee.

## ARTICLE VII
## AMENDMENTS TO TRUST AGREEMENT

7.1     **Amendments**.  The provisions of this Trust Agreement may be amended at any time and from time to time by the Plan Sponsor, provided that:

(a)     No such amendment shall be effective unless the Plan and this Trust Agreement, as so amended, shall be for the exclusive benefit of the Employees of the Plan Sponsor, and their respective Beneficiaries and Alternate Payees;

(b)     No such amendment shall operate to deprive a Participant of any rights or benefits irrevocably vested in him/her under the Plan or this Trust Agreement prior to such amendment, unless such amendment is specifically required by law or authorized by the Secretary of the Treasury or his/her delegate; and

(c)     Each such amendment shall be effective as of the date specified therein by the Board of Directors of the Plan Sponsor; provided, however, that if the amendment affects the Trustee, such amendment must be consented to, accepted or ratified by the Trustee.

7.2     **Discontinuance of the Plan**.  In the event of the termination of the Plan, the Trustee shall continue to hold the Fund in trust to be applied and distributed in accordance with the terms of the terminated Plan.  The provisions of the Plan relating to the administration thereof and to the provision of benefits thereunder shall be deemed for this purpose to have survived the termination of the Plan.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**8.1**    **Reliance on Instruments**.  Any person dealing with the Trustee may rely upon a copy of this Trust Agreement and any amendments thereto, certified to be a true and correct copy by the Trustee.

**8.2**    **Exclusive Benefit**.  Other than as provided in Section 1.5 of this Trust Agreement, in no circumstance, whether upon amendment or termination of this Trust Agreement or otherwise, shall any part of the Fund be used for or diverted to any purpose other than the exclusive benefit of the Employees and former Employees of the Plan Sponsor who are Participants under the Plan, and their respective Beneficiaries and Alternate Payees prior to the discharge of all liabilities of the Plan, fixed and contingent.

**8.3**    **This Trust Agreement as Part of the Plan**.  This Trust Agreement shall be deemed a part of the Plan, shall be considered as incorporated therein, and shall be construed together with the Plan; provided, however, that in the event of any conflicts between the provisions of the Plan and this Trust Agreement, this Trust Agreement shall control in matters affecting the Trustee.  Any term defined in the Plan shall have the same meaning in this Trust Agreement unless a different meaning is clearly required by context.  The term "Plan" whenever used in this Trust Agreement, means the Plan as it exists on the date of adoption of this Trust Agreement, and as it may be from time to time amended.  The Plan Sponsor will cause a copy of the Plan and of each amendment thereto to be delivered to the Trustee.

**8.4**    **Ratification of the Trustee's Acts**.    The Plan Sponsor shall have the right to acknowledge the acts of the Trustee and to ratify or object to the same, and to approve or decline to approve any action taken by the Trustee.

**8.5**    **Controlling Law**.  This Trust Agreement shall be construed, enforced and regulated under federal law, and to the extent, if any, that state law is not preempted by federal law, under the laws of the state specified in the Plan as the forum for construction and application of the provisions of the Plan.

**8.6**    **Name of the Trust**.  The Trust established hereunder shall be known as the Del-Air Heating, Air Conditioning & Refrigeration, Inc. Employee Stock Ownership Trust.

**8.7**    **Independent Fiduciary**.  An Independent Fiduciary may be appointed from time to time for such purposes as shall be determined by the Plan Sponsor.

(a)    An Independent Fiduciary may be appointed to serve in such capacity as may be deemed appropriate to act on behalf of the Plan and Trust with respect to issues which involve a real or perceived conflict of interest among certain parties, or for such other purposes as the Plan Sponsor may determine to be in the best interest of the Plan. The Independent Fiduciary shall be granted such power, authority and discretion as may be necessary and appropriate for it to carry out its duties and responsibilities, including, but not limited to, any and all powers and discretion granted the Trustee under the Plan, including the authority to direct the Trustee to

take such action as the Independent Fiduciary determines to be appropriate.  If the Independent Fiduciary is given power to direct the Trustee to take or not take certain actions with respect to a specified matter, the Trustee shall rely on the directions of the Independent Fiduciary with respect to that mater and shall have no independent fiduciary duty to inquire as to the otherwise applicable fiduciary duty provisions of ERISA and the Code.

(b)     For purposes hereof, the term 'Independent Fiduciary' shall refer to any entity or individual which is unrelated to any party to the Plan and which may be appointed from time to time by the Plan Sponsor to act on behalf of the Plan with respect to any issue involving a real or perceived conflict of interest among parties to the Plan, or for such other purposes as the Plan Sponsor may determine to be in the best interest of the Plan.

# 9696984 v3

93

| Summary report: Litéra® Change-Pro 7.5.0.185 Document comparison done on 9/9/2016 12:28:48 PM | |
|---|---|
| **Style name:** Phil | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://GRDMS/ORLANDO1/4619368/4 | |
| **Modified DMS:** iw://GRDMS/ORLANDO1/9696984/3 | |
| **Changes:** | |
| Add | 452 |
| Delete | 443 |
| Move From | 6 |
| Move To | 6 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 907 |